No. 23-02992, consolidated with Nos. 23-02993, 23-02994, 23-02995, 23-02996, 23-02997, 23-02998, 23-02999, 23-3000, 23-3001, 23-3002, and 23-3003

In the United States Court of Appeals
for the Seventh Circuit

KEELY ROBERTS, and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R.,

*Plaintiffs-Appellees,*

*v.*

SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, and SMITH & WESSON, INC.,

*Defendants-Appellants,*

*and*

BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO III,

*Non-Appellant Defendants.*

On Appeal from the United States District Court
for the Northern District of Illinois
Nos. 1:22-cv-06169, 1:22-cv-06171, 1:22-cv-06178, 1:22-cv-06183, 1:22-cv-06185, 1:22-cv-06190, 1:22-cv-06193, 1:22-cv-06359, 1:22-cv-06181, 1:22-cv-06191, 1:22-cv-06361, 1:22-cv-06186
The Honorable Judge Steven Charles Seeger

**BRIEF OF APPELLANTS WITH APPENDIX**

*Continued on next page*

*Continued from prior page*

Andrew Lothson
**Swanson, Martin & Bell, LLP**
330 North Wabash Street, Suite 3300
Chicago, Illinois 60611
(312) 923-8274
alothson@smbtrials.com



December 7, 2023

Edward S. Scheideman
**DLA Piper LLP (US)**
500 Eighth Street NW
Washington, DC 20004
(202) 799-4534
edward.scheideman@us.dlapiper.com

Kenneth L. Schmetterer
**DLA Piper LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606
(312) 368-2176
kenneth.schmetterer@us.dlapiper.com

*Attorneys for Smith & Wesson*
*Brands, Inc. (f/k/a American Outdoor*
*Brands Corporation), Smith & Wesson*
*Sales Company, and Smith & Wesson,*
*Inc.*

Save As   Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2992, consolid</u>ated with Nos. 23-2992, 23-2994, 23-2995, 23-2996, 23-2997, 23-2998, 23-2998, 23-2999, 23-3000
23-3001, 23-3002 and 23-3003

Short Caption: <u>Keely Roberts, et al v. Smith & Wesson Brands, Inc., et al</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   Smith & Wesson Brands, Inc.   Smith & Wesson Sales Company   Smith & Wesson, Inc.

   American Outdoor Brands Corporation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   DLA Piper LLP (US)

   Swanson, Martin & Bell

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

        see attached

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        see attached

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   n/a

Attorney's Signature: /s/ Kenneth L. Schmetterer     Date: 12/07/2023

Attorney's Printed Name: Kenneth L. Schmetterer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: DLA Piper LLP (US) - 444 West Lake Street, Suite 900, Chicago, IL 60606

Phone Number: (312) 368-2176     Fax Number: (312) 368-7516

E-Mail Address: kenneth.schmetterer@dlapiper.com

rev. 12/19 AK

For Cases: 23-2992, 23-2993, 23-2994, 23-2395, 23-2996, 23-2997, 23-2998, 23-3000, 23-3001
    and 23-3003

3(i): Smith & Wesson Inc. is a wholly owned subsidiary of Smith & Wesson Sales Company, which
is a wholly owned subsidiary of Smith & Wesson Brands, Inc.

3(ii): No publicly held company owns more than 10 percent of the stock of Smith & Wesson,
Inc. or Smith & Wesson Brands, Inc. No publicly held company owns more than 10 percent of
the stock of Smith & Wesson Sales Company other than its parent company, Smith & Wesson
Brands, Inc.

For Cases: 23-2999 and 23-3002:

3(i): Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.) has no
parent corporation.

3(ii): No publicly held company owns more than 10 percent of the stock of Smith &
Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.).

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2992, consolidated with Nos. 23-2992, 23-2994, 23-2995, 23-2996, 23-2997, 23-2998, 23-2998, 23-2990, 23-3000</u>
<u>23-3001, 23-3002 and 23-3003</u>

Short Caption: <u>Keely Roberts, et al v. Smith & Wesson Brands, Inc., et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Smith & Wesson Brands, Inc.    Smith & Wesson Sales Company    Smith & Wesson, Inc.</u>

<u>American Outdoor Brands Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>DLA Piper LLP (US)</u>

<u>Swanson, Martin & Bell</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>see attached</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>see attached</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>n/a</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>n/a</u>

Attorney's Signature: <u>/s/ Edward S. Scheideman</u>    Date: <u>12/07/2023</u>

Attorney's Printed Name: <u>/s/ Edward S. Scheideman</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]  No [✔]

Address: <u>DLA Piper LLP (US) - 500 Eight Street, NW, Washington, DC 20004</u>

Phone Number: <u>(202) 799-4534</u>    Fax Number: <u>(202) 799-5534</u>

E-Mail Address: <u>edward.scheideman@dlapiper.com</u>

rev. 12/19 AK

For Cases: 23-2992, 23-2993, 23-2994, 23-2395, 23-2996, 23-2997, 23-2998, 23-3000, 23-3001
and 23-3003

3(i): Smith & Wesson Inc. is a wholly owned subsidiary of Smith & Wesson Sales Company, which
is a wholly owned subsidiary of Smith & Wesson Brands, Inc.

3(ii): No publicly held company owns more than 10 percent of the stock of Smith & Wesson,
Inc. or Smith & Wesson Brands, Inc. No publicly held company owns more than 10 percent of
the stock of Smith & Wesson Sales Company other than its parent company, Smith & Wesson
Brands, Inc.

For Cases: 23-2999 and 23-3002:

3(i): Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.) has no
parent corporation.

3(ii): No publicly held company owns more than 10 percent of the stock of Smith &
Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.).

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2992, 23-2993, 23-2994, 23-2995, 23-2996, 23-2997, 23-2998, 23-2999, 23-3000, 23-3001, 23-3002

Short Caption: Keely Roberts, et al v. Smith & Wesson Brands, Inc., et al _____ and 23-3003

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Smith & Wesson Brands, Inc.  Smith & Wesson Sales Company   Smith & Wesson, Inc.

 American Outdoor Brands Corporation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 DLA Piper LLP (US)

 Swanson, Martin & Bell, LLP

(3)     If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

 see attached

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

 see attached

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 n/a

Attorney's Signature: /s/ Andrew A. Lothson          Date: 12/07/2023

Attorney's Printed Name:  Andrew A. Lothson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [  ]     No [✔]

Address:  Swanson, Martin & Bell, LLP -- 330 North Wabash, Suite 3300, Chicago, IL 60611

Phone Number: 312-923-8274          Fax Number: 312-321-9100

E-Mail Address: alothson@smbtrials.com

rev. 12/19 AK

For Cases: 23-2992, 23-2993, 23-2994, 23-2395, 23-2996, 23-2997, 23-2998, 23-3000, 23-3001 and 23-3003

> 3(i): Smith & Wesson Inc. is a wholly owned subsidiary of Smith & Wesson Sales Company, which is a wholly owned subsidiary of Smith & Wesson Brands, Inc.

> 3(ii): No publicly held company owns more than 10 percent of the stock of Smith & Wesson, Inc. or Smith & Wesson Brands, Inc. No publicly held company owns more than 10 percent of the stock of Smith & Wesson Sales Company other than its parent company, Smith & Wesson Brands, Inc.

For Cases:  23-2999 and 23-3002:

> 3(i): Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.) has no parent corporation.

> 3(ii): No publicly held company owns more than 10 percent of the stock of Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.).

## DISCLOSURE STATEMENT

In accordance with Fed. R. App. P. 26.1 and Cir. R. 26.1, Appellants identify the following law firms whose partners or associates who have appeared for Appellants in this matter and are expected to appear in this Court: DLA Piper LLP (US) and Swanson, Martin & Bell, LLP.

Appellants further state that Smith & Wesson Inc. is a wholly owned subsidiary of Smith & Wesson Sales Company, which is a wholly owned subsidiary of Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.).  No publicly held company owns more than 10 percent of the stock of Smith & Wesson, Inc. or Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.).  No publicly held company owns more than 10 percent of the stock of Smith & Wesson Sales Company other than its parent company, Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.).

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES .................................................................. 2

STATEMENT OF THE CASE ..................................................................... 2

      A.    Appellees' claims ..................................................... 3

      B.    Removal to federal court ......................................... 9

      C.    The district court's remand order ........................... 10

      D.    Smith & Wesson's appeal ...................................... 11

SUMMARY OF ARGUMENT .................................................................. 11

ARGUMENT ......................................................................................... 14

      I.    Standard of review. ...................................................... 14

      II.    The district court erred by refusing to find the cases were properly removed under the federal officer removal statute. ............... 15

            A.    Legal standard ................................................... 17

            B.    This case satisfies § 1442(a)(1). ........................ 19

                1.    Smith & Wesson acted under the ATF ............... 19

                2.    The judgment sought would interfere with federal policy and the federal treasury. ............... 21

                3.    The presence of other claims in the Complaints is irrelevant to removal. ..................... 25

      III.    The district court also erred by refusing to find federal question jurisdiction. ................................................. 26

            A.    The Court has federal question jurisdiction under *Grable*. ............................................................... 28

                1.    The Complaints necessarily raise a federal issue. ............................................................... 29

                2.    The federal issue is actually disputed. .................. 33

                3.    The federal issue is substantial. ........................... 34

                4.    The federal-state balance would not be

disrupted............................................................... 35

B.  The Court also has federal question jurisdiction
    under the artful pleading doctrine................................. 36

C.  Removal also was proper because Appellees' claims
    are completely preempted by federal law. ...................... 42

D.  Consent of the co-defendants is not required. ................ 47

CONCLUSION...................................................................... 49

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abramski v. United States*,
   573 U.S. 169 (2014) ........................................................................... 19

*Anghel v. Ruskin Moscou Faltischek, P.C.*,
   598 F. App'x 805 (2d Cir. 2015)............................................................. 31

*Arizona v. Manypenny*,
   451 U.S. 232 (1981) ........................................................................... 18

*Baker v. Atl. Richfield Co.*,
   962 F.3d 937 (7th Cir. 2020) ......................................................*passim*

*Beneficial Nat'l Bank v. Anderson*,
   539 U.S. 1 (2003) .............................................................................. 43

*Bennett v. SouthWest Airlines Co.*,
   484 F.3d 907 (2007) .......................................................................... 32

*Betzner v. Boeing Co.*,
   910 F.3d 1010 (7th Cir. 2018) ....................................................... 14, 21

*Bosaw v. Nat'l Treasury Employees' Union*,
   887 F. Supp. 1199 (S.D. Ind. 1995) ..................................................... 26

*Boy Blue, Inc. v. Zomba Recording, LLC*,
   2009 WL 2970794 (E.D. Va. Sept. 16, 2009) ......................................... 39

*BP P.L.C. v. Mayor of Balt.*,
   141 S. Ct. 1532 (2021) ......................................................................... 1

*Broder v. Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005).......................................................*passim*

*Bubalo v. Navegar, Inc.*,
   1997 WL 337218 (N.D. Ill. June 13, 1997) ........................................... 40

*Burda v. M. Ecker Co.*,
   954 F.2d 434 (7th Cir. 1992) .............................................................. 42

iii

*Bureau v. BASF Corp.*,
    2022 WL 807372 (M.D. La. Jan. 3, 2022) ............................................... 48

*Carl Sandburg Vill. Condo Ass'n No. 1 v. First Condo Dev. Co.*,
    557 N.E.2d 246 (Ill. App. Ct. 1st Dist. 1990) ...................................... 39

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987) ....................................................................... 42, 47

*Citadel Sec., LLC v. CBOE, Inc.*,
    2017 WL 118419 (N.D. Ill. Jan. 12, 2017) ........................................... 29

*City of Chi. v. Beretta U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004) ........................................................... 38, 39

*Connick v. Suzuki Motor Co., Ltd.*,
    675 N.E.2d 584 (Ill. 1996) .................................................................. 38

*Cook v. Peter Kiewit Sons Co.*,
    775 F.2d 1030 (9th Cir. 1985) ............................................................ 18

*In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*,
    756 F.3d 917 (6th Cir. 2014) .............................................................. 40

*De Bouse v. Bayer*,
    922 N.E.2d 309 (Ill. 2009) ................................................................. 40

*Elder v. JPMorgan Chase Bank*,
    552 F. Supp. 3d 812 (N.D. Ill. 2021) .................................................. 29

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
    2022 WL 4597526 (D. Mass. Sept. 30, 2022) ..................................... 40

*Evergreen Sq. of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*,
    776 F.3d 463 (7th Cir. 2015) .............................................................. 29

*Ferrell v. Yarberry*,
    848 F. Supp. 121 (E.D. Ark. 1994) ..................................................... 26

*Fox v. Dakkota Integrated Sys., LLC*,
    980 F.3d 1146 (7th Cir. 2020) ............................................................ 42

*Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health &*
    *Welfare Tr. Fund*,
    538 F.3d 594 (7th Cir. 2008) ................................................. 13, 36, 42

iv

*Gen. Auto Serv. Station v. City of Chi.*,
  2004 WL 442636 (N.D. Ill. Mar. 9, 2004) ............................................... 48

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005) ............................................................................*passim*

*Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*,
  756 F.3d 1032 (7th Cir. 2014) .................................................................. 33

*Heard v. Becton, Dickinson & Co.*,
  440 F. Supp. 3d 960 (N.D. Ill. 2020) ....................................................... 40

*Huddleston v. United States*,
  415 U.S. 814 (1974) .................................................................................. 19

*Ill. Pub. Risk Fund v. Purdue Pharma L.P.*,
  2019 WL 3080929 (N.D. Ill. July 15, 2019) .................................... 37, 41

*Martin v. Petersen Health Operations, LLC*,
  37 F.4th 1210 (7th Cir. 2022) ................................................................... 43

*Metro. Life Ins. Co. v. Taylor*,
  481 U.S. 58 (1987) .................................................................................... 45

*Murray v. Murray*,
  621 F.2d 103 (5th Cir. 1980) ............................................................. 12, 16

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ...................................................................................... 41

*Nationwide Invs. v. Miller*,
  793 F.2d 1044 (9th Cir. 1986) ...........................................................*passim*

*Navistar International Corp. v. Deloitte & Touche, LLP*,
  837 F. Supp. 2d 926 (N.D. Ill. 2011) ...................................................... 32

*New York v. Arm or Ally, LLC*,
  644 F. Supp. 3d 70 (S.D.N.Y. 2022) ..................................................*passim*

*O'Callaghan v. U.S.*,
  686 F. Supp. 2d 826 (N.D. Ill. 2010) ...................................................... 48

*Oliveiro v. Amoco Oil Co.*,
  776 N.E.2d 151 (Ill. 2002) ....................................................................... 39

*Praschak v. Kmart Corp.*,
  922 F. Supp. 2d 710 (N.D. Ill. 2013) ...................................................... 31

*Prince v. Sears Holding Corp.*,
   848 F.3d 173 (4th Cir. 2017) ................................................. 47

*Prolite Bldg. Supply, LLC v. MW Mfrs., Inc.*,
   891 F.3d 256 (7th Cir. 2018) ................................................. 48

*Restoration Risk Retention Grp., Inc. v. Gutierrez*,
   880 F.3d 339 (7th Cir. 2018) ................................................. 37

*Riordan v. Int'l Armament Corp.*,
   477 N.E.2d 1293 (Ill. App. Ct. 1st Dist. 1985) ................... 39

*Rivet v. Regions Bank of La.*,
   522 U.S. 470 (1998) ............................................................. 42

*Rosciszewki v. Arete Assocs., Inc.*,
   1 F.3d 225 (4th Cir. 1993) ................................................... 47

*Ruppel v. CBS Corp.*,
   701 F.3d 1176 (7th Cir. 2012) ...................................... 12, 17

*Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10*,
   966 F.3d 661 (7th Cir. 2020) .......................... 12, 29, 33, 35

*Schumacher v. Sterigenics U.S., LLC*,
   394 F. Supp. 3d 837 (N.D. Ill. 2019) ................................. 32

*Shapiro v. McManus*,
   577 U.S. 39 (2015) ......................................................... 28, 37

*Sprint Commc'ns, Inc. v. Jacobs*,
   571 U.S. 69 (2013) ............................................................... 36

*State of Minnesota v. Fleet Farm LLC*,
   2023 WL 4203088 (D. Minn. June 27, 2023) ...... 29, 31, 34, 35

*In re State of New York*,
   256 U.S. 490 (1921) ............................................................. 18

*State of Wis. v. Schaffer*,
   565 F.2d 961 (7th Cir. 1977) ...................................... 16, 19, 25

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .................................................. 28, 37, 41

*Stericycle, Inc. v. Carney*,
   2013 WL 3671288 (N.D. Ill. July 12, 2013) ....................... 40

*Tantaros v. Fox News Network, LLC,*
   12 F.4th 135 (2d Cir. 2021) ............................................................ 29, 35, 36

*Wagner v. Bank of Am., N.A.,*
   2012 WL 6586347 (S.D. Ill. Dec. 17, 2012) ........................................... 48

*Walton v. Bayer Corp.,*
   643 F.3d 994 (7th Cir. 2011) ........................................................... 28, 37

*Watson v. Philip Morris Cos.,*
   551 U.S. 142 (2007) ........................................................... 19, 20, 21, 23

*Williams v. Todd Shipyards Corp.,*
   154 F.3d 416 (5th Cir. 1998) ................................................................ 20

*Willingham v. Morgan,*
   395 U.S. 402 (1969) ................................................................. 17, 18, 19

*Young v. Bryco Arms,*
   821 N.E.2d 1078 (Ill. 2004) ................................................................. 38

**Statutes**

5 U.S.C. § 701, *et seq.* ................................................................*passim*

5 U.S.C. § 702............................................................................. 14, 45

8 U.S.C. § 923............................................................................... 8, 20

15 U.S.C. § 7902, 7903(5)(A) ............................................................... 28

18 U.S.C. § 922............................................................................. 7, 15

18 U.S.C. § 926(a) ............................................................................... 8

26 U.S.C. 5811................................................................................ 8, 23

26 U.S.C. 5812.................................................................................... 8

26 U.S.C. § 5841........................................................................ 8, 22, 23

26 U.S.C. §§ 5842-5844 ................................................................... 22, 23

26 U.S.C. § 5845................................................................................*passim*

26 U.S.C. § 5848.................................................................................... 7

26 U.S.C. § 5852(e)............................................................................... 23

26 U.S.C. § 5861 .......................................................................... 8, 22

26 U.S.C. §§ 5871, 5872(a) ............................................................... 8

26 U.S.C. § 7801 .......................................................................... 8, 20

26 U.S.C. § 7805(a) ....................................................................... 8, 20

28 U.S.C. § 599A(c)(I) ...................................................................... 8

28 U.S.C. § 1331 ......................................................................... *passim*

28 U.S.C. § 1441 .......................................................................... 9, 48

28 U.S.C. § 1442 ......................................................................... *passim*

28 U.S.C. § 1446 .......................................................................... 9, 48

28 U.S.C. § 1447(d) .......................................................................... 1

815 ILCS 505 .................................................................................. 5

815 ILCS 510/2 ............................................................................... 6

27 C.F.R. §§ 447.11 .......................................................................... 7

27 C.F.R. § 478 ........................................................................ 7, 8, 20

27 C.F.R. § 479 .......................................................................... *passim*

28 C.F.R. § 0.130 ....................................................................... 8, 20

## JURISDICTIONAL STATEMENT

This is an appeal taken pursuant to 28 U.S.C. § 1447(d) from an order entered by the district court on September 25, 2023, granting Appellees' motion for remand.[1] In the proceedings below, Smith & Wesson removed twelve similar state court cases to the United States District Court for the Northern District of Illinois on the basis of federal officer jurisdiction pursuant to 28 U.S.C. § 1442(a)(1); on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331; and because Appellees' claims are completely preempted by a combination of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA") and the National Firearms Act of 1934 ("NFA"). The district court consolidated the twelve cases when deciding the motions to remand. (Case No. 1:22-cv-6169, Dkt. 39.)

Smith & Wesson timely filed a notice of appeal from the remand order on October 16, 2023. (*Id.*, Dkt. 67.) The Court has appellate jurisdiction under 28 U.S.C. § 1447 (d), which permits interlocutory appellate review of all bases of removal. *BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1532 (2021).

---

[1] Citations to "A-__" refer to pages within the Appendix, which is included with this brief. Citations to "Dkt. __" refer to documents filed in the district court.

## STATEMENT OF THE ISSUES

1.     Whether the cases were properly removed under 28 U.S.C. § 1442(a) because the Complaint is "against or directed to" the United States Bureau of Alcohol, Tobacco, Firearms and Explosive ("ATF"), even though the ATF was not named in the Complaint, because the judgment sought would interfere with federal ATF policy.

2.     Whether the cases were properly removed based on federal question jurisdiction under 28 U.S.C. § 1331 based on *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), because the claims turn on substantial and disputed federal issues concerning the classifications of firearms under the NFA that are logically separate from any purported state law claims.

3.     Whether the cases were properly removed based on federal question jurisdiction under 28 U.S.C. § 1331 based on the artful pleading doctrine, which requires the court to evaluate and then disregard insubstantial, implausible, or foreclosed state-law claims.

4.     Whether the case was properly removed because the claims are completely preempted by the federal regulations promulgated under the National Firearms Act of 1934 and the APA, 5 U.S.C. § 701, *et seq.*

## STATEMENT OF THE CASE

This is an appeal from an order entered on September 25, 2023, by United States District Judge Steven C. Seeger, granting Appellees' Motions to Remand. (A-1.) The district court erroneously decided federal jurisdiction was lacking under the

federal officer removal statute, 28 U.S.C. § 1442(a)(1), and as a federal claim pursuant to 28 U.S.C. § 1331, on three independent grounds.

### A.   Appellees' claims

The appeal arises out of 12 nearly identical underlying state court cases. All 12 cases were removed to the United States District Court for the Northern District of Illinois, and the district court consolidated the cases "for the purpose of resolving the motions to remand." (Case No. 1:22-cv-6169, Dkt. 39). The lead case is captioned as *Keely Roberts, et al. v. Smith & Wesson, et al.*, docketed as Case No. 1:22-cv-6169 in the Northern District of Illinois. The lawsuits arise from Robert Crimo, III's ("Crimo's") shootings in Highland Park, Illinois on July 4, 2022.

Appellees are victims of Crimo's shootings and the victims' family members. The complaints seek relief against seven defendants: Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corp.), Smith & Wesson Sales Company, Smith & Wesson, Inc. (collectively, "Smith & Wesson"); Budsgunshop.com, LLC (a website Crimo allegedly frequented); Red Dot Arms, Inc. (a gun dealer that allegedly sold to Crimo); Robert Crimo, Jr. ("Crimo's Father"); and Crimo.

Appellees allege that Crimo's Father sponsored the application of his son, Crimo (identified in the Complaint as the "Shooter") to obtain a Firearm Owners Identification ("FOID") card. According to the Complaint, in June or July of 2020, Crimo went onto the website for Bud's Gun Shop, where he selected for purchase a semi-automatic rifle that had been manufactured by Smith & Wesson. Bud's Gun Shop then allegedly shipped the semi-automatic rifle to Red Dot Arms, a gun dealer

located in Illinois, which then transferred the firearm to Crimo.[2]  Approximately two years later, on July 4, 2022, during a parade through Highland Park, Illinois, Crimo began shooting from a rooftop into the crowd, killing or wounding several people.  (SA-2, SA-6 ¶¶ 3, 15-17; *see also* Case No. Case No. 1:22-cv-6169, Dkt. 39.)

Six of Appellees' eleven counts are asserted against Smith & Wesson, which is alleged to be a "federally licensed firearms manufacturer and importer" (SA-7 ¶ 21), and each is predicated on numerous "General Allegations" of Smith & Wesson's alleged violations of a federal statute—the NFA.  Specifically, Appellees claim that all AR-15 style weapons,[3] including the M&P semi-automatic rifle purchased by Crimo are actually illegal, fully automatic "machine guns" under the NFA and other federal regulations (SA-11-13 ¶¶ 42, 45-46 (citing 26 U.S.C. § 5845(b) and ATF Ruling 82-2; ATF Ruling 82-8), 51-53) and, because the rifle purchased by Crimo was an illegal "machinegun," Smith & Wesson "manufactured, transferred and sold [the firearm] in violation of the NFA and the Gun Control Act ("GCA")."  (SA-15 ¶ 52).  Appellees based their claim that Smith & Wesson violated federal law on Smith & Wesson's alleged failure "to fill out the appropriate transfer forms, get approval of the forms by the ATF, pay occupational and transfer taxes and—most critically—register

---

[2] Plaintiffs collectively refer to Bud's Gun Shop and Red Dot Arms as the "Gun Stores" or "Gun Store Defendants." Smith & Wesson will use those terms as well.

[3] Although there are differences between the Complaints in the consolidated action, they all challenge the ATF's classification of *all* AR-15 style weapons under the NFA. The allegations in *Turnipseed*, No. 1:22-cv-06359, are equally clear. (*See, e.g.*, SA-97 ¶ 93 ("AR-15 style weapons like the Rifle are 'machinegun[s]'. . . ."); SA-76, SA-80-83, SA-88, SA-93, SA-97-98, SA-106-107, SA-110  ¶¶ 27, 45, 54, 55, 64, 75, 93, 95, 102, 135, 140, 160.); *see also* Case No. 1:22-cv-06359, Dkt. 1-2.

the firearms with the ATF" (*id.*); requirements that apply only if M&P semi-automatic rifles are machine guns under the NFA as a matter of law (SA-12-13 ¶ 45) (citing 18 U.S.C. §§ 922(b)(4), (o)(1) (making it "a crime to possess or transfer machine guns to any person who has not undergone the required registration and authorization process.")).

Appellees' subsequent allegations embedded in each count, as well as each count itself against Smith & Wesson, are similarly based on alleged violations of federal statutes – the NFA and GCA. In Count I, Appellees allege that Smith & Wesson violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, by engaging in unfair and improper marketing by failing to "identify its M&P assault rifles as NFA weapons, leading people to believe that they can obtain these weapons without complying with the NFA's requirements" (SA-45 ¶ 168) and that Smith & Wesson "violated both the NFA and the [GCA] by manufacturing, transferring, and selling these weapons without filing out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes or registering the firearms" (*id.*, ¶ 174).

In Count II, Appellees allege that Smith & Wesson violated the same Illinois Consumer Fraud and Deceptive Practices Act (815 ILCS 505) by deceptively "omit[ting] the fact that its M&P rifles are NFA weapons and require registration, approval, and payment of taxes before they can be possessed" (SA-48 ¶ 189), "fail[ing] to identify their M&P rifles as NFA weapons [which] qualifies as concealment, suppression, or omission of a material fact" (*id*, ¶ 190), and "fail[ing] to identify its

M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission" (*id.,* ¶ 191).

In Count III, Appellees allege that Smith & Wesson violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, by "marketing campaigns [that are] also deceptive because they omit the fact that its M&P rifles are NFA weapons and require registration, approval, and payment of taxes before they can possessed" (SA-52 ¶ 212), by "fail[ing] to identify their M&P rifles as NFA weapons [which] qualifies as concealment, suppression, or omission of a material fact" (SA-52 ¶ 213), and by "fail[ing] to identify its M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission" (*id.*, ¶ 214).

In Count IV, Appellees assert a negligence claim against Smith & Wesson, alleging that "Smith & Wesson knowingly violated both the NFA and GCA by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes, or registering the firearms." (SA-55-56 ¶ 238.) In that same Count IV, Appellees then allege that "if Smith & Wesson had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon." (SA-56 ¶ 241.)

In Counts X and XI, Appellees assert negligent and intentional infliction of emotional distress claims against all defendants (including Smith & Wesson) which

are supported by incorporating all of "the foregoing allegations" of the Complaint. (SA-68-69 ¶¶ 319, 328.)[4]

Tellingly, in light of the inherently federal nature of Appellees claims against Smith & Wesson, Appellees' Complaints identify a litany of federal statutory or regulatory provisions that undergird their claims; *i.e.*, the NFA's statutory definition of "machinegun" (26 U.S.C. § 5845(b)); rulings of the ATF regarding certain dissimilar firearms as "machineguns" under the NFA (*e.g.*, ATF Rulings 82-2, 82-8); the GCA, which amended the NFA's definition of "firearm" by "expanding the definition of 'machinegun'" (26 U.S.C. § 5848), and its subsequent amendment prohibiting the transfer and possession of machineguns (18 U.S.C. § 922(o)).

Through the NFA and GCA, Congress has established a comprehensive federal regulatory regime governing the federal classification and treatment of firearms—a regime Congress has tasked the ATF with enforcing. *See also* 27 C.F.R. §§ 447.11, 478.11, and 479.11 (containing definitions for machineguns); 27 C.F.R. § 479.105

---

[4] In Counts V and VI, Plaintiffs assert claims against the "Gun Store Defendants" for negligence and aiding and abetting, respectively. In Count VII, Plaintiffs assert a negligence claim against Crimo's Father. In Counts VIII and IX, Plaintiffs assert claims against Crimo for battery and assault, respectively. While the factual premise of the 12 complaints are virtually identical, there are minor differences in the claims. For example, Plaintiffs in most cases also named as defendants two of Smith & Wesson Brands, Inc.'s wholly owned subsidiaries, while plaintiffs in *Turnipseed v. Smith & Wesson Brands, Inc.,* District Court Case No. 1:22-cv-6359 and *Chupack v. Smith & Wesson Brands, Inc.,* District Court Case No. 1:22-cv-6361, also named as a defendant American Outdoor Brands Corporation, which is the same legal entity as Smith & Wesson Brands, Inc. Plaintiffs in two other cases, *Sundheim v. Smith & Wesson Brands, Inc.*, District Court Case No. 1:22-cv-6178 and *Strauss v. Smith & Wesson Brands, Inc.*, District Court Case No. 1:22-cv-6181, did not assert intentional and negligent inflection of emotional distress claims.

7

(imposing regulatory requirements with respect to the "transfer and possession of machine guns"); 26 U.S.C. § 5841(a) and 27 C.F.R. § 479.101 (regarding the NFA's central registry for machineguns that are not within the federal government's control); 26 U.S.C. §§ 5811, 5812, 5841 (registration and tax requirements when an NFA firearm is transferred); 26 U.S.C. §§ 5871, 5872(a) (criminal penalties and forfeitures NFA violations); 26 U.S.C. § 5861(e, f) (making it unlawful to transfer or make a firearm in violation of the NFA); 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(I). 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a) (delegating authority to the Attorney General of the United States to promulgate regulations necessary to enforce the NFA and GCA); 28 C.F.R. § 0.130(a)(1)-(2) (Attorney General, in turn, delegating responsibility for administering and enforcing the NFA and GCA to the Director of the ATF) (*see also,* ) (ATF-National Firearms Act Handbook) at 3); 27 C.F.R. parts 478 and 479 (implementing regulations governing "Commerce in Firearms and Ammunition" and "Machine Guns, Destructive Devices, and Certain other Firearms", including "the procedural and substantive requirements relative to the . . . manufacture, making, exportation, identification and registration of, and the dealing in, machine guns." 27 C.F.R. 479.1); 27 C.F.R. § 479.102(c) (regulation permitting ATF director to issue determinations of "whether an item" is an NFA firearm); 8 U.S.C. § 923(e) & (f); 27 C.F.R. § 478.73(a) and (b); §§ 478.74, 478.78 (addressing administrative proceedings to address ATF revocation efforts); 27 C.F.R. § 478.78 (addressing Licensee's right to appeal an adverse decision in the federal district court for the district where the Licensee resides or has its principal place of business).

8

Appellees also purport to base their claims against Smith & Wesson on its advertising, but Appellees fail to allege that Crimo even saw a Smith & Wesson advertisement, let alone that he was deceived by any particular ad. Instead, Appellees plead "upon information and belief" that Crimo "was exposed to and influenced" by various "promotional materials" (some dated many years ago), without any supporting facts. (SA-14, SA-19-20, SA-24-25, SA-38 ¶¶ 50, 69-71, 82, 85, 130-31.)

## B. Removal to federal court

On November 7, 2022, Smith & Wesson removed the now-consolidated actions, pursuant to 28 U.S.C. §§ 1331, 1441(c), 1442(a)(1), and 1446. Smith & Wesson removed the actions pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), because the complaint seeks to use the state courts as the means to challenge administrative action that lies with the ATF. It invites a state court to invalidate federal agency administrative, law enforcement, and tax policy, and then hold Smith & Wesson liable for carrying out that policy as part of the public-private federal firearms partnership.

Alternatively, Smith & Wesson removed the actions as federal claims pursuant to 28 U.S.C. § 1331, on three independent grounds. First, Appellees' state law claims are removable under *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), because those claims turn on federal issues concerning the classification of firearms under the NFA—including effectively seeking to reverse the ATF's determination that semi-automatic rifles, like the M&P rifle, are not "machine guns" subject to the regulatory requirements of the NFA—an issue that is (1)

necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.

Second, Appellees' state-law claims are an artfully pleaded attempt to have a state court overturn the ATF's determination that semi-automatic rifles are not "machine guns" subject to the regulatory requirements of the NFA. Such a legal determination would side-step the statutory regime enacted by Congress to classify firearms in this regard.

Third and finally, Appellees' state law claims are completely preempted because Appellees ask that a state court determine the classification of a firearm under federal law, with Appellees' proposed classification conflicting with the ATF's longstanding regulation of federal law. The only vehicle through which Appellees could obtain such a determination, however, is by exhausting administrative remedies made available through NFA regulations and a federal claim under the APA, 5 U.S.C. § 701, *et seq.*

On December 7, 2022, Appellees moved to remand the actions to Illinois state court. On January 4, 2023, the district court consolidated the cases to resolve the motions to remand. (Case No. 1:22-cv-6169, Dkt. 39.)

## C.   The district court's remand order

On September 25, 2023, the district court granted Appellees' motions to remand, holding that the district court does not have jurisdiction over Appellees' claims. (A-1).

For the federal officer question, the district court found that that Smith & Wesson is merely a "heavily regulated" firm that was not carrying out a government

function. (A-18). For the *Grable* analysis, the district court did not distinguish between distinct federal and (purported) state law claims embodied in the same count and, only addressing the first *Grable* factor, held that "[t]he fact that the complaint points to federal law is not enough to establish federal question jurisdiction." (A-32, A-44). The district court treated the "artful pleading" doctrine synonymously with the *Grable* federal question doctrine and, therefore, summarily rejected removal based on the artful pleading doctrine without considering whether the purported state law claims were insubstantial, implausible, or foreclosed. (A-51-A-52.) Finally, the district court concluded that "Smith & Wesson may not remove this case based on the complete preemption doctrine because the NFA does not create a private right of action. The NFA also does not include a clear congressional intent to completely preempt state law." (A-51).

### D.   Smith & Wesson's appeal

On October 16, 2023, Smith & Wesson timely filed a notice of appeal to the United States Court of Appeals for the Seventh Circuit. (Case No. 1:22-cv-6169, Dkt. 67.) On October 20, 2023, Smith & Wesson moved the district court to stay the execution of the remand order. (*Id.*, Dkt. 71.) On October 30, 2023, the district court granted Smith & Wesson's motion to stay the remand order pending the resolution of the appeal. (*Id.*, Dkt. 74.) On November 8, 2023, Appellees moved to lift the stay. (*Id.*, Dkt. 76.) The parties are awaiting a briefing schedule should the district court entertain Appellees' motion.

### SUMMARY OF ARGUMENT

This case was properly removed under 28 U.S.C. § 1442(a)(1), the federal

officer removal statute. Appellees seek to use their claims against Smith & Wesson as a vehicle to challenge an administrative decision by a federal agency, the ATF. If they succeed, the result will be a state court overturning the federal regulatory, law enforcement, and tax regime premised on that administrative decision. Appellees specifically allege that all AR-15 style weapons are machineguns under the NFA and ask the state court to overturn the ATF's contrary determination, then find that Smith & Wesson violated the law by not marketing its M&P rifles as machineguns. Claims are "against or directed to" a federal agency—and therefore satisfy the section 1442(a)(1) standard—where the judgment sought would "arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials," regardless of whether the agency itself is named as a party. *Murray v. Murray*, 621 F.2d 103, 106 (5th Cir. 1980). That is exactly what Appellees seek to accomplish in this case, as they admit. Section 1442(a)(1) is to be applied liberally in favor of removal. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012). That liberal standard was satisfied here.

Federal question jurisdiction also exists under *Grable*, 545 U.S. 308, because there is an "embedded federal issue" that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.'" *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10*, 966 F.3d 661, 673 (7th Cir. 2020) (citing *Gunn v. Minton*, 568 U.S. 251, 258 (2013)). A single federal claim is sufficient to support removal and, in identifying that claim, the Court can and should "logically

separate" state and federal claims even when pleaded in a single count. *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005). The district court, however, failed to do so. Appellees' claims against Smith & Wesson cannot proceed without a judicial determination that Smith & Wesson's manufacture and sale of the M&P rifle violated the NFA. These claims are not merely "evidence of liability" or an "alternative theory of relief," but rather represent a federal issue which is the **only** way Appellees can move forward against Smith & Wesson. This federal law claim is the purpose of the complaint against Smith & Wesson, as Appellees' counsel have publicly proclaimed that the purpose of this case is to "stop" the "sale" of "assault rifles" like the M&P rifle. (Case No. 1:22-cv-6169, Dkt. 48-2.)

Removal based on federal question jurisdiction was also proper under the artful pleading doctrine. Appellees' attempts "to disguise federal claims by cleverly dressing them in the clothing of state-law theories will not succeed in keeping the case in state court." *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, 538 F.3d 594, 596 (7th Cir. 2008). In considering the artful pleading doctrine, the district court was required to evaluate Appellees' purported state law claims against Smith & Wesson to determine whether they were facially insubstantial, implausible, or foreclosed. The district court failed to do so. Illinois law firmly precludes claims based on a Smith & Wesson's advertising, among other reasons, both because the required element of causation is absent and because Smith & Wesson had no legal duty—following its lawful manufacture and sale of a lawful firearm, and thereafter following multiple transfers, transactions, and events

unfolding over a two-year period—to prevent the ultimate end user of the firearm from ever violating the law. When stripped of such insubstantial, implausible, or foreclosed claims, all that remains is an attempt to have a state court overturn the ATF's determination that the M&P rifle is not a "machinegun" under the NFA.

Last, federal jurisdiction exists because Appellees' claims are completely preempted by federal law. Appellees can either challenge existing ATF determinations or, if they believe some additional determination is required, seek a new ATF determination (27 C.F.R. § 479.102(c); *ATF National Firearms Act Handbook* at 42, U.S. Dep't of Just. (Apr. 2009), https://www.atf.gov/firearms/national-firearms-act-handbook (last viewed Dec. 6, 2023)) and then bring a federal action seeking judicial review of any adverse determination under the APA (5 U.S.C. § 702). These procedures are the only avenue through which a person can obtain and challenge a formal legal determination as to whether a firearm is a "machine gun" under the NFA—which is at the core of Appellees' claims against Smith & Wesson.

## ARGUMENT

### I.     Standard of review.

This Court "'review[s] subject-matter jurisdiction and the propriety of the removal of a state-court action de novo. The party seeking removal bears the burden of establishing federal jurisdiction . . . . [T]he Supreme Court has made clear that courts must liberally construe § 1442(a).'" *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020) (citing *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018)) (citations omitted).

14

II.  **The district court erred by refusing to find the cases were properly removed under the federal officer removal statute.**

This case was properly removed under 28 U.S.C. § 1442(a)(1), the federal officer removal statute, because Appellees challenge an administrative decision by a federal agency, the ATF, and if they are successful, the result will be a state court overturning the federal regulatory, law enforcement, and tax regime premised on that administrative decision.   Appellees allege that all AR-15 style weapons are machineguns under the NFA and ask the state court to overturn the ATF's contrary determination, then find that Smith & Wesson violated the law by not marketing its M&P rifles as machineguns.  The determination of whether the M&P (or any of the other millions of semi-automatic rifles sold in the U.S. since the 1960s) is or is not a machinegun lies within the purview of the ATF.  Manufacturers have no authority to impose their own definitions; nor should state courts.

The district court's Order remanding the case held that Smith & Wesson is merely a "highly regulated firm" and that § 1442(a)(1) removal cannot be based "in the fact of federal regulation alone."  (A-12.)  This was error because Appellees do not challenge Smith & Wesson's compliance with ATF regulations; they challenge the ATF's underlying administrative judgment.  (SA-11-13 ¶¶ 42, 45-46 (citing 26 U.S.C. § 5845(b) and 18 U.S.C. § 922(b)(4), § 922(o)(1)), 51-53); *see also* SA-97 ¶ 93 ("AR-15 style weapons like the Rifle are 'machinegun[s]'. . . ."); SA-76, SA-80-81, SA-83-84, SA-88, SA-97-98, SA-107, SA-110 ¶¶ 27, 45, 54, 55, 64, 65, 95, 102, 140, 160.)  Unlike all of the cases the district court cited, this case is not about whether Smith & Wesson complied with regulatory standards; it is about whether the standards themselves

are correct. (A-17-A-19.)

The court was also much too swift to dismiss the federal interests at stake. Smith & Wesson argued that this case was about the "distinctly federal objectives embodied in the federal firearms partnership, including treating machineguns as a specific class of weapons under the NFA" and applying a variety of specific requirements to machineguns that do not apply to other weapons. (Case No. 1:22-cv-6169, Dkt. 48 at 11-12.) In analogizing to federal contractor cases, however, the district court focused too narrowly on whether Smith & Wesson was providing the same kind of physical assistance to the government as a manufacturer of Air Force bombers or a supplier of zinc oxide, and missed the larger point that the acts being challenged were exercises of federal policy, not merely regulated private acts. (*See id.* at 5; A-17-A-19.)

Precedent squarely holds that claims are "against or directed to" a federal agency—and therefore satisfy the § 1442(a)(1) standard—where the judgment sought would "arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials," regardless of whether the agency itself is named as a party. *Murray v. Murray*, 621 F.2d 103, 106 (5th Cir. 1980). The district court dismissed this possibility out of hand (A-10), but this Court and others have been clear that the "against or directed to" standard turns on whether the judgment sought would interfere with federal policy or the federal treasury, not on who appears in the caption. *State of Wis. v. Schaffer*, 565 F.2d 961, 964 (7th Cir. 1977); *see also Nationwide Invs. v. Miller*, 793 F.2d 1044, 1046-47 (9th Cir. 1986). This is precisely

the circumstance here.

The district court acknowledged that § 1442(a)(1) differs from other removal statutes in that it is applied liberally in favor of removal. (A-10); *Ruppel*, 701 F.3d at 1181. Yet, it seemingly missed that there is no requirement that the claims "against or directed to" a federal agency be the only claims in the case, or even that they predominate. (*See* A-11); *Baker*, 962 F.3d at 945. On the contrary, it is sufficient if any part of the case is "against or directed to" a federal agency. *Baker*, 962 F.3d at 945; *Nationwide Invs.*, 793 F.2d at 1046-47.

Moreover, the merits of this case will turn on federal defenses including Appellees' failure to join the ATF as an indispensable party, preemption, and potentially sovereign immunity, precisely because the claim is really "against or directed to" the ATF. "One of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

Congress designed § 1442(a)(1) specifically for cases like this one, to ensure that disputes affecting federal policy and the federal treasury would be adjudicated in a federal forum, and both the Supreme Court and this Court have been clear that Appellees may not circumvent that liberal policy in favor of removal through creative framing of a complaint's caption or claims.

## A.    Legal standard

Although federal officer jurisdiction is invoked less frequently than other sources of federal jurisdiction, it "has had a long history," and was born of Congress's judgment that it is necessary "to protect federal officers from interference by hostile

17

state courts." *Willingham*, 395 U.S. at 405. "The act of removal permits a trial upon the merits of [a] state-law question free from local interests or prejudice. It also enables the defendant to have the validity of [any] immunity defense adjudicated, in a federal forum." *Arizona v. Manypenny*, 451 U.S. 232, 241–42 (1981). The Supreme Court has held that this right of removal "is absolute" and the Court "has insisted that the policy favoring removal should not be frustrated by a narrow, grudging interpretation of 1442(a)(1)." *Id.*

Removal under § 1442(a)(1) turns on whether the action is "against or directed to" a federal agency or officer, or someone "acting under" a federal officer. *Cook v. Peter Kiewit Sons Co.*, 775 F.2d 1030, 1034 (9th Cir. 1985) ("The only prerequisite to removal of a civil action under § 1442 is that it be brought against a federal officer or agency"). Crucially, this is not a question of who appears in the case caption, but rather a practical inquiry into whether the government has an interest in the action, regardless of how the action is styled. *Cf. In re State of New York*, 256 U.S. 490, 500 (1921) ("As to what is to be deemed a suit against a [sovereign], . . . it is now established that the question is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record."). This is consistent with Supreme Court precedent on what qualifies as a suit against the government for sovereign immunity purposes. As the Court explained in *Dugan v. Rank*, "a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the

Government from acting, or to compel it to act." 372 U.S. 609, 620 (1963) (cleaned up). Whenever such federal interests exist, so too does jurisdiction. *Willingham*, 395 U.S. at 406 ("Federal jurisdiction rests on a federal interest in the matter, the very basic interest in the enforcement of federal law through federal officials.") (cleaned up); *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007).

Consistent with § 1442(a)(1)'s liberal protection of federal agencies and officers, the Seventh Circuit and the Ninth Circuit have upheld removal of state court actions that do not name a federal agency or officer as a defendant, but nonetheless threaten to interfere with federal objectives. *See Nationwide Invs.*, 793 F.2d at 1046-47; *Schaffer*, 565 F.2d at 964. Ultimately, "the statute looks to the substance rather than the form of the state proceeding; this is the reason for the breadth of its language." *Schaffer*, 565 F.2d at 964.

### B.     This case satisfies § 1442(a)(1).

#### 1.     Smith & Wesson acted under the ATF.

Smith & Wesson is part of a federal firearms partnership with the ATF, which Congress and the ATF created to implement federal firearms policy and help balance firearms regulation with protection of the Second Amendment. *See Huddleston v. United States*, 415 U.S. 814, 824 (1974) (describing Congress's decision to "channel" "[c]ommerce in firearms . . . through federally licensed . . . manufacturers"); *Abramski v. United States*, 573 U.S. 169, 186, 190 (2014) (licensed dealers are "principal agent[s] of federal enforcement"); *Open Letter to All Federal Firearms Licensees*, U.S. DOJ (Jan. 14, 2004) (Case No. 1:22-cv-6169, Dkt. 48-5.) Certain government functions are delegated to manufacturers (e.g., tracing crime guns,

19

collecting certain taxes, and maintaining registration and transfer records), while others are performed by the ATF. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.123-478.125.   One principal ATF responsibility is to determine whether firearms are "machineguns" under the NFA.   26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 27 C.F.R. § 479.102; 28 C.F.R. § 0.130(a)(1)-(2).

The relevance of this is not the ATF's choice of the word "partnership" (which the district court discounted) but rather the close and interdependent nature of the relationship, and within that context, the ATF's authority on what is or is not an NFA machinegun.   *See Watson*, 551 U.S. at 153–54, 157; *Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 4 (5th Cir. 1998).   Indeed, unlike many federal regulatory schemes, there are no specific regulations by which manufacturers could decide for themselves whether something is an NFA machinegun (or for that matter an NFA silencer, or several other categories of NFA items).   Appellees argue that the ATF's decision regarding "AR-15 style weapons" is incorrect.   That is not an issue for the state court to decide.

Contrary to the district court's suggestion (A-18), this does not mean that all claims against firearms manufacturers are subject to federal officer jurisdiction.   But it does mean that a narrow (and presumably rare) class of cases in which plaintiffs putatively sue a manufacturer to challenge an agency action or authority are removable.   As Smith & Wesson noted in the district court, "[t]he novelty and sweep of [Appellees'] NFA allegations make this an extraordinary case."   (Case No. 1:22-cv-6169, Dkt. 48 at 6.)

The district court relied heavily on a line of cases that distinguish between private parties (mostly federal contractors) that are "acting under" a federal officer because they are "helping the Government to produce an item that it needs" and those that are merely highly regulated. (A-18-19.) However, those cases grappled with a different issue than that presented here. The foremost issue in those cases generally was the extent to which defendants complied with regulatory, contractual, or testing standards, so the opinions focused extensively on the degree of detailed control exercised by the federal agency. *See, e.g., Watson,* 551 U.S. at 146–47; *Betzner,* 910 F.3d at 1016; *Baker*, 962 F.3d at 946-47. In none of those cases did the plaintiff challenge the federal agency standard *itself.* Here, there is no need to analyze the degree of control exercised by the federal agency, because Appellees' allegations are directed straight to the source. The fundamental point is that Appellees' suit challenges the ATF directly by asking a state court to overrule its administrative judgment.

> **2.     The judgment sought would interfere with federal policy and the federal treasury.**

The district court's focus on regulatory control also failed to adequately account for the enormous federal interests implicated by Appellees' allegations. Appellees allege that all AR-15 style weapons are NFA machineguns, that "Smith & Wesson . . . marketed the rifle as not requiring NFA paperwork," and that "it manufactured and transferred the rifle without complying with any of the NFA's [tax, registration, and recordkeeping] requirements, in violation of the [GCA] and the NFA." (SA-96-100, SA-114-15.) This claim is "against or directed to" the ATF within the meaning of §

1442(a)(1) because the ATF determined more than 50 years ago that semiautomatic AR-15 style weapons are *not* NFA machineguns. (Case No. 1:22-cv-6169, Dkt. 48-7.) Nothing more than these allegations are required to illustrate that Appellees seek to use the state court to circumvent the authority given to the ATF by Congress and overturn federal law.

Appellees frontally attack federal law, and their efforts unquestionably would also "expend itself on the public treasury, . . . interfere with the public administration, . . . restrain the Government from acting, [and] to compel it to act" within the Supreme Court's meaning in *Dugan*. *Dugan*, 372 U.S. at 620. A state court re-designation of "machine gun" would have significant regulatory, tax, and law enforcement implications. AR-15 style rifles are among the most popular firearms in the U.S. among lawful private gun owners. About 16 million Americans own AR-15 style rifles today. Emily Guskin, *et al.*, *Why do Americans own AR-15s?*, Wash. Post (Mar. 27, 2023), https://www.washingtonpost.com/nation/interactive/2023/american-ar-15-gun-owners/ (last viewed Dec. 7, 2023). Because these 20 million firearms were not treated as NFA machineguns when sold, the owners were not required to file NFA transfer forms with the ATF, pay a federal transfer tax, secure approval of transfer forms from the ATF, or register the firearms in the National Firearms Registration and Transfer Record (NFRTR). *See* ATF, *National Firearms Act Handbook* at 59-60 (Rev. 2009); *see also* 26 U.S.C. §§ 5841-5845; 27 C.F.R. 479.84-479.88. If a state court accepts Appellees' invitation, all of these currently lawful gun owners would be made criminals. 26 U.S.C. §§ 5845(a)(6) & 5861(d).

The change in designation also would interfere with the ATF's operations as it would be faced with administering a vastly expanded program of documenting, approving, tracking, and collecting taxes on the transfer of a huge class of weapons. *See* 26 U.S.C. §§ 5841-5845; 27 C.F.R. 479.84-479.88. For example, it would be forced to implement a program for taxing the millions of semi-automatic AR-15 style weapons as NFA "machineguns." *See* 26 U.S.C. §§ 5811, 5852(e), 5845; 27 C.F.R. 479.11, 479.82, 479.84-479.88, 479.91. It would also be compelled to invade the privacy of ordinary, law-abiding AR-15 owners by adding them to the NFRTR. 26 U.S.C. § 5841.

These changes would be a monumental shift in federal policy. According to the ATF, only about 3 million NFA items (a category much broader than machineguns, that also includes short-barreled shotguns, silencers, destructive devices, and more) have ever been registered in the NFRTR in the entire period of 1934 to the present. ATF National Firearms Act Division, www.atf.gov/firearms/national-firearms-act-division (Jan. 7, 2022). If Appellees prevail, more than six times that number of firearms would be added to the ATF's docket overnight.[5] *See* Guskin, *supra* at 22. These weapons would become immediately illegal, requiring either a massive confiscation program or an extensive remedial program administered by the ATF.

This is exactly the sort of interference that § 1442(a)(1) is designed to prevent. *Watson*, 551 U.S. at 150. And such effects on federal administration and the federal

---

[5] This is a conservative estimate, as other (and perhaps all) semiautomatic weapons would be implicated by such a decision.

treasury are more than sufficient to satisfy the removal statute. In *Miami Herald Media Co. v. Fla. Dep't of Trans.*, the plaintiff sought and received an order from a Florida state court compelling the production of records related to a lethal bridge collapse. 345 F. Supp. 3d 1349 (N.D. Fla. 2018). The order effectively overturned a confidentiality directive from the National Transportation Safety Board ("NTSB"), without the NTSB being named as a party. *Id.* at 1363. The United States thereafter filed a Statement of Interest on behalf of the NTSB and removed the action to federal court, claiming that plaintiffs were indirectly challenging a NTSB directive. The federal district court quashed the state court action and denied a motion to remand, holding that the lawsuit "interfere[ed] with the administration of the national government by undermining the NTSB's authority to control its investigative operations, including the authority to control the timing of the release of investigative information." *Id.* These effects pale in comparison to what the Appellees seek to impose on the ATF, which makes the *Miami Herald* court's reasoning apply even more strongly in this case: "While [Appellees] have attempted to ignore the very real and substantial interest of the United States by framing their lawsuit as a public records case against [a non-federal defendant], the court finds that Plaintiffs' lawsuit is indeed 'against or directed to' [a federal agency]." *Id.*

Similarly, in *Nationwide Investors*, the Ninth Circuit addressed whether a federal employee who received an order to appear in a state court garnishment action in which she was not a party could remove the proceeding to federal court. 793 F.2d at 1046. The court answered in the affirmative, noting that, "Whisler, the federal

24

officer, is threatened with a fine or imprisonment if she fails to appear. These consequences are sufficiently real that her case fits under the broad category of actions 'brought against' a federal officer. She is not named as a defendant, but she is threatened with the state's coercive power nonetheless." *Id.*

Although a threat to hold an individual federal officer in contempt is significant (particularly to that officer), the degree to which such a judgment of contempt "would expend itself on the public treasury or domain, or interfere with the public administration, or . . . restrain the Government from acting, or to compel it to act'" (*Dugan*, 372 U.S. at 620) is of a far lesser magnitude than the judgment that Appellees seek here.

This Court has been clear that § 1442(a)(1) "looks to the substance rather than the form of the state proceeding; this is the reason for the breadth of its language. *Schaffer*, 565 F.2d at 964. If threatening a single officer with the state's coercive power is enough to satisfy § 1442(a)(1), then threatening to upend an entire administrative, tax, and law enforcement regime plainly satisfies the standard as well.

### 3. The presence of other claims in the Complaints is irrelevant to removal.

As the district court's Order highlights, many of Appellees' allegations are not, on their face, related to the ATF, but that changes nothing with respect to § 1442(a)(1) removal. As this Court has explained, even if many of the allegations do not relate to a federal agency, "removal need not be justified as to all claims asserted in the [Appellees'] complaint . . . ." *Baker*, 962 F.3d at 945. If any of the claims are "against

25

or directed to" a federal agency or a federal officer acting under color of law, the removal statute is satisfied. *See id.* ("Because Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves a federal officer or agency, the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction."). *Id.* Consistent with that principle, this Court and others have permitted § 1442(a)(1) removal of actions based on the presence of *any* claim "against or directed to" a federal agency or officer, even if that claim bears little connection to the rest of the case. *See Nationwide Invs.*, 793 F.2d at 1047; *see also Bosaw v. Nat'l Treasury Employees' Union*, 887 F. Supp. 1199, 1207 (S.D. Ind. 1995); *Ferrell v. Yarberry*, 848 F. Supp. 121, 122 (E.D. Ark. 1994). And courts can "logically separate" distinct claims for purposes of federal jurisdiction, even when pled in a single count. *Broder*, 418 F.3d at 194.

The purpose of § 1442(a)(1) is to provide a federal forum for cases exactly like this one. Denying this case a federal forum risks upending a wide-ranging program of federal law enforcement, taxation, and civil administration by subjugating it to a ruling of the state court.

## III. The district court also erred by refusing to find federal question jurisdiction.

"A single claim over which federal-question jurisdiction exists is sufficient to allow removal." *Broder*, 418 F.3d at 194 (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005); *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-66 (1997)). Such a claim exists here. Appellees' claims against Smith & Wesson arise from a wholly distinct set of facts from the other defendants, specifically (allegedly), Smith & Wesson's advertising, as well as Smith & Wesson's alleged

26

failure to comply with federal ATF requirements.  But Appellees do not allege that Crimo saw the advertisements, let alone was influenced by them.  Appellees also fail to plead causation, instead alleging multiple intervening acts (including criminal acts) by Crimo and the other parties wholly outside of Smith & Wesson's control. These failures preclude all purported state-law claims alleged against Smith & Wesson.

In identifying a federal claim, the Court can and should "logically separate" state and federal claims even when pleaded in a single count. *Broder*, 418 F.3d at 194-95.  The only way Appellees' ATF-based claims may potentially proceed is through a ruling accepting Appellees' allegations that Smith & Wesson illegally distributed an NFA weapon (a "machinegun") and violated NFA regulations, including identification, taxation, and registration requirements. (SA-15, SA-45, SA-48, SA-52, SA-55-56, SA-68, SA-70 ¶¶ 52, 168, 174, 189-191, 212-214, 238-241, 321, 330; SA-96, SA-113-115 ¶¶ 87-89, 174-175, 184-187.)  Underscoring its centrality to the Complaints, references to the NFA, "machineguns," "assault rifles," "weapons of war," or NFA weapons (all functionally equivalent terms) appear throughout. (SA-2-16, SA-18-19, SA-22-23, SA-28-30, SA-32, SA-38-39, SA-41, SA-44-45, SA-47-48, SA-51-52, SA-54--56, SA-59-60, SA-65, SA-67-70 ¶¶ 3, 5-11, 15-18, 23, 29, 38-39, 40-59, 65, 69, 77-78, 81, 90, 93-95, 97, 106, 132-33, 144, 161-63, 168-69, 174, 182, 187, 189-91, 209, 212-15, 227-29, 234, 238-41, 262-64, 270, 305, 312, 320-21, 329-30; SA-76-80, SA-96-97, SA-99, SA-100, SA-113-115, SA-117 ¶¶ 26-34, 38, 84, 86-89, 92-94, 98, 108, 114, 174-75, 184-87, 200-06.)  Appellees squarely allege that "if Smith & Wesson had

complied with the . . . the NFA, the Shooter would not have been able to access the weapon." (SA-56 ¶ 241; SA-115 ¶ 187.) Appellees also transparently seek an order requiring Smith & Wesson to disclose that the M&P rifle (allegedly) is an NFA weapon under federal law. (SA-52-53 ¶¶ 212-13, 224; SA-113, SA-115 ¶¶ 174, 186.)

The district court concluded that Appellees' claims against Smith & Wesson can proceed without a judicial determination that Smith & Wesson's manufacture and sale of the M&P rifle violated the NFA. But the NFA issue is not merely "evidence of liability" or an "alternative theory of relief." Rather, this federal issue is the *only* way Appellees can move forward against Smith & Wesson on those claims.[6] This is the very purpose of the Complaints against Smith & Wesson. Indeed, Appellees' counsel publicly proclaimed that the purpose of this case is to "stop" the "sale" of "assault rifles" like the M&P rifle. (Case No. 1:22-cv-6169, Dkt. 48-2.) When stripped of the facially insubstantial, implausible, or foreclosed state-law claims—an exercise that the district court was required to undertake but did not (*Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Walton v. Bayer Corp.*, 643 F.3d 994, 999 (7th Cir. 2011)), all that remains is an attempt to have a state court overturn the ATF's determination that the M&P rifle is not a "machinegun" under the NFA.

### A. The Court has federal question jurisdiction under *Grable.*

*Grable* jurisdiction rests on the "commonsense notion" that "in certain cases

---

[6] In the absence of a knowing violation of a statute applicable to the sale or marketing of firearms, Smith & Wesson is entitled to threshold immunity from suit under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902, 7903(5)(A).

federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable*, 545 U.S. at 312; *see also Sarauer*, 966 F.3d at 673. The elements of *Grable* jurisdiction are an "embedded federal issue" that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 673 (citing *Gunn*, 568 U.S. at 258). Those elements are established here.[7]

### 1.    The Complaints necessarily raise a federal issue.

Appellees allege that Smith & Wesson unlawfully failed to "identify its M&P assault rifles as NFA weapons, leading people to believe that they can obtain these weapons without complying with the NFA's requirements" (SA-45 ¶ 168) and "violated both the NFA and the [GCA] . . . by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes or registering the firearms" (*id.*, ¶ 174). *See also,* Count II (SA-48 ¶¶ 189-191) (alleging failure to properly register and pay taxes on alleged NFA weapons and failure to "identify their M&P Rifles as NFA weapons"); Count III (SA-52 ¶¶ 212-14) (repeating allegations of Count II); Count IV (SA-54-56 ¶¶ 225, 238, 240, 241) (alleging violation of NFA by failing to fill out appropriate ATF forms, pay certain taxes or register firearms

---

[7] Numerous courts, including this one, have recently exercised or affirmed *Grable* jurisdiction. *See Evergreen Sq. of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 466 (7th Cir. 2015); *Tantaros v. Fox News Network, LLC*, 12 F.4th 135, 140 (2d Cir. 2021); *State of Minnesota v. Fleet Farm LLC,* 2023 WL 4203088 (D. Minn. June 27, 2023); *Elder v. JPMorgan Chase Bank*, 552 F. Supp. 3d 812, 816 (N.D. Ill. 2021); *Citadel Sec., LLC v. CBOE, Inc.*, 2017 WL 118419, at *4 (N.D. Ill. Jan. 12, 2017).

allegedly required by federal law); Count X (SA-68 ¶ 319) (incorporating the identical allegations); and Count XI (SA-69 ¶ 328) (same).  Even more, Appellees strikingly allege that "if Smith & Wesson had complied with the . . . the NFA, the Shooter would not have been able to access the weapon." (SA-56 ¶ 241; SA-115 ¶ 187.)

Appellees here package distinct claims into each of several counts.  One set is based on purported misrepresentations.  (SA-47-48, SA-51, SA-88-89 ¶¶ 68, 182-189, 204-211.)  The other is based on an alleged omission: failing to disclose that the M&P rifle is allegedly an NFA "machinegun."  (SA-45, SA-48, SA-52, SA-56 ¶¶ 168, 189, 212, 241; SA-113, SA-115 ¶¶ 174-176, 187.)  The latter plainly requires a determination of federal law, specifically whether the M&P rifle is a "machinegun."  A single claim that arises under federal question jurisdiction is sufficient and, in identifying such a claim, the Court can and should "logically separate" state and federal claims even when pleaded in a single count.  *Broder*, 418 F.3d at 194-5.

As well, Appellees transparently seek an order requiring Smith & Wesson to disclose that the M&P rifle is an NFA weapon under federal law. (SA-52-53 ¶¶ 212-13, 224; SA-113, SA-115 ¶¶ 174, 186.)  The only way Appellees can obtain such relief is to secure a ruling that the M&P rifle is *in fact* an NFA weapon.  That further shows that the NFA allegations are a separate claim and not a mere alternative "theory." *See Broder*, 418 F.3d at 195 (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 810 (1988)).  Appellees' counsel has made clear that these federal claims are central to the complaint, by which Appellees seek to eliminate the "sale" of firearms such as the M&P rifle. As in *Broder*, Appellees' claims necessarily implicate

30

a "complex federal regulatory scheme": the manufacture, classification, distribution, taxing, and sale of firearms. *Id.; see also Minnesota v. Fleet Farm, LLC*, 2023 WL 4203088, at * 4 (holding that the state's complaint alleging negligence and public nuisance theories for selling firearms to allegedly known straw purchasers properly removed under *Grable* because "the State . . . elected to raise a claim with an element that cannot be established without exploration of federal laws and regulations…"); *New York v. Arm or Ally, LLC*, 644 F. Supp. 3d 70, 78-79 (S.D.N.Y. 2022) (denying motion to remand under *Grable* because purported state law claims necessarily raised federal issue in that "the State must demonstrate that the products at issue . . . were 'firearms' or 'component parts' thereof within the meaning of federal law").

The district court, concluding instead that Appellees' claims involve "multiple theories, all of [which] must present embedded issues of federal law to satisfy *Grable*" (A-29), primarily cites *Praschak v. Kmart Corp.*, 922 F. Supp. 2d 710, 713 (N.D. Ill. 2013). The plaintiff in that case alleged that negligent construction caused her injuries, basing its claim on several standards of care, one of which was from a federal statute, the Americans with Disabilities Act. Here, by contrast, Appellees allege a distinct federal claim that requires resolution of a distinct federal question.[8]

---

[8] The district court also cited *Anghel v. Ruskin Moscou Faltischek, P.C.,* 598 F. App'x 805, 807 (2d Cir. 2015). That case is identified as a "RULING[] BY SUMMARY ORDER' with "NO PRECEDENTIAL EFFECT" to be governed by Federal Rule of Appellate Procedure 32.1. The summary order simply affirmed the dismissal for lack of jurisdiction of a legal malpractice and breach of contract claim filed by a physician, in which one theory presented was that the attorney-defendants should have referenced a federal statute purportedly guiding the physician's conduct.

The district court also recognized the unexceptional proposition that standards of care in tort litigation that may draw on federal standards does not make the tort claim one "arising under" federal law.  (A-28.)  The plaintiff in *Schumacher v. Sterigenics U.S., LLC*, 394 F. Supp. 3d 837 (N.D. Ill. 2019), cited by the district court, asserted toxic tort claims, a portion of which drew on arguments about federal EPA standards.  *Id.* at 842.  But the defendants' assertion of federal question jurisdiction in that case "rel[ied] on the bare existence of federal standards, while failing to identify any particular issue of federal law necessarily raised by the complaints. *None of the complaints cite a federal law or regulation, and none of Appellees' claims require proof that a federal law was violated." Id.* at 844 (emphasis added).  Here, by contrast, the Complaints expressly and repeatedly cite the NFA and other federal laws and regulations, and their claims require proof that the M&P rifle is an NFA weapon for Appellees to succeed.

Similarly, the plaintiff in *Navistar International Corp. v. Deloitte & Touche, LLP*, 837 F. Supp. 2d 926, 930 (N.D. Ill. 2011), also relied on by the district court, asserted professional malpractice and fraud-based claims.  *Id.* at 928.  The defendant removed on the basis of federal question jurisdiction, arguing that some standards applicable to the "malpractice" group of claims were imposed by federal accounting regulatory standards. But the Court held that a threshold issue required for *Grable* federal question jurisdiction was missing; there was no "clearly identified federal audit standard [that was] subject to a live dispute."  *Id.* at 930; *see also Bennett v. SouthWest Airlines Co.*, 484 F.3d 907, 912 (2007) (cited by the district court,

32

recognizing that federal regulations in that case do little more than "lay down minimum standards" that were then subject to a host of fact-specific considerations required to apply governing *state* law).

None of the cases relied on by the district court addressed the issue faced by the district court here; namely, an invitation to a state court to vitiate federal law and a carefully constructed federal regulatory scheme. The fundamental issue of whether the M&P rifle is an NFA weapon is *the* central—and federal—dispute of Appellees' Complaints against Smith & Wesson and each of Appellees' claims against Smith & Wesson.[9]  Because the state court must adjudicate the meaning and application of the NFA to resolve Appellees' claims, a federal issue has been necessarily raised. The federal issue satisfies the first *Grable* factor because state courts are "not entitled to give an independent answer to this question, different from federal law." *Sarauer*, 966 F.3d at 673. The state court must decide this federal issue if the cases are remanded. It is "inescapable." *Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014).

### 2.    The federal issue is actually disputed.[10]

There is no doubt that Appellees' core claim that Smith & Wesson violated the NFA is "actually disputed." *Grable*, 545 U.S. at 314; *Arm or Ally*, 644 F. 3d at 80–81.

---

[9] At a bare minimum, distinct federal claims are embedded within counts that purport or attempt to sprinkle in the appearance of unrelated state court claims. That is sufficient to confer federal jurisdiction. *Broder*, 418 F.3d at 194-95.

[10] The district court, having erroneously concluded that the first *Grable* factor was not satisfied, did consider the remaining three factors. (A-44.)

Accordingly, this second factor is satisfied.

### 3.    The federal issue is substantial.

The federal NFA issue is substantial because Appellees effectively seek to have a state court re-define "machinegun" contrary to federal regulations with sweeping consequences for state and federal regulation that would instantly make illegal the ownership or possession of an M&P rifle (or any AR-type rifle) by law-abiding Americans.  The court in *Arm or Ally* found that "properly defining the terms 'firearm' and 'component part'" and "determining whether the products at issue" fell within those terms was "plainly a substantial issue" because of the "sweeping consequences" on federal and state regulatory authority and individual liability.  644 F. 3d at 79–80.

Similarly, in *Fleet Farm*, the state's negligence and public nuisance claims against a firearms dealer for selling to allegedly known straw purchasers was held to have raised a substantial federal issue supporting *Grable* jurisdiction.  The court recognized that "[i]n adopting the GCA, Congress recognized the importance of a consistent, nationwide approach to regulating firearm sales and deemed it necessary to enact federal control over interstate and foreign commerce of firearms by creating a federal scheme of regulations over the sale of firearms." 2023 WL 4203088, at *7. "At issue [in that case was] not just the [GCA], but also the various regulations and enforcement requirements by the ATF."  *Id.*   The court concluded that "[t]he resolution of this case is likely to have a substantial impact on how future firearm retailers—in and out of Minnesota—act in similar circumstances. Therefore, the Court concludes that the federal issue is substantial."  *Id.*  As well, the question of

34

what is or is not an NFA firearm presents a nearly pure issue of law, further supporting the substantiality element. *Tantaros*, 12 F. 4th at 145 (citing *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 701 (2006)); *Fleet Farm*, 2023 WL 4203088, at *7.

The district court ignored this, holding instead that the elements of reliance and causation, in assessing Illinois Consumer Fraud Act claims, is often "fact bound" and "situation specific" and does not "present a nearly pure issue of law." (A-38.) As a threshold matter, this statement ignores the issue of law inherent in the *federal* claim at issue, which is sufficient for federal question jurisdiction under *Grable*. In any event, as set forth below, *even as to the* insubstantial, implausible, and foreclosed state law claims, the absence of any duty on the part of, and causation attributed to, weapon manufactures implicate pure legal issues. *Infra* at III.B.

### 4.    The federal-state balance would not be disrupted.

The exercise of federal jurisdiction to resolve whether the M&P rifle is a "machinegun" and whether Smith & Wesson violated the NFA "would be consistent with, and not disruptive to, the 'congressionally approved balance of federal and state judicial responsibilities.'" *Arm or Ally*, 644 F. 3d at 82 (citing *Grable*, 545 U.S. at 314). Removal would not "displace state law or preclude state remedies; it leaves intact the states' legitimate" interests. *Sarauer*, 966 F.3d at 674-75. State courts, for example, would remain free to consider claims of actual consumers deceived into purchasing products by deceptive advertising that they actually saw. But because interpretation of the NFA will "rare[ly]" arise state court actions, federal jurisdiction here will have only a "microscopic effect on the federal-state division of labor."

35

*Grable*, 545 U.S. at 315.  Indeed, a *remand* would disrupt the appropriate balance by allowing a state court to resolve a federal question that implicates a substantial federal interest and potentially upend a federal regulatory scheme.  *Tantaros*, 12 F.4th at 146.  As in *Arm or Ally*, "there is a strong federal interest in the issues presented in this case – namely, the regulation of firearms generally and whether the products at issue qualify" under the federal definitions.  644 F. 3d at 82.[11]

### B.    The Court also has federal question jurisdiction under the artful pleading doctrine.

"Artful pleading on the part of the plaintiff to disguise federal claims by cleverly dressing them in the clothing of state-law theories will not succeed in keeping the case in state court."  *Franciscan Skemp Healthcare*, 538 F.3d at 596.  "[A] plaintiff may not defeat federal subject matter jurisdiction by 'artfully pleading' his complaint as if it arises under state law where the plaintiff's suit is, in essence, based on federal law."  *Arm or Ally*, 644 F. 3d at 76 (denying State of New York's motion to remand complaint against manufacturers and sellers of firearm frames) (citing *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 271 (2d Cir. 2005)).

The district court summarily rejected Smith & Wesson's removal under the "artful pleading" doctrine by improperly conflating it with a *Grable* analysis, holding that "this case does not present federal claims . . . or necessarily raise a federal issue." (A-52.) But this case plainly "present[s] federal claims," as explained above.  And the

---

[11] In the related area of abstention, federal courts have a "virtually unflagging" "obligation" not to defer to state courts if the federal court has jurisdiction.  *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013).

district court, in holding that the case does not "necessarily raise a federal issue," failed to consider whether the purported and implausible state law claims could be disregarded, leaving only the federal NFA issue. Federal courts not only *can* conduct such an analysis, they *must* evaluate the merits of claims when determining whether a plaintiff has attempted to artfully plead to affect federal jurisdiction. Courts routinely perform such analyses, for example, in the context of fraudulent joinder. *See Walton v. Bayer Corp.*, 643 F.3d 994, 999 (7th Cir. 2011). When a plaintiff attempts to plead a federal claim to establish jurisdiction over related state-law claims, the court must consider whether the federal claim is insubstantial, implausible, or foreclosed. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015). Where, as here, a defendant removes a case based on federal question jurisdiction, the same *Steel Co.* standard governs whether artfully pleaded state-law claims can be disregarded. *See Ill. Pub. Risk Fund v. Purdue Pharma L.P.*, 2019 WL 3080929, at *2 (N.D. Ill. July 15, 2019).[12]

The district court failed to conduct this analysis and, as a result, ignored extensive authority demonstrating that Appellees' state-law claims are foreclosed, implausible, and insubstantial under Illinois law. For example, causation is an

---

[12] *Purdue* considered only whether the claims were "wholly insubstantial or frivolous," citing *Shapiro*. The "insubstantial, implausible, or foreclosed" standard applied by the Supreme Court and Seventh Circuit is broader than the "wholly insubstantial or frivolous" standard applied in *Purdue*, as seen in *Steel Co.* (cited approvingly in *Shapiro*) and, *e.g.*, *Restoration Risk Retention Grp., Inc. v. Gutierrez*, 880 F.3d 339, 347 (7th Cir. 2018) (citing *Steel Co.* and similar Seventh Circuit precedent).

essential element of each claim, but the Illinois Supreme Court foreclosed causation against firearm manufacturers where "the claimed harm is the aggregate result of numerous unforeseeable intervening criminal acts by third parties not under defendants' control." *Young v. Bryco Arms*, 821 N.E.2d 1078, 1087-1092 (Ill. 2004); *City of Chi. v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127-1138 (Ill. 2004). Causation, of course, is a threshold element of every tort claim (*e.g.*, *Beretta*, 821 N.E.2d at 1127) as well as Appellees' statutory consumer fraud claims (*Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996)). Here, Appellees allege multiple intervening acts by other defendants (including Crimo's Father procuring the FOID card, the Gun Shop Defendants selling and transferring the firearm in alleged violation of the municipal code and, of course, Crimo's shooting). (SA-5, SA-58-59, SA-61-66 ¶¶16-17, 253-59, 261-64, 272-81, 286-99, 305-07; SA-73-75, SA-108, SA-116 ¶¶ 3, 7, 19-20, 150, 198.)[13]   The simple application of Appellees' own allegations to well-settled law readily shows that Appellees' claims are foreclosed and implausible.  The district court ignored this issue entirely.

Causation is not the only obvious fatal failure in Appellees' pleading.  The absence of duty also renders Appellees' claims implausible as a matter of law.  Negligence-based claims against firearms manufacturers are foreclosed under Illinois law because manufacturers such as Smith & Wesson "owe no duty . . . to prevent their

---

[13] On November 6, 2023, Crimo's father pled guilty to seven counts of misdemeanor reckless conduct, in connection with his support for his son's effort to secure an Illinois FOID card. Highland Park shooting: Father of accused gunman pleads guilty to misdemeanor reckless conduct charges in deal with prosecutors | CNN.

firearms from 'ending up in the hands of persons who use and possess them illegally.'" *Beretta*, 821 N.E.2d at 1124-1127; *Riordan v. Int'l Armament Corp.*, 477 N.E.2d 1293, 1296 (Ill. App. Ct. 1st Dist. 1985). The district court failed to consider this dispositive authority as well.[14]

Even beyond those threshold deficiencies, it is also axiomatic that unfair or deceptive advertising claims such as those pled in Counts I-III cannot be the proximate cause of damages unless it actually deceives the plaintiff. *Oliveiro v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002) (affirming dismissal of complaint for failure to allege plaintiff was deceived by defendant's advertisements). Yet Appellees do not allege that Crimo *even saw* any of the allegedly offending ads. The Complaints plead only that "on information and belief" Crimo likely was "exposed to", "enticed by", "influenced by", or "induced and encouraged by" certain ads. (SA-38, SA-41, SA-55 ¶¶ 130-31, 145, 237; SA-106-107 ¶¶ 135-138.) But they do not allege a single fact on which such a belief could be based. Nowhere does the complaint include necessary facts such as when or where the ads were distributed, let alone how Crimo would have ever seen them.[15] The district court failed to address whether it relied on such

---

[14] This would address Plaintiffs' claims of negligence (Count IV), negligent infliction of emotional distress (Counts X and XI) and the statutory consumer fraud act counts. *See Carl Sandburg Vill. Condo Ass'n No. 1 v. First Condo Dev. Co.*, 557 N.E.2d 246, 250 (Ill. App. Ct. 1st Dist. 1990) (recognizing that a Consumer Fraud Act violation may be based on an innocent or negligent misrepresentation as well as one that is intentional).

[15] An allegation based on "information and belief" is appropriate only when substantiating facts are uniquely in a defendant's possession. *See, e.g.*, *Boy Blue, Inc. v. Zomba Recording, LLC*, 2009 WL 2970794, at *2 (E.D. Va. Sept. 16, 2009)

speculation but, in any event, courts need only give credence to "facts" properly pled. *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014); *Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960, 969 (N.D. Ill. 2020). "The court is not required to credit rank speculation." *Id.* "Although *Iqbal* and *Twombly* do not prohibit pleading on information and belief, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Stericycle, Inc. v. Carney*, 2013 WL 3671288, at *6 (N.D. Ill. July 12, 2013) (cleaned up). Appellees' use of "information and belief" without a single factual allegation supporting such belief is inadequate. *See also De Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009) (rejecting a consumer fraud claim based on a "market theory" of causation where the plaintiff did not "receive, directly or indirectly," advertising from the defendant); *Bubalo v. Navegar, Inc.*, 1997 WL 337218, at *2, 8–9 (N.D. Ill. June 13, 1997) (rejecting similar claims where the shooter was not alleged to have seen the ads).[16]

---

(collecting cases and explaining that pleading "upon information and belief" is generally permissible only when the "information is in the opposing party's possession"). There is no plausible reason to believe evidence of the shooter's motivation is uniquely in Smith & Wesson's possession, or their possession at all.

[16] Further, as in *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 2022 WL 4597526 (D. Mass. Sept. 30, 2022), the alleged "violation by Smith & Wesson is that the firearm functions exactly as it is advertised to," which is not deceptive as a matter of law. *Id.* at *21; *Bubalo*, 1997 WL 337218, at *9. Here, for example, Plaintiffs contend that the advertisements misleadingly suggest the M&P rifle is used and endorsed by the military (Case No. 1:22-cv-6169, Dkt. 61 at 3; Case No. 1:22-cv-6359, Dkt. 26 at 17) but also insist it is a "weapon of war" designed for and used by the military. (SA-11-12, SA-14, SA-44, SA-54 ¶¶ 42, 43, 51, 161, 162, 229; SA76-79 ¶¶ 26-34.)

Underscoring all of these deficiencies is the constitutional right of Americans to own firearms which are in "common use," and "presumptively protected" by the Second Amendment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). Appellees' case is a backdoor attempt to do what only the legislative branch can attempt to do, subject to constitutional limitations: enact firearms bans specific to the classification or reclassification of particular firearms as NFA firearms.

This Court must cast aside Appellees' insubstantial, implausible, or foreclosed state-law claims. *Steel Co.*, 523 U.S. at 89; *Purdue Pharma*, 2019 WL 3080929, at *2. The district court sidestepped this issue by citing *Collins v. Pontikes,* 447 F. Supp. 23d 895, 902 (N.D. Ill. 2006), for the proposition that "Defendants cannot establish federal jurisdiction by reading out of the complaint independent state law grounds that support the claims." (A-35.) But the defendants in *Collins* court did not assert the artful pleading doctrine at all, and the district court was not called upon to consider (and therefore did not consider) whether the state law claims before it were insubstantial, implausible, or foreclosed. The district court *here,* however, was required to consider that issue as to the state claims before it, yet failed to do so.

When stripped of insubstantial, implausible, or foreclosed state-law claims, all that is left is a claim for strict liability conditioned on a finding that Smith & Wesson violated the NFA by selling an illegal "machinegun" (or, correspondingly, that the ATF misclassified the M&P rifle). That issue can and should be resolved in federal court. Any state court finding on that issue threatens to overturn the carefully crafted firearms classification scheme, potentially making felons of millions of law-

abiding Americans.  The artful pleading doctrine confers federal court jurisdiction under precisely these circumstances.

### C.    Removal also was proper because Appellees' claims are completely preempted by federal law.

The district court erred by remanding these actions to state court for another reason: the "complete preemption doctrine" provides an additional, distinct jurisdictional basis for removal of this action under 28 U.S.C. § 1331.  *See Burda v. M. Ecker Co.*, 954 F.2d 434, 441 n.8 (7th Cir. 1992).

"Under the complete-preemption doctrine, 'a plaintiff's state cause of action [can be recast] as a federal claim for relief making [its] removal [by the defendant] proper on the basis of federal question jurisdiction.'" *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151 (7th Cir. 2020) (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009)) (brackets in original).  "Although federal preemption is ordinarily a defense, 'once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state-law claim is considered, from its inception, a federal claim, and therefore arises under federal law.'" *Rivet v. Regions Bank of La.*, 522 U.S. 470, 476 (1998).  The complete preemption doctrine thus permits courts to "recharaterize[]" any state law claim "as arising under federal law where Congress has completely preempted a given area of state law so that removal of the claim is proper." *Burda*, 954 F.2d at 441 n.8; *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  It applies where, as here, "the federal law has effectively displaced any potential state-law claims," *Franciscan Skemp Healthcare*, 538 F.3d at 596, or where the federal statutory scheme "provide[s] the exclusive cause of action

42

for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003); *see Martin v. Petersen Health Operations, LLC*, 37 F.4th 1210, 1213 (7th Cir. 2022) (explaining that complete preemption is a "misleadingly named doctrine . . . because its focus is not on preemption (a defense to a state-law claim) but on federal occupation of a field").

The requirements for complete preemption are satisfied here. Examining Appellees' claims against Smith & Wesson reveals why. Those claims are predicated and rely upon Smith & Wesson's alleged violations of a federal statute—the NFA— which provides an exclusively federal regulatory regime for certain classes of firearms. Specifically, Appellees claim that:

A. The M&P semi-automatic rifle purchased by Crimo was actually an illegal "machinegun" under the NFA and federal regulations (SA-12-13 ¶¶ 45-46 (citing 26 U.S.C. § 5845(b); ATF Ruling 82-2; ATF Ruling 82-8), 52, 53, 239, 262);

B. Smith & Wesson deceptively and unfairly marketed the M&P firearm by failing to identify it as an "NFA weapon" (*i.e.*, a machine gun) (SA-45, SA-48, SA-52 ¶¶ 168, 189-191, 212, 214); and

C. Smith & Wesson "violated both the NFA and [GCA] by manufacturing, transferring, and selling these weapons without" satisfying various transfer, approval, tax, registration and other NFA requirements (SA-15, SA-45, SA-48, SA-52-53, SA-55-56 ¶¶ 52, 168, 174, 190-191, 212-224, 238-241)—requirements that apply only if M&P semi-automatic rifles are "machineguns" under the NFA as a matter of law (SA-12-13 ¶ 45 (citing 18 U.S.C. §§ 922(b)(4), (o)(1) (making it a crime to possess or transfer "machineguns" to any person who has not undergone the required registration and authorization process))).

Such claims are completely preempted by a combination of the NFA and the APA, 5 U.S.C. § 701, *et seq.* Taken together, those federal statutes—and the

43

regulatory regimes underlying them—provide the exclusive vehicle for litigating the appropriate classification of firearms under federal law (as Appellees seek to do in these actions). Collectively, the NFA (and regulations promulgated under it) and the APA have completely displaced state-law claims, such as those at issue here, that ask a state court to determine whether a firearm has been appropriately classified at the federal level under the NFA. That conclusion is particularly appropriate here, where Appellees' proposed classification conflicts with the federal government's longstanding interpretation of the NFA.

The federal regulatory regime governing NFA firearms and the judicial review provisions of the APA operate in tandem to completely preempt Appellees' claims, which seek to use state tort claims to obtain a state court declaration that all semi-automatic rifles are federally prohibited machine guns. State law does not reach that far, and state courts lack jurisdiction to resolve that uniquely federal issue. Congress and the ATF have created an exclusively federal framework through which persons can obtain a binding legal determination as to whether a particular firearm falls within the scope of the NFA. There is thus already an existing set of administrative and federal court mechanisms these Appellees can invoke to challenge ATF's longstanding regulatory treatment of the M&P rifles under the NFA. Specifically, Appellees can either challenge existing ATF determinations or, if they believe some additional determination is required, seek a new ATF determination (27 C.F.R. § 479.102(c); *ATF National Firearms Act Handbook* at 41, U.S. Dep't of Just. (Apr. 2009), https://www.atf.gov/firearms/national-firearms-act-handbook (last viewed

Nov. 10, 2023)) and then bring a federal action seeking judicial review of any adverse determination under the APA (5 U.S.C. § 702). These procedures are the only avenue through which a person can obtain and challenge a formal legal determination as to whether a firearm is a "machinegun" under the NFA.

The district court wrongly concluded that complete preemption does not apply because Congress did not intend to displace state law in these circumstances. But to the contrary, by promulgating these procedures, Congress has "clearly manifested an intent" to filter all such challenges to federal court and to entirely displace state law claims that seek a state-court declaration on the proper classification of firearms under the NFA. *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987). Thus, federal law provides the exclusive cause of action for the Appellees here to obtain the relief they are seeking: a declaration by a state court that the M&P rifle is a machine gun under the NFA.

Any contrary ruling would effectively and improperly side-step the statutory regime enacted by Congress to classify firearms in this regard and to regulate them at the federal level. That is because Appellees are effectively asking a state court to interpret federal law in a manner that would conflict with the federal government's interpretation and would completely upend the carefully crafted regulatory regime that Congress enacted and that the ATF has implemented through a complex web of federal regulatory requirements.[17] But state courts are not the appropriate forum to

---

[17] Examples of the vast array of federal firearms regulations applicable through the NFA and GCA are set forth *supra* at 8.

decide the manner in which firearms are regulated by federal law. A patchwork of state-law tort rules adopted in individual suits regarding the classification of federally regulated firearms—which is precisely what Appellees seek here—would be ineffective and unadministrable. If allowed to proceed in state court, these claims would operate as a trojan horse intended to vitiate the NFA and eviscerate the ATF's role in enforcing the NFA. Appellees should not be able to avoid federal review of these federal legal issues by painting federal claims with a state law brush. For these reasons, the NFA's regulatory regime, together with the APA's judicial review procedures, operate to completely preempt Appellees' claims here, which therefore "arise under" federal law for jurisdictional purposes. Because state law cannot exist in this area, federal law necessarily controls, and the case was properly removed.

The district court concluded that complete preemption does not apply because the NFA does not supply a private right of action. (A-51.) But Smith & Wesson presents a different argument: the regulations promulgated under the NFA (27 C.F.R. 479.102(c)) provides an *administrative* procedure through which the Appellees (or anyone else) may seek a determination as to whether a particular firearm should be classified as a machinegun, and the APA provides a *federal statutory* right of action through which a person dissatisfied with that determination may seek judicial review in federal court. So, there is in fact an exclusively federal right of action through which Appellees can obtain the exclusively federal relief on the issue of federal law raised in their complaint. The fact that the NFA—viewed in isolation— is not privately enforceable is of no moment here.

Nor does it matter that Appellees have deliberately chosen not to pursue this available pathway to obtain the relief they are seeking or that Appellees cannot seek monetary damages in an APA action. It is immaterial that the APA does not provide for compensatory damages because the inquiry in a complete preemption analysis is not the scope of relief available, but the "nature of the claim." *Rosciszewki v. Arete Assocs., Inc.*, 1 F.3d 225, 230 (4th Cir. 1993); *Prince v. Sears Holding Corp.*, 848 F.3d 173, 178 (4th Cir. 2017). The nature of the claim is for a declaration that the M&P rifle is a "machinegun." In any event, the Supreme Court has stated that its precedents "squarely contradict[]" the view that complete preemption cannot occur unless federal law provides a remedy. *Caterpillar*, 482 U.S. at 391 n.4. "The breadth or narrowness of the relief which may be granted under federal law . . . is a distinct question from whether the court has jurisdiction over the parties and the subject matter." *Id.*; *see Lippitt*, 340 F.3d at 1046 ("We have found no case holding that the want of a federal remedy creates an automatic right to a remand of a removed claim to state court.").

This case was accordingly removed properly under the complete preemption doctrine. The district court's contrary conclusion was error.

### D.     Consent of the co-defendants is not required.

The district court, erroneously concluding that there are no federal claims, did not resolve Appellees' assertion that Smith & Wesson's removal was defective for failing to secure the consent of all defendants. Smith & Wesson addresses this issue here in an abundance of caution. First, because the case was not "solely removed

under section 1441(a)," but also under Section 1442,[18] the consent requirement of Section 1446(b)(2)(A) was not triggered. *Bureau v. BASF Corp.*, 2022 WL 807372, at *11-12 (M.D. La. Jan. 3, 2022) (citing *BP P.L.C.*, 141 S. Ct. at 1538).

Second, Section 1441(c) only requires federal-claim defendants to consent. Consent is not required from defendants in state claims over which the court lacks supplemental jurisdiction.[19]     Supplemental jurisdiction is lacking where the "operative facts" differ, even if the claims have "some things in common." *Prolite Bldg. Supply, LLC v. MW Mfrs., Inc.*, 891 F.3d 256, 258-59 (7th Cir. 2018).  The Court lacks supplemental jurisdiction here because the alleged unlawful acts by Crimo and the other defendants are completely distinct from the claims against Smith & Wesson, which are purportedly based solely on marketing, including marketing the M&P rifle without identifying it as a purported NFA weapon.  If Smith & Wesson were not a party, the claims against the other defendants would be "unaffected." *Gen. Auto Serv. Station v. City of Chi.*, 2004 WL 442636, at *12 (N.D. Ill. Mar. 9, 2004); *Wagner v. Bank of Am., N.A.*, 2012 WL 6586347, at *2-3 (S.D. Ill. Dec. 17, 2012).[20]

---

[18] Consent is not required under § 1442. *O'Callaghan v. U.S.*, 686 F. Supp. 2d 826, 828 (N.D. Ill. 2010).

[19] The Court also must sever and remand the claims against the other defendants. 28 U.S.C. § 1441(c)(2).

[20] Separately, defendant Robert Crimo, Jr. has filed for bankruptcy protection. (Case No. 1:22-cv-6169, Dkt. 72-2.)

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court reverse and vacate the district court's order remanding these actions to state court.

Dated: December 7, 2023                    DLA PIPER LLP (US)


                                           By:    */s/ Kenneth L. Schmetterer*


Andrew Lothson                             Edward S. Scheideman
**Swanson, Martin & Bell, LLP**            500 Eighth Street NW
330 North Wabash Street, Suite 3300        Washington, DC 20004
Chicago, Illinois 60611                    (202) 799-4534
(312) 923-8274                             edward.scheideman@us.dlapiper.com
alothson@smbtrials.com
                                           Kenneth L. Schmetterer
                                           444 West Lake Street, Suite 900
                                           Chicago, Illinois 60606
                                           (312) 368-2176
                                           kenneth.schmetterer@us.dlapiper.com


*Attorneys for Smith & Wesson Brands,*
*Inc. (f/k/a American Outdoor Brands*
*Corporation), Smith & Wesson Sales*
*Company, and Smith & Wesson, Inc.*

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g) AND CR 32(c)

The undersigned, counsel of record for the Defendants-Appellants furnishes the following in compliance with Fed. R. App. P. 32 and Cir. R. 32:

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32 and Cir. R. 32 for a brief produced with a proportionally spaced font. The length of this brief is 13,449 words.


Dated: December 7, 2023

DLA PIPER LLP (US)


By:   */s/ Kenneth L. Schmetterer*

Kenneth L. Schmetterer

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2023, the Brief of Defendants-Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 7, 2023

DLA PIPER LLP (US)

By:    */s/ Kenneth L. Schmetterer*

Kenneth L. Schmetterer

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

Dated: December 7, 2023

DLA PIPER LLP (US)

By: _  /s/ Kenneth L. Schmetterer_

Kenneth L. Schmetterer

No. 23-02992, consolidated with Nos. 23-02993, 23-02994, 23-02995, 23-02996,
23-02997, 23-02998, 23-02999, 23-3000, 23-3001, 23-3002, and 23-3003

In the United States Court of Appeals
for the Seventh Circuit

KEELY ROBERTS, and JASON ROBERTS, individually and as parent and next
friend of C.R. and L.R.,

*Plaintiffs-Appellees,*

*v.*

SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, and
SMITH & WESSON, INC.,

*Defendants-Appellants,*

*and*

BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and
ROBERT CRIMO III,

*Non-Appellant Defendants.*

On Appeal from the United States District Court
for the Northern District of Illinois
Nos. 1:22-cv-06169, 1:22-cv-06171, 1:22-cv-06178, 1:22-cv-06183, 1:22-cv-06185,
1:22-cv-06190, 1:22-cv-06193, 1:22-cv-06359, 1:22-cv-06181, 1:22-cv-06191, 1:22-cv-
06361, 1:22-cv-06186
The Honorable Judge Steven Charles Seeger

## DEFENDANTS-APPELLANTS' APPENDIX TO OPENING BRIEF

*Continued on next page*

*Continued from prior page*

Andrew Lothson
**Swanson, Martin & Bell, LLP**
330 North Wabash Street, Suite 3300
Chicago, Illinois 60611
(312) 923-8274
alothson@smbtrials.com



December 7, 2023

Edward S. Scheideman
**DLA Piper LLP (US)**
500 Eighth Street NW
Washington, DC 20004
(202) 799-4534
edward.scheideman@us.dlapiper.com

Kenneth L. Schmetterer
**DLA Piper LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606
(312) 368-2176
kenneth.schmetterer@us.dlapiper.com

*Attorneys for Smith & Wesson*
*Brands, Inc. (f/k/a American Outdoor*
*Brands Corporation), Smith & Wesson*
*Sales Company, and Smith & Wesson,*
*Inc.*

Table of Contents for Appendix

| Case and Docket No. | Date of Entry or Filing | Description | Appendix Number |
|---|---|---|---|
| 22-cv-6359, Dkt. 31 | 09/25/2023 | Order on Motion for Remand | A-1-A-55 |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Lead Case No. 22-cv-6169 |
| v. | ) ) | Hon. Steven C. Seeger |
| SMITH & WESSON BRANDS, INC., *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) | |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) ) ) ) ) ) | Consolidated cases: 22-cv-6186; 22-cv-6361; 22-cv-6193; 22-cv-6191; 22-cv-6171; 22-cv-6181; 22-cv-6183; 22-cv-6190; 22-cv-6185; 22-cv-6178; and 22-cv-6359 |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Shots rang out at a Fourth of July parade in Highland Park, Illinois in 2022. Out of nowhere, in the blink of an eye, a celebration of the birth of freedom turned into a complete nightmare. When it was all said and done, scores of patriotic Americans were killed or injured, leaving wounds that will never fully heal.

Keely and Jason Roberts, and their two minor children C.R. and L.R., attended the parade. The family suffered life-changing injuries. Keely and C.R. were shot, and L.R. was hit by shrapnel.

**A-1**

The Roberts family later filed suit in state court against a collection of defendants, including three Smith & Wesson companies. They also sued two gun dealers involved in the sale of the firearm to the alleged shooter, Robert Crimo III. Plaintiffs brought claims against Crimo III and his father, Robert Crimo, Jr., too.

The Roberts family was not alone, at the parade or in the courthouse. A dozen families filed separate lawsuits against the defendants in state court. Smith & Wesson, in turn, removed all twelve cases to federal court. Smith & Wesson offered four different grounds for pulling this case from state court to federal court.

The Roberts family and the rest of the plaintiffs moved to remand. For the reasons stated below, the motions to remand are hereby granted.

## Background

When deciding a motion to remand, the Court accepts as true the complaint's allegations at the time of removal. *See Curry v. Boeing Co.*, 542 F. Supp. 3d 804, 808 (N.D. Ill. 2021) ("The court assumes the truth of the operative complaint's allegations at the time of removal . . . ."); *Elftmann v. Village of Tinley Park*, 191 F. Supp. 3d 874, 878 (N.D. Ill. 2016) ("In considering a motion for remand, the court must examine the plaintiffs' complaint at the time of the defendant's removal and assume the truth of all factual allegations contained within the original complaint.") (quoting *Scouten v. MNL-FTS, LLC*, 708 F. Supp. 2d 729, 731 (N.D. Ill. 2010)).

The Court also may consider facts stated in the notice of removal. *See Curry*, 542 F. Supp. 3d at 808; 14C Charles Alan Wright *et al.*, Federal Practice and Procedure Jurisdiction § 3739 (4th ed. 2023) ("Whether an action should be remanded to state court must be resolved by the district court with reference to the complaint, the notice of removal, and the state-court record at the time the notice of removal was filed."). But the complaint's "[j]urisdictional

**A-2**

allegations control unless it is legally impossible for them to be true." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) (alteration in original) (quoting *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 815 (7th Cir. 2015)).

This case is about a mass shooting at a Fourth of July parade in the heart of the country. For a few years, the COVID-19 pandemic dampened festivities, and prevented communities from getting together for a full-throated celebration of Independence Day. But in 2022, Highland Park finally returned to normal, or so it seemed. Hundreds of families attended the parade. *See* Cplt., at ¶ 1 (Dckt. No. 1-2).

Crimo III was there, too. He arrived on his bicycle around 8:30 a.m., before the parade started. *Id.* at ¶ 142. He didn't bring flags or banners, or patriotic spirit. He brought a Smith & Wesson Military and Police ("M&P") 15 semi-automatic rifle. *Id.* at ¶¶ 3, 24, 144. And three 30-round magazines. *Id.* at ¶ 141. His gun was loaded, and Crimo III was full of bad intentions.

Crimo III perched himself on the rooftop of a cosmetics store on the parade route, with his lethal weapon in hand. *Id.* at ¶ 143. And from there, when the celebration began, he unloaded his M&P15 rifle on the crowd below. *Id.* at ¶ 144.

The bullets started flying at 10:14 a.m. *Id.* Dozens of projectiles flew through the air and tore through the community. The shooter "fired a total of 83 shots indiscriminately at the hundreds of people gathered to watch and participate in the Highland Park Fourth of July Parade." *Id.* at ¶ 144. The 83 shots were fired in a matter of seconds. *Id.* at ¶ 3.

Seven people died. Dozens were injured. *Id.*

The devastation reached the Roberts family. Keely and Jason Roberts live in Highland Park with their twin boys, C.R. and L.R. *Id.* at ¶ 19. The family arrived early at the parade,

eager to celebrate and hopeful for good seats.  *Id.* at ¶ 148.  They found prime seats right in front of the pancake house.  *Id.*

All of a sudden, they heard popping sounds.  *Id.* at ¶ 149.  At first, Jason Roberts thought that it was fireworks.  And then, bullets hit the family.  *Id.*

Two members of the family suffered gunshot wounds.  *Id.* at ¶¶ 2, 5.  Keely was hit by a bullet that "punctured her forefoot tearing through it and exiting through her heel."  *Id.* at ¶ 2. She received treatment at two different hospitals for her injuries.  *Id.* at ¶ 19.

Another bullet hit C.R.  *Id.* at ¶ 5.  C.R. laid on the sidewalk, "lifeless and unable to move."  *Id.* at ¶ 4.  "His skin was white, his lips were blue.  He was unconscious."  *Id.* at ¶ 152. He needed hospitalization for 73 days "for comprehensive treatment for the catastrophic injuries he sustained."  *Id.* at ¶ 19.  His life was saved, but was forever changed.  C.R. "will never walk again."  *Id.* at ¶ 5.

The other boy, L.R., suffered injuries, too.  He was hit with shrapnel and treated at a local hospital.  *Id.* at ¶ 19.

"Collectively, the entire Roberts family has suffered, and continues to suffer, severe emotional distress stemming from the attack on their family."  *Id.*  The family has "trouble participating in public, crowded events due to the fear of another massacre."  *Id.* at ¶ 157.

The complaints in each of the consolidated cases tell similar stories of personal destruction.  So many suffered so much at that Fourth of July parade, and for so long after.

The police soon arrested Robert Crimo III.  *Id.* at ¶ 28.  He was charged with 21 counts of first-degree murder, 48 counts of attempted murder, and 48 counts of aggravated battery.  *Id.* The criminal case remains pending in state court.

Keely and Jason Roberts later filed suit on behalf of themselves and their children in the Circuit Court of Lake County. The complaint includes eleven claims against seven defendants. All of the claims involve state law. There are no federal claims.

The defendants include three Smith & Wesson entities: Smith & Wesson Brands, Inc., Smith & Wesson Co., and Smith & Wesson, Inc. (collectively, "Smith & Wesson"). Smith & Wesson is the manufacturer of the M&P15 semi-automatic rifle. *Id.* at ¶¶ 20–22; *id.* at ¶ 24 ("One or more of the Smith & Wesson defendants manufactured, designed, marketed and sold the Smith & Wesson M&P15 semiautomatic rifle that was used in the shooting.").

The Roberts family also sued two gun dealers: Bud's Gun Shop and Red Dot Arms. *Id.* at ¶¶ 25–27. Bud's Gun Shop has a "large online retail presence," with physical locations in Kentucky and Tennessee. *Id.* at ¶ 25. The complaint alleges that "Bud's Gun Shop sold the Shooter the Smith & Wesson M&P15 semiautomatic rifle that he used in the shooting." *Id.* at ¶ 26. Red Dot Arms is a gun retailer in Lake County. *Id.* at ¶ 27. Red Dot Arms "transferred to the Shooter the Smith & Wesson M&P15 semiautomatic rifle." *Id.*

The Roberts family also named the alleged shooter, Robert Crimo III, and his father, Robert Crimo, Jr. *Id.* at ¶¶ 28–31. The complaint alleges that Crimo III purchased the Smith & Wesson rifle online from Bud's Gun Shop and picked up the gun from Red Dot Arms. *Id.* at ¶ 29.

Crimo III used a Illinois Firearm Owners Identification card – a so-called "FOID card" – to purchase the weapon. *Id.* at ¶ 127. Illinois residents must have a FOID card to legally possess firearms or ammunition. A person can get a FOID card by submitting an application to the Illinois State Police. Crimo III applied for a FOID card in December 2019. *Id.* at ¶ 123.

**A-5**

Crimo Jr. sponsored his son's application for a FOID card, and assumed liability for any ensuing damages. The father attested that he "understands he shall be liable for any damages resulting from the minor applicant's use of firearm or firearm ammunition." *Id.* at ¶ 31 (cleaned up); *see also id.* at ¶¶ 30, 124.

The first four claims are against Smith & Wesson (only). Counts I and II allege violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). *Id.* at ¶¶ 158–201. Count III is a claim under the Illinois Uniform Deceptive Trade Practices Act. *Id.* at ¶¶ 202–24. Count IV is a negligence claim. *Id.* at ¶¶ 225–45.

The next two claims involve the two gun dealers, Bud's Gun Shop and Red Dot Arms. Count V is a negligence claim, and Count VI is an aiding and abetting claim. *Id.* at ¶¶ 246–84.

The next three claims are against Crimo III and his father, Crimo Jr. Count VII is a negligence claim against the father, Crimo Jr. *Id.* at ¶¶ 285–303. Counts VIII and IX are assault and battery claims against the alleged shooter, Crimo III. *Id.* at ¶¶ 304–18.

The final two claims are against all Defendants. Counts X and XI allege intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* at ¶¶ 319–36. Keely Roberts brings those claims on behalf of herself and her family.

Smith & Wesson responded by timely removing the case to federal court, and removed the other cases, too. *See* Notice of Removal (Dckt. No. 1). Smith & Wesson served the notice of removal and attached consents from the two gun dealers. *Id.* at ¶ 9; *see also* Consents to Removal (Dckt. No. 1-1). Crimo III and Crimo Jr. did not join in, or consent to, removal.

Smith & Wesson addressed the lack of consent in the notice of removal. Smith & Wesson argued that the removal statute does not require consent when a case involves a federal officer. *Id.* at ¶ 6. In the alternative, Smith & Wesson asserted that the claims against them arise

**A-6**

under federal law, which means that the Court can simply sever the claims against the

non-consenting defendants under 28 U.S.C. § 1441(c)(2). *Id.* at ¶ 9.

This Court later granted a motion to reassign all of the related cases to this Court's

docket. *See* 12/15/22 Order (Dckt. No. 30). The complaints are not quite identical, but there is

substantial overlap.[1]

Plaintiffs in each case filed motions to remand. This Court consolidated the twelve cases

"for the purpose of resolving the motions to remand." *See* 1/4/23 Order (Dckt. No. 39).

The motions to remand are now before the Court.

At this point, the question is not about the merits of the case. The question is whether

this case can stay in federal court at all. That is, the question is whether this Court has subject

matter jurisdiction. If not, the case must go back to state court.

---

[1] Plaintiffs in five of the eleven other consolidated cases brought the same eleven counts against the same seven Defendants. *See Tenorio v. Smith & Wesson Brands, Inc.*, No. 22-cv-6186 (Dckt. No. 1-2); *Zeifert v. Smith & Wesson Brands, Inc.*, No. 22-cv-6193 (Dckt. No. 1-2); *Bennett v. Smith & Wesson Brands, Inc.*, No. 22-cv-6171 (Dckt. No. 1-2); *Vergara v. Smith & Wesson Brands, Inc.*, No. 22-cv-6190 (Dckt. No. 1-2); *Rodriguez v. Smith & Wesson Brands, Inc.*, No. 22-cv-6185 (Dckt. No. 1-2). Plaintiffs in one of the eleven other consolidated cases brought nine counts against the same seven Defendants. *See Sedano v. Smith & Wesson Brands, Inc.*, No. 22-cv-6183 (Dckt. No. 1-2). That complaint does not bring an assault claim against Crimo III, or a second count based on intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* at ¶¶ 295–310. Plaintiffs in two of the eleven consolidated cases brought seven counts against only one of the Smith & Wesson Defendants (Smith & Wesson Brands, Inc.) and the other four Defendants. *See Chupack v. Smith & Wesson Brands, Inc.*, No. 22-cv-6361 (Dckt. No. 1-2); *Turnipseed v. Smith & Wesson Brands, Inc.*, No. 22-cv-6359 (Dckt. No. 1-2). The complaints in those cases combine the counts based on the ICFA, and combine the battery and assault counts against Crimo III. *See Chupack*, No. 22-cv-6361 (Dckt. No. 1-2, at ¶¶ 159–231); *Turnipseed*, No. 22-cv-6359 (Dckt. No. 1-2, at ¶¶ 158–230). They do not assert a claim under the Illinois Uniform Deceptive Trade Practices Act, and do not assert an aiding and abetting claim against the two gun dealers. *Id.* They also do not bring intentional infliction of emotional distress and negligent infliction of emotional distress claims against all Defendants. *See Chupack*, No. 22-cv-6361 (Dckt. No. 1-2, at ¶¶ 214–24); *Turnipseed*, No. 22-cv-6359 (Dckt. No. 1-2, at ¶¶ 213–23). Plaintiffs in three of the eleven other consolidated cases brought additional counts against the seven Defendants. *See Toledo v. Smith & Wesson Brands, Inc.*, No. 22-cv-6191 (Dckt. No. 1-2) (eighteen counts); *Straus ex rel. Straus v. Smith & Wesson Brands, Inc.*, No. 22-cv-6181 (Dckt. No. 1-2) (fifteen counts); *Sundheim ex rel. Sundheim v. Smith & Wesson Brands, Inc.*, No. 22-cv-6178 (Dckt. No. 1-2) (fifteen counts). The additional counts are survival and wrongful death claims brought by estate administrators on behalf of deceased individuals.

**Legal Standard**

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *United States v. Wahi*, 850 F.3d 296, 299 (7th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

"When a plaintiff files suit in state court but could have invoked the original jurisdiction of the federal courts, the defendant may remove the action to federal court."  *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009) (citing the removal statute, 28 U.S.C. § 1441(a)); *see also Velsicol Chem. LLC v. Magnetek, Inc.*, 2017 WL 2311245, at *2 (N.D. Ill. 2017).  The party seeking removal has the burden to demonstrate subject matter jurisdiction.  *See Schur*, 577 F.3d at 758.

"[F]ederal courts should interpret the removal statute narrowly, resolving any doubt in favor of the plaintiff's choice of forum in state court."  *Id.*  Under "long-established precedent . . . the removal statutes are to be strictly construed to preserve the limited jurisdiction of federal courts."  *Morris v. Nuzzo*, 718 F.3d 660, 670 (7th Cir. 2013); *see also Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002).

The reason for the judicial reluctance involves a mix of federalism and the longstanding tradition of federal courts exercising limited power.  Removal, after all, involves taking a case out of the hands of one sovereign and placing it in the hands of another.  *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 18 (2003) (Scalia, J., dissenting) (noting "our long tradition of respect for the autonomy and authority of state courts"); *see also Healy v. Ratta*, 292 U.S. 263, 270 (1934) ("Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the

**A-8**

precise limits which the statute has defined."); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941) (noting that the policy underlying the removal statute "is one calling for the strict construction of such legislation").

A federal court must remand a case back to state court if it lacks jurisdiction. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). A case can't stay here if it doesn't belong here.

### Analysis

Smith & Wesson relied on four jurisdictional bases when it removed each of the consolidated cases to federal court. The first basis involves the federal officer removal statute, 28 U.S.C. § 1442. The second basis is federal question jurisdiction under 28 U.S.C. § 1331 based on an embedded federal question under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). The third basis is federal preemption. The fourth basis is the artful pleading doctrine.

The Court will address each proffered justification for removal, one by one. And then, the Court will close the loop on one final point: whether removal was defective because Smith & Wesson did not obtain the consent of all Defendants.

### I.     Federal Officer Removal

The first question is whether Smith & Wesson can remove the case to federal court based on a statute about federal officers.

Congress gave special latitude to federal officers to remove cases to federal court. The federal officer removal statute permits removal to federal court by "[t]he United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of

any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." *See* 28 U.S.C. § 1442(a)(1) (emphasis added). As the text reveals, the statute covers federal officers, as well as anyone "acting under that officer." *Id.*

Ordinarily, courts interpret the removal statutes narrowly. *See Schur*, 577 F.3d at 758. But the interpretive winds blow in the other direction when it comes to the federal officer removal statute. Courts construe the federal officer removal statute liberally, not strictly. *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) ("The presumption against removal in ordinary diversity jurisdiction cases does not extend to the federal officer removal statute."); *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 526–27 (7th Cir. 2018).

The presumption against removal "does not extend to cases in which there is a contrary congressional policy favoring removal." *Hammer*, 905 F.3d at 526. And the "Supreme Court has repeatedly found such a policy" when it comes to removal by federal officers. *Id.* at 527. "The federal officer removal statute is not 'narrow' or 'limited,'" *Willingham v. Morgan*, 395 U.S. 402, 407 (1969), and the statute must be "liberally construed," *Watson*, 551 U.S. at 147. Congress paved the way for easy removal by federal officers, and courts are leery of blocking the road.

To state the obvious, Smith & Wesson is not the United States, a United States agency, or an officer of the United States or any of its agencies. So, to fall within the federal officer removal statute, it must fit within the "acting under" language. *See* 28 U.S.C. § 1442(a)(1). That is, Smith & Wesson may remove the case if it "was 'acting under' any 'agency' or 'officer' of 'the United States'" when "carrying out the 'act[s]' that are the subject of the [plaintiff's]

10

**A-10**

complaint." *Watson*, 551 U.S. at 147 (first alteration in original) (quoting 28 U.S.C.
§ 1442(a)(1)).

The Seventh Circuit has developed a four-part test to determine if a defendant may
invoke the statute's "acting under" provision. "Federal officer removal is proper when the
defendant (1) is a person within the meaning of the statute, (2) is acting under the United States,
its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable
federal defense." *Betzner*, 910 F.3d at 1015; *see also Baker v. Atl. Richfield Co.*, 962 F.3d 937,
941 (7th Cir. 2020).

Step one is a short walk. The Seventh Circuit has held that companies and corporations
are persons under the statute. *See Baker*, 962 F.3d at 941 (citing *Ruppel v. CBS Corp.*, 701 F.3d
1176, 1181 (7th Cir. 2012)). The statute is not limited to natural persons.

At step two, the Court must look to the relationship between the defendant seeking to
remove the case (on the one hand) and the United States, its agencies, or its officers (on the
other). Not just any relationship will do. "The relevant relationship is that of a private person
'*acting under*' a federal 'officer' or 'agency.'" *Watson*, 551 U.S. at 151 (emphasis in original)
(quoting 28 U.S.C. § 1442(a)(1)). "Typically, '[t]hat relationship . . . involves subjection,
guidance, or control. In addition, precedent and statutory purpose make clear that the private
person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of
the federal superior.'" *Baker*, 962 F.3d at 942 (emphasis and alterations in original) (quoting
*Watson*, 551 U.S. at 151–52).

To fall within the federal officer removal statute, the private person must help or assist a
federal officer in carrying out his duties. But "the help or assistance necessary to bring a private

person within the scope of the statute does *not* include simply *complying* with the law." *Watson*, 551 U.S. at 152 (emphasis in original).

The Supreme Court gave some everyday examples in *Watson*. Imagine "[t]axpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking," and "for that matter well-behaved federal prisoners." *Id.* In some sense all of these people "'help' or 'assist' federal law enforcement authorities." *Id.*

The Internal Revenue Service depends on voluntary compliance. Airline passengers who refrain from smoking reduce the need for federal enforcement of the nonsmoking regulation. And well-behaved federal prisoners may reduce the need for law-enforcement action by the Bureau of Prisons.

But none of them can rely on the federal officer removal statute as a basis for federal jurisdiction. "One would usually describe the behavior of the taxpayers, airline passengers, and prisoners we have described as *compliance* with the law (or *acquiescence* to an order), not as 'acting under' a federal official who is giving an order or enforcing the law." *Id.* (emphasis in original).

Ordinary people who comply with federal statutes and regulations are not "acting under" an officer of the United States. Otherwise, just about everyone acts under federal officers. The argument would prove too much.

The same is true of business entities in complex industries. "[A] highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if

the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 153.

Regulation alone does not establish jurisdiction under the statute. It is not enough to invoke "an extensive regime of regulations and directives." *DeAngelo v. Artis Senior Living of Elmhurst, LLC*, 2022 WL 3357276, at *5 (N.D. Ill. 2022). Despite complying with extensive regulation, a removing defendant will "nonetheless remain[] [a] private service provider[]" unless it can demonstrate that it "was helping to carry out the duties of a federal superior." *Id.*

After all, "regulation is ubiquitous, and much regulation can be called complex; if following federal rules allowed litigation in federal court, then all food and drug suits, and many others too, would be removable." *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 809 (7th Cir. 2015). Permitting regulatory compliance to act as the hook for removal under section 1442(a) "would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Watson*, 551 U.S. at 153.

Instead, the removing defendant must "provide aid in law enforcement, such as a local police officer who accompanies a federal agent on a drug raid and acts under the federal agent's direction." *Lu Junhong*, 792 F.3d at 809. Acting under a federal official also "includes situations 'where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete.'" *Betzner*, 910 F.3d at 1015 (quoting *Ruppel*, 701 F.3d at 1181).

"Government contractors are a classic example." *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 405 (3d Cir. 2021). When "a private contractor helps 'the Government to produce an item that it needs, the assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'"

13

**A-13**

*Baker*, 962 F.3d at 942 (quoting *Watson*, 551 U.S. at 153).  And even then, a government contractor acts under a federal official only "when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153.  The private party must "work[] hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Ruppel*, 701 F.3d at 1181.

"On the other hand, 'merely being subject to federal regulations or performing some functions that the government agency controls is not enough to transform a private entity into a federal officer.'" *Betzner*, 910 F.3d at 1015 (quoting *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016)).  Even a company subject to "intense regulation" does not act under a federal official unless the company also "helps [government] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153.

It also is not enough to "certif[y] compliance" with regulations "and in the process reduce[] the size of the federal bureaucracy." *Lu Junhong*, 792 F.3d at 809.  "The list of people who have to certify things is exceedingly long. . . . We doubt that the Justices would see a dispositive difference between certified compliance and ordinary compliance." *Id.* at 810.

So, section 1442(a) does not "cover the activities of regulated businesses," standing alone. *Id.* at 809.  The federal officer removal statute does not blow a gaping hole through the guardrails limiting the jurisdiction of the federal courts, even if the removal statute is interpreted liberally.  To fall within the statute, the regulated business must help or assist an officer of the United States in performing official duties.

Smith & Wesson argues that it is entitled to remove this case because it acted under the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), a federal agency.  It contends

14

**A-14**

that it satisfies the federal officer removal statute's "acting under" provision because of "the unique, symbiotic manufacturer-ATF partnership created by the federal firearms laws." *See* Defs.' Resp., at 4 (Dckt. No. 48).

According to Smith & Wesson, "[c]ertain government functions are designated to manufacturers (e.g., tracing crime guns, collecting certain taxes, and maintaining registration and transfer records), while others are performed by the ATF." *Id.* These duties – "taxation, registration, and identification" – "were mandatory, performed on behalf of the ATF, and would have been performed by the ATF had they not been delegated." *Id.*

From the get-go, Smith & Wesson's argument runs into trouble. Smith & Wesson points to three federal firearms *regulations* to argue that it acted under a federal officer. All three requirements involve the collection of firearm records. The fact that Smith & Wesson must comply with federal regulations does not mean that Smith & Wesson is "acting under" a federal "officer" or "agency." *See* 28 U.S.C. § 1442(a)(1).

The three federal regulations at issue require a licensed firearms manufacturer to keep certain records. Federal law requires "[e]ach licensed importer, licensed manufacturer, and licensed dealer" to "maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." *See* 18 U.S.C. § 923(g)(1)(A). The federal government may review these records only under certain circumstances. *Id.* § 923(g)(1)(A), (g)(1)(B).

The first regulation involves maintaining records related to firearm *registration*. *See* Defs.' Resp., at 4 (Dckt. No. 48). A federal regulation provides that "each licensed manufacturer shall record the name of the manufacturer and importer (if any), type, model, caliber or gauge,

and serial number (including any associated license number either as a prefix, or if remanufactured or imported, separated by a semicolon) of each firearm manufactured or otherwise acquired (including a frame or receiver to be disposed of separately), the date of such manufacture or other acquisition, and if otherwise acquired, the name and address or the name and license number of the person from whom it was received." *See* 27 C.F.R. § 478.123(a).

The regulation also dictates how a manufacturer must store the information. *Id.* It must keep separate records for "each firearm disposed of by a manufacturer" and "armor piercing ammunition dispositions to governmental entities." *Id.* § 478.123(b).

The second regulation involves maintaining records related to firearm *transactions*. *See* Defs.' Resp., at 4 (Dckt. No. 48). A "licensed manufacturer . . . shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record." *See* 27 C.F.R. § 478.124(a). Licensed manufacturers must retain these records. *Id.* § 478.124(b). They also must keep records for the "over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located." *Id.* § 478.124(c)(1).

The third regulation involves maintaining records related to firearm *receipt and disposition*. *See* Defs.' Resp., at 4 (Dckt. No. 48). Federal regulations require licensed firearms dealers to "enter into a record each receipt and disposition of firearms." *See* 27 C.F.R. § 478.125(e). Once again, the regulation specifies the required format. *Id.* And special records apply to armor-piercing ammunition sales. *Id.* § 478.125(a)–(d).

Smith & Wesson argues that complying with these regulations was "mandatory" and "performed on behalf of the ATF." *See* Defs.' Resp., at 4 (Dckt. No. 48). It argues that complying with these regulations "advance[d] distinctly federal objections" including "giv[ing]

force and effect to the ATF's determinations about which weapons qualify" as machineguns under federal law. *Id.* at 5.

The argument goes nowhere. All regulations are mandatory. Regulatory compliance is not the same thing as aiding or helping a federal officer carry out his official duties.

"*Compelling an industry to engage in a particular act is regulation*. It is not delegation or direction of the sort that would compel a conclusion that the defendants were 'acting under' a federal officer so as to justify removal." *See* 16 James W. Moore *et al.*, Moore's Federal Practice § 107.100(4)(b)(iii) (3d ed. 2022) (emphasis added).

This case fits squarely within the Supreme Court's decision in *Watson*. There, plaintiffs "filed a civil lawsuit in Arkansas state court claiming that the Philip Morris Companies, the [defendants], violated state laws prohibiting unfair and deceptive business practices" when manufacturing cigarettes. *Watson*, 551 U.S. at 146. Plaintiffs contended that Philip Morris "had cleverly manipulated the testing of its products to show low levels of tar and nicotine." *Lu Junhong*, 792 F.3d at 809 (describing *Watson*).

Philip Morris removed the case to federal court, invoking section 1442(a). *See Watson*, 551 U.S. at 146. It contended that it was acting under a federal official because "it had tested [its products] exactly as federal officials required and that any deviation from those protocols was forbidden." *Junhong*, 792 F.3d at 809.

The Supreme Court disagreed. "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 551 U.S. at 153.

*Watson* snuffs out any possibility that Smith & Wesson acted as a federal officer. The gun industry, like the cigarette industry, is heavily regulated. Like Philip Morris, Smith & Wesson argues that it can remove state-law tort claims to federal court because it had to comply with regulations. But regulatory compliance alone won't cut it. If federal regulations about cigarettes don't create a basis for the federal officer removal statute, then federal regulations about firearms don't create a basis, either.

It is hard to see a limiting principle, too. The federal government has a vast reach into the economy, and into untold corners of daily life. If compliance with a federal regulation were enough to fall within the removal statute, the flood of cases flowing from state to federal court would reach biblical proportions. *Id.* ("A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries.").

The Seventh Circuit has demonstrated what it means to act under a federal officer. For example, in *Baker*, the Seventh Circuit held that industrial manufacturing companies acted under federal officials when they "provided the federal government with materials that it needed to stay in the fight at home and abroad – namely, lead, zinc oxide, and white lead carbonate, used in turn to manufacture products like rubber, paint, ammunition, die casts, and galvanized steel." *See Baker*, 962 F.3d at 942.

One of the companies was a government contractor "under contract with the United States military itself for the procurement of zinc oxide." *Id.* And all the companies produced materials that the government otherwise would "have had to manufacture . . . on its own." *Id.* That relationship made *Baker* "not simply a case of compliance, but *assistance*." *Id.* (emphasis in original).

**A-18**

Likewise, in *Betzner*, the Seventh Circuit held that Boeing could remove a case under section 1442(a) as a military supplier.  Boeing "contracted to manufacture heavy bomber aircraft for the United States Air Force," and in doing so "it acted under the military's detailed and ongoing control."  *See Betzner*, 910 F.3d at 1015.  So, Boeing adequately alleged "that it was assisting or carrying out the duties of the United States Air Force," a federal agency.  *Id.*

*Baker* and *Betzner* fit comfortably within *Watson*'s requirement that the private company was a "private contractor . . . helping the Government to produce an item that it needs."  *Watson*, 551 U.S. at 153.  Smith & Wesson sits somewhere on the other end of the spectrum.  When recording the information required by 27 C.F.R. §§ 478.123–.125, Smith & Wesson was complying with federal law.  *Id.* at 152.  But it was not helping the ATF carry out a governmental function and acting under a federal officer.

Smith & Wesson points out that, if gun manufacturers did not keep the records, the ATF would have to bridge the gap and do the job itself.  *See* Defs.' Resp., at 4 (Dckt. No. 48).  Again, that argument blurs together compliance with a regulation and performance of a government function.  It is not enough to "reduce[] the size of the federal bureaucracy."  *Lu Junhong*, 792 F.3d at 809.  "*Every* regulated firm must use its own staff to learn whether it has satisfied federal regulations."  *Id.* (emphasis in original).  A private company cannot hang its hat on regulatory compliance that enables a federal agency to "have a smaller workforce" or "cut the [agency's] payroll."  *Id.*

Smith & Wesson makes two additional arguments for why it can remove under the federal officer removal statute.  Neither is persuasive.

First, Smith & Wesson points to an "Open Letter to All Federal Firearms Licensees" from the ATF, published in January 2004.  *See* ATF Open Letter (Dckt. No. 48-5).  In the letter,

19

**A-19**

the ATF said that it "is responsible for enforcing the Federal firearms laws, regulating the firearms industry, and promoting community outreach in an effort to reduce violent firearms crime." *Id.* at 1. Federal firearms licensees "play a vital role in this effort." *Id.*

The ATF's letter "emphasize[d] the importance of the partnerships that have been established between ATF and the firearms industry and . . . reinforce[d those parties'] joint responsibilities under the Gun Control Act (GCA)." *Id.* The ATF explained that it has "always viewed this as a partnership between industry and Government and continue[d] to do so." *Id.* at 2.

The letter continued. Federal firearms licensees are "an active partner in the fight against crime," and therefore "need to *comply with all Federal laws and regulations* that govern your firearms business." *Id.* at 1 (emphasis added). Failure to comply with these regulations could lead to "a number of possible consequences, including recommendations for warning letters, warning conferences, and – in instances of willful offenses – license revocation or criminal prosecution." *Id.* "In order to achieve our shared goal of ensuring proper and accurate business practices, ATF must take appropriate administrative or criminal action when voluntary compliance is not achieved." *Id.* at 1–2.

The message was clear: ATF requires federal firearms licensees to comply with federal laws and regulations. "ATF remains committed to assisting licensees in *complying* with the Federal firearms laws." *Id.* at 2 (emphasis added).

The ATF's nearly two-decades old letter does not establish that Smith & Wesson acted under a federal official. If anything, the letter reinforces that Smith & Wesson was required to comply with ATF *regulations*. The letter mentioned the need for compliance, and the possible sanctions for noncompliance.

The ATF simply used a figure of speech when it referred to the gun industry as its partner. Figures of speech are not enough to establish federal jurisdiction. For example, "[j]udges often call lawyers 'officers of the court,' but no one should think that this means that a lawyer can use § 1442 to remove a state-law malpractice suit to federal court." *Lu Junhong*, 792 F.3d at 809. "A figure of speech does not make someone a federal officer or a person 'acting under' one." *Id.* at 809–10.

Second, Smith & Wesson mentioned that it has "duties regarding taxation" under federal law. *See* Defs.' Resp., at 4 (Dckt. No. 48). Smith & Wesson does not cite any federal statute or regulation. However, federal law does require the collection of certain firearm-specific taxes. *See, e.g.*, 26 U.S.C. § 5811(a) ("There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred, except, the transfer tax on any firearm classified as any other weapon under section 5845(e) shall be at the rate of $5 for each such firearm transferred.").

Regardless, the argument is a nonstarter. The Supreme Court put it plainly in *Watson*: paying your taxes is not enough to act under a federal official. *See Watson*, 551 U.S. at 152. Lots of companies play a role in collecting taxes, too (ever get a W-2?). The fact that taxes are specific to firearms transactions makes no difference. Smith & Wesson was complying with federal law, not helping a federal officer meet a governmental objective.

In sum, Smith & Wesson was not acting under a federal officer when it complied with the ATF's firearm registration and reporting regulations. So, it cannot invoke section 1442(a) as a private company "acting under" a federal officer.

## II.    Federal Question Jurisdiction

Next, Smith & Wesson argues that federal question jurisdiction exists under 28 U.S.C. § 1331.  District courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  *See* 28 U.S.C. § 1331.

The issue turns on whether the complaint includes an embedded federal question within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).  To set the scene, the Court will start with an overview of the requirements for federal question jurisdiction.  Then, the Court will address each of the claims.

The punchline is that this Court lacks federal question jurisdiction.  There is no federal cause of action, and the complaint cannot travel down the narrow path paved in *Grable*.

### A.    Overview of Federal Question Jurisdiction

"The Supreme Court has recognized two ways in which a case can arise under federal law and satisfy § 1331."  *E. Cent. Illinois Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc.*, 3 F.4th 954, 958 (7th Cir. 2021).  "A case arises under federal law within the meaning of § 1331 . . . if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  *Empire Healthcare Assurance, Inc. v. McVeigh*, 547 U.S. 677, 690–91 (2006) (cleaned up).

Section 1331 creates two avenues to the federal courthouse, and the first path is the widest and the most direct route.  A case arises under federal law "when federal law creates the cause of action asserted."  *Gunn v. Minton*, 568 U.S. 251, 257 (2013).  That is, federal question jurisdiction exists when a federal cause of action appears "on the face of [the] complaint."  *Prather Plumbing*, 3 F.4th at 958.

A federal defense to a state-law claim typically does not give rise to federal question jurisdiction. "[A] state law claim ordinarily cannot be removed, even if it is necessarily defeated by a federal defense, because the federal question supporting jurisdiction must appear on the face of the plaintiff's properly or 'well-pleaded' complaint." *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers*, 966 F.3d 661, 669 (7th Cir. 2020) (citation omitted).

Here, the parties agree that the complaint does not include a federal cause of action. *See* Notice of Removal, at ¶¶ 36–41 (Dckt. No. 1); Pls.' Mtn. to Remand, at 8–13 (Dckt. No. 26). The complaint includes 11 state-law claims, and no federal law claims. *See* Cplt., at ¶¶ 158–336 (Dckt. No. 1-2).

So, the first route to the federal courthouse is blocked. And "[t]his category – lawsuits raising federal causes of action – 'accounts for the vast bulk of suits that arise under federal law." *Prather Plumbing*, 3 F.4th at 959 (quoting *Gunn*, 568 U.S. at 257). The only route left is the road less traveled.

"The second way of meeting the arising-under requirement is much narrower." *Id.* The second route is the "so-called . . . 'embedded' federal question." *Sarauer*, 966 F.3d at 669. The Supreme Court pointed the way in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).

Under *Grable*, "[a] case arises under federal law within the meaning of § 1331" if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthcare Assurance*, 547 U.S. at 690–91 (cleaned up). That is, federal question jurisdiction exists if a federal question is embedded in a state-law cause of action. A federal court can hear a case if a federal question is baked into the middle of the state-law claim.

23

**A-23**

Embedded federal question cases are rare. The Supreme Court has described them as a "special and small category" of cases. *See Gunn*, 568 U.S. at 258 (quoting *McVeigh*, 547 U.S. at 699). The opening for federal jurisdiction "is exceedingly slim." *Prather Plumbing*, 3 F.4th at 963; *see also Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 466 (7th Cir. 2015) (describing embedded federal questions as a "slim category"). The "existence of a federal issue" embedded in a state-law claim "rarely allows removal." *Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014); *see also Webb v. Fin. Indus. Regul. Auth., Inc.*, 889 F.3d 853, 860 (7th Cir. 2018) ("Federal jurisdiction is rarely established on this basis."); *Praschak v. Kmart Corp.*, 922 F. Supp. 2d 710, 713 (N.D. Ill. 2013) (noting that embedded federal question jurisdiction is a "rare case"). Words like "special," "small," "slim," and "rare" don't leave a lot of room to enter the doors of the federal courthouse.

In *Grable*, the IRS seized real property belonging to Grable & Sons Metal Products, Inc. and sold it to satisfy Grable's federal tax delinquency. *See Grable*, 545 U.S. at 310. Darue Engineering and Manufacturing purchased the property in the IRS's sale. *Id.* at 310–11. Five years later, Grable sued Darue in state court. *Id.* at 311. Grable brought a state-law quiet title action, "claiming that Darue's record title was invalid because the IRS had failed to notify Grable of its seizure of the property in the exact manner required by [26 U.S.C.] § 6335(a), which provides that written notice must be 'given by the Secretary to the owner of the property [or] left at his usual place of abode or business.'" *Id.* (second alteration in original).

Darue removed the case to federal court, arguing that Grable's state-law claim presented a significant question of federal law. *Id.* The Supreme Court agreed.

Grable's case presented a single issue: whether the IRS complied with section 6335(a)'s notice requirement before seizing Grable's property to satisfy the tax lien. And that question

turned entirely on the meaning of the federal statute. *Id.* at 315 ("Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case.").

A federal question was the whole ballgame. If the IRS did *not* comply with section 6335(a), then Grable did not receive the required notice, and the sale to Darue was invalid. If the IRS *did* comply with section 6335(a), then Grable did receive the required notice and the sale was valid. In other words, the state-law claim necessarily raised a federal question, even though it was not a federal cause of action *per se*.

The fact that the case necessarily raised a federal question was an important factor. But it wasn't enough. The Supreme Court recognized other requirements before a complaint with state-law claims can enter the federal courthouse. The importance of the federal question matters. So does the impact on the balance of power between the federal government and the states.

"The meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court." *Id.* That is, the state-law claim raised a "substantial question[] of federal law." *Id.* at 312. And "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id.* at 315. So, Grable's claim would not disrupt the balance between the federal and state courts, partly because it was "rare" and would have "microscopic" effects.

In later cases, the Supreme Court has distilled *Grable* into four factors. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually

disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the

federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258 (citing *Grable*, 545 U.S. at

313–14).

A complaint gets by step one of *Grable* if the federal issue is "necessarily raised on the

face of plaintiff's complaint." *Sarauer*, 966 F.3d at 674. It must be "impossible to decide" the

state-law claim without deciding an issue of federal law. *Hartland Lakeside*, 756 F.3d at 1035.

To meet the requirements of *Grable*, "[d]eciding an issue of federal law" must be "inescapable."

*Id.* There must be no way out, except through the door of federal law.

"To be 'necessarily raised' for purposes of federal-question jurisdiction, the answer to the

federal question must be an essential element of the state cause of action. If the case can be

resolved without reaching the federal issue, the federal question is not necessarily raised." *See*

15A James W. Moore *et al.*, Moore's Federal Practice § 103.31(4)(g)(ii) (3d ed. 2022).

A plaintiff's state-law claim raises a federal issue "only if" an issue of federal law must

be resolved. *Sarauer*, 966 F.3d at 674; *see also Illinois ex rel. Elder v. JPMorgan Chase Bank,*

*N.A.*, 552 F. Supp. 3d 812, 817–18 (N.D. Ill. 2021) ("To prevail on his claim, relator must

establish those reports were false. Those reports, however, could have been false *only* if relator

is correct that the property was subject to escheat in Illinois, rather than Ohio, i.e., that cashier's

checks are, as relator asserts, 'similar written instruments' under 12 U.S.C. § 2503. That is

something relator must establish to prevail on his claim under [state law]. A federal question is

necessarily raised by relator's claims.") (emphasis in original).

"A federal issue may not be necessarily raised even if the predominant issue concerns

federal law." *See* Moore, *supra*, § 103.31(4)(g)(ii). "Federal law must be dispositive of the case

26

**A-26**

to give rise to federal jurisdiction." *Illinois ex rel. Elder v. U.S. Bank N.A.*, 2021 WL 4942041, at *3 (N.D. Ill. 2021).

In *Grable*, "[t]he Court held that [Grable's quiet title action] arises under federal law because, apart from the procedural device (a quiet-title action), there was *nothing* in it but federal law, with the potential to affect the national government's revenues." *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (7th Cir. 2007); *see also Hartland Lakeside*, 756 F.3d at 467 (holding that *Grable* step one was met because "[w]hile state law may create the breach-of-contract causes of action, *the only disputed issues* involve the proper interpretation of Section 8 and HUD's implementing guidance") (emphasis added); *Rosenberg v. Advoc. Health & Hosps. Corp.*, 2011 WL 1548391, at *5 (N.D. Ill. 2011) ("Unlike *Grable* and like *Bennett*, Rosenberg's suit is not one in which the only contested issue is a question of federal law.").

The existence of a federal question is necessary, but not sufficient, to give rise to federal question jurisdiction under *Grable*. For example, *Grable* itself noted that state-law tort claims often point to violations of federal law as evidence of negligence. But a case is not removable simply because federal law might come into play when litigating a state-law claim.

"One only need[s] to consider the treatment of federal violations generally in garden variety state tort law. The violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings." *Grable*, 545 U.S. at 318 (quotation marks omitted). But "[a] general rule of exercising federal jurisdiction *over state claims resting on federal mislabeling and other statutory violations* would thus have heralded a potentially enormous shift of traditionally state cases into federal courts." *Id.* at 319 (emphasis added).

These "'garden variety state tort law' claims that borrow standards of care from federal law are so numerous that they cannot be deemed subject to federal question jurisdiction." *Ward*

*v. Soo Line R.R. Co.*, 901 F.3d 868, 875 (7th Cir. 2018) (quoting *Grable*, 545 U.S. at 318).

Under *Grable*, "it takes more than a federal element 'to open the arising under door.'"  *McVeigh*,

547 U.S. at 701 (quoting *Grable*, 545 U.S. at 313).

The Seventh Circuit underscored the point in *Bennett*, a case involving an airline

accident.  "[T]he influence of federal law on the outcome of a contract (or tort) suit is not enough

to support the arising-under jurisdiction."  *Bennett*, 484 F.3d at 910.  When the state-law claim

presents "a fact-specific application of rules that come from both federal and state law rather

than a context-free inquiry into the meaning of a federal law," then the case does not necessarily

raise a federal issue within the meaning of *Grable*.  *Id.*

"That some standards of care used in tort litigation come from federal law does not make

the tort claim one 'arising under' federal law."  *Id.* at 912; *see also Schumacher v. Sterigenics*

*U.S., LLC*, 394 F. Supp. 3d 837, 843 (N.D. Ill. 2019) (noting that the Seventh Circuit has

"rejected the argument that the potential relevance of federal standards to state law negligence

claims can cause the claims to arise under federal law"); *Navistar Int'l Corp. v. Deloitte &*

*Touche LLP*, 837 F. Supp. 2d 926, 930 (N.D. Ill. 2011) ("The mere fact that Navistar alleges that

Deloitte violated federal standards does not, by itself, give rise to *Grable* jurisdiction.").

A complaint trips at step one of *Grable* when "none of Plaintiffs' claims *require proof*

that a federal law was violated."  *Schumacher*, 394 F. Supp. 3d at 843 (emphasis added).  So,

"even if the application of a federal standard of care were a substantial federal issue . . . it is

certainly not one 'necessarily raised' in a complaint, as *Grable* requires."  *Id.* at 844.  If a

plaintiff's state-law claim could succeed "without reference to any federal statute" or other

source of federal law, then there is no embedded federal question.  *Id.* at 845.

By the same token, when a claim has multiple theories, all of the theories must present embedded issues of federal law to satisfy *Grable*. "If the plaintiff can support her state-law claim with theories unrelated to the federal statute, then the state-law claim does not arise under federal law." *Praschak*, 922 F. Supp. 2d at 713. "[A] claim supported by alternative theories in the complaint may not provide the basis for federal question jurisdiction unless federal law is essential to each of the theories." *See* 13D Charles Alan Wright *et al.*, Federal Practice and Procedure Jurisdiction § 3562 (3d ed. 2023); *see also Anghel v. Ruskin Moscou Faltischek, P.C.*, 598 F. App'x 805, 807 (2d Cir. 2015) ("Where a federal issue is present as only one of multiple theories that could support a particular claim . . . this is insufficient to create federal jurisdiction.") (quotation marks omitted).

The Supreme Court made a similar point in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016). The Supreme Court rejected Merrill Lynch's argument that "whenever . . . a plaintiff's complaint either explicitly or implicitly asserts that the defendant breached an Exchange Act duty, then the suit is brought to enforce that duty and a federal court has exclusive jurisdiction." *Id.* at 381 (cleaned up). That holding shed light on *Grable*, because the jurisdictional test under section 27 of the Securities Exchange Act of 1934 "is the same as the one used to decide if a case 'arises under' a federal law." *Id.* at 377 (quoting 28 U.S.C. § 1331); *see also Webb*, 889 F.3d at 860 (noting that *Manning* held that "the *Grable & Sons* test determines the reach of 'arising under' jurisdiction for purposes of the jurisdictional grant in the Securities Exchange Act of 1934").

The Supreme Court in *Merrill Lynch* gave an example of a state-law cause of action that did not raise a federal issue under *Grable*. "Consider, for example, a simple state-law action for breach of contract, in which the plaintiff alleges, for atmospheric reasons, that the defendant's

conduct also violated the Exchange Act – or still less, that the defendant is a bad actor who infringed that statute on another occasion." *Id.* at 381–82.

Despite the reference to federal law, at the end of the day, "that hypothetical suit is brought to enforce state contract law, not the Exchange Act." *Id.* at 382 (quotation marks omitted). "[T]he plaintiff can get all the relief he seeks just by showing the breach of an agreement, without proving any violation of federal securities law. The suit, that is, can achieve all it is supposed to even if issues involving the Exchange Act never come up." *Id.*; *see also Virginia ex rel. Hunter Lab'ys, LLC v. Virginia*, 828 F.3d 281, 288 (4th Cir. 2016) (holding that for a state-law claim to necessarily raise a federal issue, "every theory of relief must raise [a] federal issue for [the] claim to arise under federal law").

In sum, a case does not belong in the federal courthouse simply because a federal question might come up. A case falls within *Grable* only if it involves an inescapable federal question that demands an answer. If the court or the jury could step around the federal question, then the complaint does not get past step one of *Grable*. And even if a federal question is inescapable, *Grable* includes other steps before a complaint can get to the federal courthouse.

## B.     The Complaint

After setting the scene, the Court now turns to the complaint at hand.

Smith & Wesson believes that this case can travel the narrow path laid down in *Grable*. As Smith & Wesson sees it, a federal issue is "necessarily raised" because the Court "must adjudicate the meaning and application of the NFA [*i.e.*, the National Firearms Act] to resolve Plaintiffs' claims." *See* Defs.' Resp., at 11 (Dckt. No. 48). Smith & Wesson believes that "Plaintiffs transparently seek an order requiring Smith & Wesson to disclose that the M&P rifle is an NFA weapon." *Id.* at 12.

The complaint includes 11 state-law claims, but there is a sprinkling of federal law, too. It spans 336 paragraphs, and 14 of the 336 paragraphs mention the National Firearms Act (plus three other paragraphs that apply to the gun shops only). *See* Pls.' Mtn. to Remand, at 4 (Dckt. No. 26); *see also* Cplt., at ¶¶ 45–46, 52, 168, 174, 189–91, 212–214, 238, 240–41 (Dckt. No. 1-2). The complaint supports the state-law tort claims by alleging that Smith & Wesson violated federal law on the manufacture, transfer, and sale of the M&P15.

The first references to federal law merely describe parts of the National Firearms Act. *See* Cplt., at ¶¶ 45–46 (Dckt. No. 1-2). The NFA defines what qualifies as a "machinegun," *see* 26 U.S.C. § 5845(b), and "[i]t is a crime to possess or transfer machine guns to any person who has not undergone the required registration and authorization process." *Id.* at ¶ 45.

The complaint then summarizes an ATF ruling from 1982. The ATF "clarified" that "semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with simple modification or elimination of existing component parts were machineguns under the NFA." *Id.* at ¶ 46 (quotation marks omitted).

A few paragraphs later, the complaint alleges that Smith & Wesson violated the NFA. "Smith & Wesson chose to design the M&P15 assault rifles with features that allow the rifles to be easily modified to fire automatically, *but manufactured, transferred and sold them in violation of the NFA and the Gun Control Act ('GCA')*, since the company failed to fill out the appropriate transfer forms, get approval of the forms by the ATF, pay occupational and transfer taxes and – most critically – register the firearms with the ATF." *Id.* at ¶ 52 (emphasis added). Smith & Wesson created the M&P15 by "essentially cop[ying] the design of the fully automatic weapon that is made for combat, not for any legitimate need of a law-abiding citizen." *Id.* at ¶ 53.

31

**A-31**

The fact that the complaint points to federal law is not enough to establish federal question jurisdiction. *See Merrill Lynch*, 578 U.S. at 381. It depends on the substance of the claims. So the Court will march through the individual claims, and determine if they necessarily raise questions of federal law.

A close look at the complaint confirms that the claims do not "necessarily raise" a federal question. The complaint does not satisfy the first step of *Grable*, let alone march down the other steps and get the rest of the way there.

### 1.     The Statutory Tort Claims (Counts I, II, & III)

The Court will begin with the statutory claims. The complaint includes two claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (again, "ICFA"). Count I is an unfairness claim, and Count II is a deception claim. The third claim is under the Illinois Uniform Deceptive Trade Practices Act (Count III). *See* Cplt., at ¶¶ 158–224 (Dckt. No. 1-2). Each claim *mentions* federal law, but does not *turn* on federal law.

All three claims incorporate the complaint's general allegations, including the references to the NFA. *Id.* at ¶¶ 158, 179, 202. Each claim also includes additional allegations that Smith & Wesson violated federal law.

The unfairness claim under the ICFA (Count I) includes more than a dozen paragraphs about Smith & Wesson's marketing practices. *Id.* at ¶¶ 160–74. Most of the paragraphs have nothing to do with federal law. But a few paragraphs do mention federal law.

For example, Smith & Wesson "does not identify its M&P assault rifles as NFA weapons, leading people to believe that they can obtain these weapons without complying with the NFA's requirements." *Id.* ¶ 168. "Smith & Wesson violated both the NFA and the Gun Control Act . . . by manufacturing, transferring, and selling these weapons without filling out the

32

**A-32**

appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes or registering the firearms." *Id.* at ¶ 174.

The deception claim under the ICFA (Count II) makes similar allegations. "Smith & Wesson's marketing campaigns are also deceptive because they omit the fact that its rifles are NFA weapons and require registration, approval, and payment of taxes before they can be possessed." *Id.* at ¶ 189. "Smith & Wesson's failure to identify their M&P rifles as NFA weapons" – an alleged violation of federal law – "qualifies as concealment, suppression, or omission of a material fact." *Id.* at ¶ 190. And "[u]pon information and belief, Smith & Wesson failed to identify its M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission." *Id.* at ¶ 191.

The claim under the Illinois Uniform Deceptive Trade Practices Act (Count III) repeats the allegations of Count II. *See id.* at ¶¶ 212–14.

So each claim includes references to federal law, here and there. Even so, the scattered references to federal law recede into the background when reading the claims as a whole. Most of the allegations have nothing to do with federal law. The complaint gives lots of reasons why Smith & Wesson violated the state statutes, and only some of the reasons involve federal regulations.

A jury could decide the statutory claims without reaching any question of federal law. A violation of federal regulations is a *possible* basis for violating the state statutes, but it is not a *necessary* basis for violating the state statutes. A federal question is not embedded because answering a federal question is not *unavoidable*. There is another way out.

Start with Plaintiffs' unfairness claim under the ICFA. Plaintiffs allege that Smith & Wesson's conduct was unfair because "Smith & Wesson sells and promotes its line of assault

33

**A-33**

rifles, which are designed for military and law enforcement personnel, by intentionally and unfairly targeting the propensity of young men for risk-taking, impulsive behavior." *Id.* at ¶ 161.

Smith & Wesson promised "young civilian men that these assault rifles will offer 'more adrenaline.'" *Id.* at ¶ 163. Smith & Wesson "models its marketing videos after first-person shooter games despite the risk that a certain subset of young men who play these games will want to act them out in real life." *Id.* at ¶ 164. The company also uses "social media posts that harness images and themes popular among young people like first-person shooter games" and social media "influencers" to market to "young civilian consumers." *Id.* at ¶¶ 165–66.

Plaintiffs allege that this "unfair marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence." *Id.* at ¶ 167.

Those allegations appear before the allegations that Smith & Wesson violated the NFA. They provide a potential hook for the jury to hang its hat on, without getting into federal law.

A jury could decide the claim without reaching whether Smith & Wesson violated the NFA. The complaint gives lots of other reasons why the marketing was unfair. Going down the road of federal law is not "inescapable." *Hartland Lakeside*, 756 F.3d at 1035; *Schumacher*, 394 F. Supp. 3d at 845 ("Plaintiffs' claims can succeed without reference to any federal statute.").

The complaint offers many reasons why Smith & Wesson violated the state statutes, and many of those reasons have nothing to do with federal law. The non-federal reasons provide, in effect, a *Grable* off-ramp. A jury doesn't need to decide a federal question to get from here to there, and the mere possibility of addressing federal law is not enough to blaze a path to the federal courthouse.

34

**A-34**

Smith & Wesson tries to downplay the non-federal reasons alleged in the complaint. In its view, "when stripped of the purported state-law bases that are insubstantial, implausible, or foreclosed by prior decisions of the Illinois Supreme Court, as this Court must do, the Complaint is necessarily based on federal issues." *See* Notice of Removal, at ¶ 38 (Dckt. No. 1).

But Smith & Wesson cannot ignore state-law theories in the complaint to establish federal question jurisdiction. "Defendants cannot establish federal jurisdiction by reading out of the complaint independent state law grounds that support the claims." *Collins v. Pontikes*, 447 F. Supp. 2d 895, 902 (N.D. Ill. 2006).

Smith & Wesson points to *New York v. Arm or Ally, LLC*, 2022 WL 17496413 (S.D.N.Y. 2022), but it does not lend a hand. There, the State of New York sued firearm manufacturers and sellers under a New York state law "which provides liability for gun industry members that either 'create, maintain or contribute to a condition in New York state that endangers the safety or health of the public.'" *Id.* at *3 (quoting N.Y. Gen. Bus. Law § 898-b(1)). The court held that this state-law claim necessarily raised a federal issue under *Grable*. *Id.* at *5–6.

The New York statute "applies to 'gun industry member[s]' who, among other things, sell a 'qualified product.'" *Id.* at *5 (quoting N.Y. Gen. Bus. Law § 898-b(1)). The term "qualified product" under state law has the same meaning as the term "qualified product" as defined by *federal law*. *Id.* (citing 15 U.S.C. § 7903(4)).

That is, a gun industry member sells a qualified product under New York state law *only if* that product meets the definition of "qualified product" under federal law. So, to answer the state-law question, the court *needed* to interpret a federal statute. "In order to prevail on its claim that Defendants' conduct falls under General Business Law § 898-b(1), therefore, the State *must demonstrate* that the products at issue in this case were 'firearms' or 'component parts' thereof

35

**A-35**

within the meaning of federal law." *Id.* (emphasis added). The plaintiff could not prevail on its claim without the court first deciding a federal issue.

A claim under the ICFA differs from the claim under the New York statute. Deciding a question of federal law is not a *necessary* part of an ICFA claim. "The elements of a claim under the ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Leszanczuk v. Carrington Mortg. Servs., LLC*, 21 F.4th 933, 940 (7th Cir. 2021) (quotation marks omitted). "In addition, to prevail under ICFA, a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010); *see also Wigod v. PNC Bank, N.A.*, 338 F. Supp. 3d 758, 769 (N.D. Ill. 2018).

To determine if a practice is "unfair," courts consider "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Leszanczuk*, 21 F.4th at 940 (cleaned up). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (quotation marks omitted).

The question is whether a practice is "unfair," and one of the ways to make that showing is to demonstrate that the practice offends "public policy." That is, a plaintiff could show that "it violates a standard of conduct embodied in a statute, the common law, or otherwise, *i.e.*, if it is within at least the penumbra of some common-law, statutory or other established concept of unfairness." *Id.* at 940–41 (quotation marks omitted).

A plaintiff *could* prove that a practice is unfair by showing that the practice violates public policy. But a plaintiff doesn't *have to* show that the practice violates public policy. *Id.* at 940. The practice could be "immoral," or "unethical," and so on. *Id.*

If the plaintiff *does* show that the practice violates public policy, the plaintiff *could* prove that the practice violates public policy by violating the law. But the plaintiff doesn't *have to* show that the practice violates public policy by violating the law. *Id.* at 940–41.

If the plaintiff *does* show that the practice violates public policy by violating the law, the plaintiff *could* prove that the practice violates public policy by violating *federal* law. But the plaintiff doesn't *have to* show that the practice violates public policy by violating federal law. A violation of state law would count, too. *See Elder v. Coronet Ins. Co.*, 558 N.E.2d 1312, 1316 (Ill. App. Ct. 1990) (noting that a practice can offend public policy "without necessarily having been previously considered unlawful" so long as "it is within at least the penumbra of some common-law, statutory or other established concept of unfairness"); *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 832 (7th Cir. 2014) ("*Although there was no specific statute prohibiting insurance companies from using polygraphs in this way*, the court thought the practice offended the policy against polygraphs 'as it has been established by statutes, the common law, or otherwise.'") (emphasis added) (quoting *Elder*, 558 N.E.2d at 1316).

Even if a jury did find a violation of federal law, the complaint still would not satisfy *Grable*. Again, a complaint does not arise under federal law within the meaning of *Grable* simply by relying on federal law as the standard of care. *See Bennett*, 484 F.3d at 912 ("That some standards of care used in tort litigation come from federal law does not make the tort claim one 'arising under' federal law.").

And on top of it all, the case involves more than a clean, legal question under federal law. A plaintiff must prove more than an unfair practice. An ICFA claim includes other elements, too, including reliance and proximate causation. *See Leszanczuk*, 21 F.4th at 940; *Siegel*, 612 F.3d at 935. The claim "is fact-bound and situation-specific," and does not "present a nearly pure issue of law." *McVeigh*, 547 U.S. at 700–01 (cleaned up). The unfair practices claim involves more than a clean, dispositive question under federal law, so it does not satisfy *Grable*.

Plaintiffs' claims about deceptive conduct under the two statutes (Counts II & III) do not satisfy *Grable*, either. Once again, deciding a question of federal law is not a necessary part of the claims.

Plaintiffs allege that Smith & Wesson's marketing was deceptive because it "associate[ed] its line of M&P rifles with United States military personnel to create the false impression that its products were utilized and/or endorsed by these reputable users, and to target a class of consumers at particular risk to use assault rifles for mass shootings." *See* Cplt., at ¶ 182 (Dckt. No. 1-2) (Count II); *see also id.* at ¶¶ 204–05 (Count III). Smith & Wesson's marketing "impliedly misrepresented and overstated that the U.S. military endorses or uses Smith & Wesson's M&P assault rifles, causing a likelihood of confusion and misunderstanding as to any military sponsorship, use, or approval of the company's M&P rifles." *Id.* at ¶ 187 (Count II); *see also id.* at ¶¶ 209–11 (Count III).

Again, these allegations come before the allegations that Smith & Wesson's conduct violated the NFA. *See id.* at ¶¶ 189–91, 212–14. And again, the allegations about deceptive conduct form a standalone theory that does not rely on federal law. Plaintiffs could prevail even if the jury never reaches a question of federal law.

Plaintiffs' deception claims also do not present a "nearly pure" issue of federal law.  *See McVeigh*, 547 U.S. at 700.  The legal framework for a deception claim is the same as the framework for an unfairness claim.  *See Phila. Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014).  "The elements of a claim under the Act are:  (1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (3) the deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deceptive act."  *Id.*

So again, the court will need to decide issues of state law, such as intent, damages, and causation.  And again, those issues are "fact-bound and situation-specific," and do not "present a nearly pure issue of law."  *McVeigh*, 547 U.S. at 700–01.

In sum, the claims under the Illinois statutes do not necessary raise a question of federal law.  A jury could decide the claims without reaching any issue of federal law.

### 2.    Negligence Claim (Count IV)

The next claim is negligence under Illinois law.  *See* Cplt., at ¶¶ 225–45 (Dckt. No. 1-2).  Once again, the complaint alleges that Smith & Wesson violated the NFA.

The negligence claim incorporates the complaint's general allegations, some of which allege that Smith & Wesson violated the NFA.  *Id.* at ¶ 225.  The complaint then makes additional allegations, echoing the statutory tort claims.

"Smith & Wesson knowingly violated both the NFA and the GCA by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes, or registering the firearms."  *Id.* at ¶ 238.  "Smith & Wesson marketed the rifle as not requiring NFA paperwork,

and, upon information and belief, it manufactured and transferred the rifle without complying with any of the NFA's requirements." *Id.* at ¶ 240.

The complaint also linked these violations to the Highland Park shooting. "Upon information and belief, if Smith & Wesson had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon." *Id.* at ¶ 241.

Federal law is in play, but it is not the only ball in play. The complaint gives a bunch of other reasons why Smith & Wesson was negligent. Those reasons have nothing to do with federal law.

Plaintiffs allege that "Smith & Wesson knows, or should know, that adolescents and young adults are more susceptible to claims made in advertising than older age groups." *Id.* at ¶ 231. So, "Smith & Wesson knows, or has reason to know, of the foreseeable risk that marketing of its M&P assault rifles to civilian adolescents and young adults using military and law enforcement imagery and references and appeals to increasing their adrenaline will inspire or encourage such consumers to choose M&P rifles for use in mass shootings." *Id.* at ¶ 234. According to the complaint, this allegation *alone* supports a finding that Smith & Wesson breached its duty of care. "Smith & Wesson has breached its duty of care by choosing – in the face of this foreseeable risk – to negligently and misleadingly market its M&P rifles to teenagers and young adults." *Id.* at ¶ 235.

That theory of liability – based on Smith & Wesson's use of military imagery targeted at young adults – stands apart from Plaintiffs' allegations about the NFA. Once again, Plaintiffs could prevail without establishing that Smith & Wesson violated the NFA's manufacturing and labeling requirements.

40

**A-40**

Plaintiffs allege that Smith & Wesson breached a duty of care by failing to comply with federal law. But under *Grable*, "federal violations generally in garden variety state tort law" do not raise a federal issue. *See Grable*, 545 U.S. at 318; *see also Bennett*, 484 F.3d at 912 ("That some standards of care used in tort litigation come from federal law does not make the tort claim one 'arising under' federal law."); *Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1297–98 (11th Cir. 2008) (holding that a state-law negligence claim did not necessarily raise a federal issue despite plaintiffs' allegation that "defendants broke federal law" as a basis for liability).

Finally, Plaintiffs' state-law negligence claim presents unambiguously state-law issues, like damages. Here "[s]tate issues, such as the amount of damages, may well predominate." *Bennett*, 484 F.3d at 910. So, the case presents "a fact-specific application of rules that come from both federal and state law rather than a context-free inquiry into the meaning of a federal law." *Id.*

In sum, the negligence claim does not raise an embedded federal question.

### 3. Emotional Distress Claims (Counts X and XI)

Finally, the complaint includes claims of intentional infliction of emotional distress and negligent infliction of emotional distress. *See* Cplt., at ¶¶ 319–36 (Dckt. No. 1-2). Unlike the other claims, the emotional distress claims do not expressly allege a violation of federal law.

Both counts incorporate the complaint's allegations, including that Smith & Wesson violated the NFA. *Id.* at ¶¶ 319, 328. But neither count includes additional allegations stating that Smith & Wesson violated the NFA, or any other federal law. *Id.* at ¶¶ 319–36.

Instead, the complaint alleges that "[a]s set forth in the various counts against each Defendant, the Shooter was enabled to purchase and use the M&P assault rifle through the conduct of the Smith & Wesson Defendants, the Gun Store Defendants, and Robert Crimo, Jr."

*Id.* ¶¶ 321, 330.  "Each defendants' conduct was both extreme and outrageous," and "[a]s a direct and proximate result of the Shooter's conduct," the Plaintiffs "experienced emotional distress." *Id.* at ¶¶ 325, 334.

So, out of the gate, Plaintiffs do not include claim-specific allegations showing that there is an embedded federal question in their emotional distress claims.

Under Illinois law, the plaintiff must prove three elements to succeed on a claim for intentional infliction of emotional distress.  "First, the conduct involved must be truly extreme and outrageous.  Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress.  Third, the conduct must in fact cause severe emotional distress." *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003)).  "To qualify as outrageous, the conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 859 (7th Cir. 2023) (quotation marks omitted).

Whether Smith & Wesson's conduct was extreme and outrageous is a question of state tort law.  Even if Plaintiffs argue that Smith & Wesson's conduct was extreme and outrageous because it violated the NFA, Plaintiffs must still show that violating the NFA is conduct that is so extreme that it violates all possible bounds of decency tolerated in a civilized society.  Whether the conduct was extreme and outrageous "is a factual matter that can be resolved without applying federal law." *Adventure Outdoors*, 552 F.3d at 1297.

Plaintiffs' claims for negligent infliction of emotional distress also do not raise embedded federal questions.  A claim for negligent infliction of emotional distress is a common-law

42

**A-42**

negligence claim.  So, the plaintiff must prove the elements of a negligence claim:  duty, breach, causation, and damages.

Additionally, the plaintiff must show that they were either a direct victim of the negligent conduct or a bystander.  "Direct victims are the persons that the negligent conduct has directly affected; they are the ones that are actually physically injured by the defendant's negligent conduct.  To fall in this category the plaintiff must suffer some contemporaneous physical contact that caused the emotional distress.  Meanwhile, bystanders are those who are in the zone-of-physical danger and who because of the defendant's negligence fear for their own safety, which caused them emotional distress and a physical injury or illness from the emotional distress."  *Barnes v. Anyanwu*, 391 F. App'x 549, 552 (7th Cir. 2010).

Plaintiffs' claims for negligent infliction of emotional distress do not raise an embedded federal question for the same reasons that the common-law negligence claim does not.  A negligent infliction of emotional distress claim is a negligence claim, but with the additional requirement that the plaintiff was a direct victim of the negligent conduct or a bystander.

This additional element of the claim does not raise an embedded federal question.  Instead, it is a fact-bound question about the individual plaintiffs' injuries and physical proximity to the shootings.  So, the state-law claim "is fact-bound and situation-specific."  *McVeigh*, 547 U.S. at 701.  It does not present a pure issue of federal law.

Plaintiffs' state-law emotional distress claims do not raise an embedded federal issue.

*      *      *

In sum, Plaintiffs' state-law claims do not necessarily raise a federal issue within the meaning of *Grable*.  So, this Court lacks federal question jurisdiction.

There are other factors under *Grable*, too.  But the Court does not need to reach them because the claims do not get past step one.  *See Webb*, 889 F.3d at 861 ("As for the rest of the *Grable & Sons* test, an issue not raised cannot be actually disputed or substantial, and without any federal question necessarily in play, we need not consider how taking the question would affect the federal-state balance.").

## III.  Preemption

Next, Smith & Wesson contends that this Court has jurisdiction because "Plaintiffs' state law claims are completely preempted."  *See* Notice of Removal, at ¶ 16.d (Dckt. No. 1).

Smith & Wesson argues that the NFA and the Administrative Procedure Act "have completely displaced state law claims that require a state court to decide the classification of a firearm under federal law, particularly where, as here, the proposed classification conflicts with the ATF's longstanding interpretation of federal law."  *See* Notice of Removal, at ¶ 16.d (Dckt. No. 1).

"The complete preemption doctrine refers to a limited set of cases in which a properly pled state law claim may be said to arise under federal law because Congress has effectively eliminated state law causes of action in the entire field."  *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 894 (7th Cir. 2013).

The logic is simple, even if the law of preemption is not.  If federal law completely preempts state law over an entire field, then a state-law cause of action no longer exists.  Any cause of action must be a federal cause of action, even if it calls itself something else.

"[C]ongressional intent to displace a state law cause of action – such that there is 'no such thing as a state-law claim' for violation of the right asserted only a federal one – is sufficient to create jurisdiction."  *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers*, 966

F.3d 661, 669 (7th Cir. 2020) (citation omitted) (quoting *Beneficial Nat'l Bank v. Anderson*, 539

U.S. 1, 11 (2003)).  "'Complete preemption' is not a defense; instead it represents a conclusion

that all claims on the topic arise under federal law, so that 28 U.S.C. § 1441 permits removal."

*Pollitt v. Health Care Serv. Corp.*, 558 F.3d 615, 616 (7th Cir. 2009) (per curiam).

Complete preemption applies when Congress "so completely pre-empt[s] a particular

area that any civil complaint raising [the] select group of claims is necessarily federal in

character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987).  "[C]ongressional intent to

displace a state law cause of action – such that there is no such thing as a state-law claim for

violation of the right asserted, only a federal one – is sufficient to create jurisdiction.  The state

law claim is then said to be completely pre-empted and is considered, from its inception, a

federal claim." *Sarauer*, 966 F.3d at 669 (cleaned up).  When complete preemption applies, the

name tag on the claim does not matter – the DNA of the claim changes from state to federal law.

Complete preemption can give rise to removal.  If the state-law claim is preempted, then

it's a federal claim.  And if it's a federal claim, it's removable.  *See Studer*, 867 F.3d at 723 ("[A]

defendant can remove a plaintiff's state-law claim if the defendant can show complete

preemption because the state law claim, 'even if pleaded in terms of state law, is in reality based

on federal law.'") (quoting *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003)); *see also* 14C

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722.1 (4th ed. 2023)

("When a plaintiff has asserted a cause of action under state law that has been judicially declared

to be completely preempted by federal law, that claim – no matter how it may have been set out

in the complaint or characterized by the plaintiff – is necessarily federal, and will be

recharacterized as federal, thereby permitting removal.").

"Complete preemption is rare." *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 408 (3d Cir. 2021). It applies only "in a small number of areas." *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013). In fact, "[t]he Supreme Court has recognized only three federal statutes that completely preempt analogous state-law actions: § 301 of the Labor Management Relations Act, § 502(a) of the Employee Retirement Income Security Act, and §§ 85–86 of the National Bank Act." *In re Repository Techs., Inc.*, 601 F.3d 710, 723 (7th Cir. 2010); *see also Maglioli*, 16 F.4th at 408 (noting that "[t]he Supreme Court has recognized only three completely preemptive statutes: the Employee Retirement Income Security Act ('ERISA'), the Labor Management Relations Act ('LMRA'), and the National Bank Act"); *Sarauer*, 966 F.3d at 669 ("Only a small number of federal statutes have completely preemptive effect."). The Seventh Circuit has also recognized complete preemption "under a portion of the Federal Communications Act." *Ne. Rural Elec. Membership Corp.*, 707 F.3d at 894.

The list is not rapidly expanding. In fact, "any further expansion of the doctrine . . . requires a clear showing of Congressional intent to eliminate state law entirely." *Id.* The Seventh Circuit has "recognized the narrowness of the doctrine, applying complete preemption only where Congress clearly intended completely to replace state law with federal law and create a federal forum." *In re Repository Techs., Inc.*, 601 F.3d at 723.

To occupy the field and displace state claims, the federal statute must provide a federal cause of action. All the statutes that the Supreme Court has found to completely preempt state law "contain[] an exclusive federal cause of action." *Maglioli*, 16 F.4th at 408. "After *Franchise Tax Board* and *Taylor*, it appears that a state court suit is removable to federal court based on a claim of preemption *if Congress created a cause of action in the allegedly preemptive statute.*" *See* Erwin Chemerinsky, Federal Jurisdiction § 5.2.3 (7th ed. 2016) (emphasis added)

(citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1 (1983); and *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987)). It is *this* for *that* – a federal claim for a state-law claim.

The Seventh Circuit agrees. "As this circuit interprets the law, the 'ability to bring suit under [federal law] is an element of complete preemption.' Logically, complete preemption would not be appropriate if a federal remedy did not exist in the alternative." *Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 788 (7th Cir. 2002) (alteration in original) (citation omitted) (quoting *Vorhees v. Naper Aero Club, Inc.*, 272 F.3d 398, 404 (7th Cir. 2001)). "Otherwise, a plaintiff would be forced into federal court with no relief available for vindicating the same interest." *Id.* (quotation marks omitted).

"[U]nless the federal law has created a federal remedy – no matter how limited – the federal law, of necessity, will only arise as a defense to a state law action and will thus not give rise to the federal question jurisdiction underlying complete preemption." *Id.* (quotation marks omitted); *see also Lancaster v. Astellas Pharma, Inc.*, 2008 WL 4378441, at *3 (S.D. Ill. 2008) ("Under Seventh Circuit law, complete preemption occurs only when a federal statute provides an exclusive federal remedy.").

"A prerequisite to complete preemption is identifying a federal cause of action that includes the same ingredients as the state claim and provides some recovery." *In re Repository Techs.*, 601 F.3d at 723 (quotation marks omitted). The "lack of an express federal remedy indicates that . . . state-law claims are not completely preempted." *Id.*

The question is not simply whether preemption might come into play. The question is whether there is complete preemption, meaning that federal law so preoccupies the field that a state-law claim is out of the picture, and a federal claim is all that is left. A federal statute might have "significant preemptive force" without completely preempting state law. *Id.* But "[a]bsent

47

**A-47**

complete preemption, a defense that relies on 'the pre-emptive effect of a federal statute' does not provide a basis for removal." *Id.* (quoting *Beneficial Nat'l Bank*, 539 U.S. at 11).

As Smith & Wesson seems to concede, the NFA does *not* create a private right of action with the same elements as state tort law. *See* 26 U.S.C. §§ 5801 *et seq.*; Defs.' Resp., at 14–15 (Dckt. No. 48). "[O]n its face, the NFA is a taxing scheme." *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018). In fact, the NFA is part of the Internal Revenue Code (Title 26). "The statute collects occupational and excise taxes from businesses and transactions involving listed firearms – which include short-barreled rifles, silencers, and destructive devices." *Id.*

"But the NFA does more than lay taxes. To carry out the taxing scheme, it also mandates the registration of every importer, manufacturer, and dealer, and of every firearm made or transferred. And to ensure compliance, the statute has teeth: the failure to abide by any of its rules is a crime punishable by up to ten years in prison (or a fine, or both)." *Id.* (citations omitted).

What the NFA does *not* do, however, is provide a private right of action. Instead, it creates a taxation scheme, coupled with firearm-registration requirements and criminal penalties to carry out that taxing scheme. So, on the NFA's face, Congress has not "created a cause of action in the allegedly preemptive statute" itself. *See* Chemerinsky, *supra*, § 5.2.3.

Instead, Smith & Wesson contends that the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, provides a statutory right of review. *See* Defs.' Resp., at 14 (Dckt. No. 48). So, in Smith & Wesson's view, the NFA does have a private right of action, albeit through the Administrative Procedure Act.

The Court disagrees. The Administrative Procedure Act permits suits against *federal agencies* for "legal wrong[s] because of agency action." *See* 5 U.S.C. § 702; *see also id.* § 704

(defining "Actions reviewable" as "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review"). The statute permits courts to "hold unlawful and set aside agency action, findings, and conclusions" that do not satisfy certain standards. *Id.* § 706(2).

The "APA's omnibus judicial-review provision . . . permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). That is, the APA permits suits to challenge federal agency action across a wide array of substantive law.

But the APA does not create a private right of action to sue *private parties* – like Smith & Wesson. So, maybe Plaintiffs could sue under the Administrative Procedure Act to challenge an action by the ATF. But they cannot use the APA to sue Smith & Wesson for allegedly tortious marketing practices, negligence, and infliction of emotional distress. The APA is a way to keep public agencies – not private parties – in check.

In fact, if the APA, coupled with another federal statute, completely preempted an entire field of state law, complete preemption would not be "rare" and applicable only "in a small number of areas." *See Maglioli*, 16 F.4th at 408; *Crosby*, 725 F.3d at 800. Suits challenging agency action under the APA are ubiquitous. But the APA does not completely preempt all substantive areas of law that are subject to agency review under the statute. The APA does not "override[] all possible applicable state law" across the substantive areas that are subject to judicial review. *Crosby*, 725 F.3d at 800.

By pointing to the NFA, combined with the Administrative Procedure Act, Smith & Wesson has not "identif[ied] a federal cause of action that includes the same ingredients as the

49

**A-49**

state claim and provides some recovery." *In re Repository Techs.*, 601 F.3d at 723. The APA does not permit plaintiffs to sue the same defendants. An APA claim does not have the same elements as the state-law tort claims, either.

Again, "[t]he elements of a claim under the ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; . . . (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce"; (4) damages; and (5) proximate cause. *Leszanczuk*, 21 F.4th at 940 (quotation marks omitted). These are not the elements of a claim under the APA. Under the APA, "a court must set aside an agency determination if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or if it is 'unsupported by substantial evidence.'" *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1024 (7th Cir. 2018) (quoting 5 U.S.C. § 706(2)(A), (E)). The APA permits a court to "deferentially examine an agency's work, but not rubber-stamp it." *Id.*

In short, judicial review of agency action does not preempt the ICFA. It does not preempt Plaintiffs' other state-law tort claims, either.

Moreover, the NFA does not include a "clear showing of Congressional intent to eliminate state law entirely." *Ne. Rural Elec. Membership Corp.*, 707 F.3d at 894. In fact, it shows the opposite congressional intent. The NFA's chapter on criminal penalties includes a provision clarifying the statute's effect on state law. "*No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter*, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together." *See* 18 U.S.C. § 927 (emphasis added).

50

**A-50**

Included within this chapter of the U.S. Code are the NFA's licensing requirements – the same licensing requirements that Smith & Wesson argues completely preempt state law. *See* 18 U.S.C. § 923; Defs.' Resp., at 4, 14–15 (Dckt. No. 48). But Congress was clear that the NFA's licensing requirements do not completely preempt state law, even if they preempt conflicting state laws. *See City of Gary ex rel. King v. Smith & Wesson Corp.*, 94 F. Supp. 2d 947, 952 (N.D. Ind. 2000) (noting that "§ 927 of the Gun Control Act specifically allows non-conflicting state regulation").

In sum, Smith & Wesson may not remove this case based on the complete preemption doctrine because the NFA does not create a private right of action. The NFA also does not include a clear congressional intent to completely preempt state law.

## IV.     Artful Pleading Doctrine

The last proffered basis for removal is the artful pleading doctrine.

Smith & Wesson contends that "Plaintiffs' state law claims are an artfully pleaded attempt to have a state court improperly overturn the ATF's determination that semi-automatic rifles, like the M&P rifle, are not 'machine guns' subject to the regulatory requirements of the NFA." *See* Notice of Removal, at ¶ 16.b (Dckt. No. 1). In Smith & Wesson's view, because Plaintiffs' "state-law claims are foreclosed, implausible, and insubstantial under Illinois law," the claims must be federal claims in disguise. *See* Defs.' Resp., at 8 (Dckt. No. 48).

The Court can make short order of this argument. The artful pleading doctrine does not permit Smith & Wesson to remove this case.

"Artful pleading on the part of a plaintiff to disguise federal claims by cleverly dressing them in the clothing of state-law theories will not succeed in keeping the case in state court." *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Board Health & Welfare Tr. Fund*, 538

F.3d 594, 596 (7th Cir. 2008).  But as discussed above, this case does not present federal claims or necessarily raise a federal issue.  So, Plaintiffs' claims are not federal claims in disguise.

**V.     Consent**

The Court ends by closing the loop on one final point.  Plaintiffs contend that Smith & Wesson may not remove this case for another reason.  They argue that Smith & Wesson did not get the consent of all Defendants to remove.  *See* Pls.' Mtn. to Remand, at 7 (Dckt. No. 26).

Removal generally requires the consent of all defendants.  "When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action."  *See* 28 U.S.C. § 1446(b)(2)(A).

That provision governs removal "solely under section 1441(a)," and thus does not cover removal under the federal officer removal statute, meaning section 1442.  *Id.*  So, if the federal officer removal statute applied, Smith & Wesson would not need the consent of the Crimos.

But section 1441 does govern removal based on federal question jurisdiction under 28 U.S.C. § 1331.  *See* 28 U.S.C. § 1441(a).  So, as a starting point, Smith & Wesson would need the consent of all defendants to remove the case based on federal question jurisdiction.

Smith & Wesson acknowledges that it does not have the consent of all Defendants to remove this case.  Defendants Crimo Jr. and Crimo III have not consented to removal.  *See* Notice of Removal, at ¶ 9 (Dckt. No. 1).

Instead, Smith & Wesson argues that it did not need the consent of every defendant.  The removal statute includes a provision that applies when a complaint includes a mixed bag of claims, meaning claims over which the court has jurisdiction (because they arise under federal law) and does not have jurisdiction (because they do not fall within the court's original or supplemental jurisdiction).  As an example, imagine a complaint that includes a federal claim

and a state-law claim against two defendants, when there is no diversity and no supplemental jurisdiction over the state-law claim.

Under the removal statute, if a case includes *both* "a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title)," *and* "a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute," then "the entire action may be removed if the action would be removable without the inclusion" of the state-law claim. *See* 28 U.S.C. § 1441(c)(1). In that situation, "the district court shall sever from the action" the claims that are "not within the original or supplemental jurisdiction of the district court or [claims] that [have] been made nonremovable by statute" and remand them while retaining jurisdiction over the federal claims. *Id.* § 1441(c)(1)–(2).

That is, section 1441(c) contemplates that a complaint might include both federal claims and state-law claims. If the court does not have original or supplemental jurisdiction over the state-law claims, a defendant can remove the case, and the district court can sever the claims where there is no jurisdiction. "In plain terms, Section 1441(c)(2) requires the Court to remand 'separate and independent' claims that are removed with a federal question claim but that fall outside the Court's jurisdiction." *Elftmann v. Village of Tinley Park*, 191 F. Supp. 3d 874, 882 (N.D. Ill. 2016) (quoting *Montano v. City of Chicago*, 375 F.3d 593, 600 (7th Cir. 2004)).

In that situation, there is no need for all defendants to consent to removal. Under section 1441(c)(2), a defendant does not need to consent if that defendant is facing claims over which the court lacks jurisdiction. When a defendant is facing a state-law claim (only), and when a federal court lacks jurisdiction over that claim, there is no need to get the consent of that defendant because that defendant will get shipped back to state court anyway. *See* 28 U.S.C.

§ 1441(c)(2) ("Only defendants against whom a claim described in paragraph (1)(A) has been asserted are required to join in or consent to the removal under paragraph (1).").

So, in Smith & Wesson's view, it does not need the consent of Crimo Jr. and Crimo III. The Court does not have original jurisdiction over the state-law claims against the Crimos (because of the lack of diversity). And as Smith & Wesson sees it, there is no supplemental jurisdiction over those claims because they are not part of the same case or controversy as the rest of the case. *See* 28 U.S.C. § 1367(a) (creating supplemental jurisdiction when the claim "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014) ("Claims form part of the same case or controversy when they 'derive from a common nucleus of operative fact.'") (citation omitted).

The argument fails because it assumes the existence of a federal claim, which is a necessary element under section 1441(c)(1)(A). The statute applies only when the complaint includes a claim that arises under federal law. *See* 28 U.S.C. § 1441(c)(1)(A). But here, as explained above, no claim arises under federal law. If one of the other claims *did* arise under federal law, then Smith & Wesson potentially could remove the case without the consent of the Crimos. But that's not this case.

### Conclusion

For the foregoing reasons, Plaintiffs' motions to remand are hereby granted in each of the consolidated cases. All of the consolidated cases are remanded to the Nineteenth Judicial Circuit Court of Lake County, Illinois.

**A-54**

Date:  September 25, 2023

_____

Steven C. Seeger
United States District Judge