No. 23-02992, consolidated with Nos. 23-02993, 23-02994, 23-02995, 23-02996, 23-02997, 23-02998, 23-02999, 23-3000, 23-3001, 23-3002, and 23-3003

In the United States Court of Appeals
for the Seventh Circuit

KEELY ROBERTS, and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R.,

*Plaintiffs-Appellees,*

*v.*

SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, and SMITH & WESSON, INC.,

*Defendants-Appellants,*

*and*

BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO III,

*Non-Appellant Defendants.*

On Appeal from the United States District Court
for the Northern District of Illinois
Nos. 1:22-cv-06169, 1:22-cv-06171, 1:22-cv-06178, 1:22-cv-06183, 1:22-cv-06185, 1:22-cv-06190, 1:22-cv-06193, 1:22-cv-06359, 1:22-cv-06181, 1:22-cv-06191, 1:22-cv-06361, 1:22-cv-06186
The Honorable Judge Steven Charles Seeger

**DEFENDANTS-APPELLANTS' SEPARATE APPENDIX TO OPENING BRIEF**

*Continued on next page*

*Continued from prior page*

Andrew Lothson
**Swanson, Martin & Bell, LLP**
330 North Wabash Street, Suite 3300
Chicago, Illinois 60611
(312) 923-8274
alothson@smbtrials.com



December 7, 2023

Edward S. Scheideman
**DLA Piper LLP (US)**
500 Eighth Street NW
Washington, DC 20004
(202) 799-4534
edward.scheideman@us.dlapiper.com

Kenneth L. Schmetterer
**DLA Piper LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606
(312) 368-2176
kenneth.schmetterer@us.dlapiper.com

*Attorneys for Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corporation), Smith & Wesson Sales Company, and Smith & Wesson, Inc.*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

Dated: December 7, 2023

DLA PIPER LLP (US)

By: ___/s/ Kenneth L. Schmetterer___

Kenneth L. Schmetterer

## Table of Contents for Separate Appendix

| Case and Docket No. | Date of Entry or Filing | Description | Appendix Number |
|---|---|---|---|
| Case No. 1:22-cv-6169, Dkt. 1-2 | 11/07/2022 | Complaint filed in *Keely Roberts, et al. v. Smith & Wesson, et al.*, | SA-1-SA-71 |
| 22-cv-6359, Dkt. 1-2 | 11/14/2022 | Complaint filed in *Turnipseed v. Smith & Wesson Brands, Inc.* | SA-72-SA-125 |

**FILED**
**9/27/2022 7:21 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**IN THE CIRCUIT COURT OF THE 19ᵀᴴ JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | |
|---|---|
| KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., | 22LA00000487 |
| | No.: |
| Plaintiffs, | |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO, III, | |
| Defendants. | |

NOTICE
PURSUANT TO LCR - 2-2.14
THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE
IN COURTROOM _____ ON
_____ AT _____ A.M./P.M.
FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR
AN ORDER OF DEFAULT BEING ENTERED.

## COMPLAINT AT LAW

Keely Roberts and Jason Roberts, individually and as parents and next friends of minors, C.R. and L.R. (jointly, the "Roberts Family"), by and through their attorneys, state as follows for their complaint at law against defendants, Smith & Wesson Brands, Inc., Smith & Wesson Sales Company, Smith & Wesson, Inc. (collectively, "Smith & Wesson"); Budsgunshop.com, LLC ("Bud's Gun Shop"); Red Dot Arms, Inc. ("Red Dot Arms"); Robert Crimo, Jr. (the "Shooter's Father"); and Robert Crimo, III (the "Shooter"):

## INTRODUCTION

1.      The parade started out like any other—a familiar scene across America on the Fourth of July—with floats, marching bands, and fanfare. This was the first Fourth of July parade in the City of Highland Park after two years of cancellations due to COVID-19. Hundreds of families woke up early to find the best seats along the parade route, hoping to enjoy an American

tradition. But when shots rang out at 10:14 a.m., Highland Park's Fourth of July Parade became another example of something all too uniquely American: the site of a mass shooting.

2.     Jason Roberts thought it was fireworks; but his annoyance over what he believed to be a simple, juvenile act gave way to complete horror when he heard his wife and mother of his six (6) children, including 8-year-old twin boys, frantically scream in pain: "I've been hit!" Stunned and immobilized by a bullet that punctured her forefoot tearing through it and exiting through her heel, Jason quickly reacted by tending to Keely's injury as she lay on the ground bleeding profusely. Keely and Jason quickly attempted to get their sons to the ground and protect them. As the barrage of bullets continued to surround them, Keely screamed, "they're going to kill us," and "we're sitting ducks."

3.     The bullets were coming from a nearby rooftop, where a 21-year-old obsessed with violence and armed with a Smith & Wesson Military and Police ("M&P") assault rifle was indiscriminately targeting and killing people along the parade route. The Shooter exchanged one empty magazine for another at least three different times. He fired 83 rounds in seconds. Seven people were killed, dozens were injured, and countless others will be traumatized forever.

4.     After the shooting appeared to stop, Keely yelled to her boys to get up and run. As instructed, L.R. attempted to get to his feet; however, C.R. didn't respond—he laid on the sidewalk near the corner of Central Avenue and Second Street in Highland Park, Illinois near the Walker Brothers Pancake House lifeless and unable to move.

5.     L.R. screamed that his brother was hit with a "sleeping bullet." In reality, the cause of this nightmare was a bullet shot from a Smith & Wesson M&P15, a weapon marketed and intended for war. And as a result, C.R., an 8-year-old boy that loved soccer and playing with his

twin brother Luke and friends, will never walk again. His life, and his family's life, forever changed on July 4, 2022, at 10:14am.

6.     The mass shooting at Highland Park's Fourth of July Parade was the foreseeable and entirely preventable result of a chain of events initiated by Smith & Wesson.  For years, the manufacturer has deceptively and unfairly marketed its assault rifles in a way designed to appeal to the impulsive, risk-taking tendencies of civilian adolescent and post-adolescent males—the same category of consumers whom Smith & Wesson has watched, time after time, commit the type of mass shooting that unfolded again on the Fourth of July in Highland Park.  Smith & Wesson's M&P rifles have been repeatedly used in such mass shootings, including those in Aurora, Colorado; San Bernardino, California; and Parkland, Florida.

7.     Instead of taking steps to stop or reduce the risk of this senseless slaughter, Smith & Wesson facilitates violence for profit.  It employs sales and marketing practices that create and feed a consumer base of young, civilian men who keep the money rolling in by purchasing not only the rifles, but all the deadly accessories that go with them—optics, high-capacity magazines, silencers, and laser-aiming devices, among others.  When these consumers foreseeably use Smith & Wesson assault rifles in mass shootings, the families and communities affected suffer while Smith & Wesson celebrates a boost to its bottom line.  Smith & Wesson knows that demand for its weapons increases in the aftermath of mass shootings.  Rather than behave responsibly, Smith & Wesson stokes fear of gun regulations after each shooting to increase that demand.

8.     Smith & Wesson's marketing and promotion attracts young men looking for military-style rifles to act out a perverse combat fantasy of killing as many people as possible. And Smith & Wesson knows it.  It promises that its assault rifles will provide "More Adrenaline," encourages consumers to "Kick Brass," and models advertisements after first-person shooter video

games.  It utilizes social media influencers who try to pump up civilian purchases by showing followers how to use M&P assault rifles in combat-like situations, including teaching how "to get accurate hits on target" while avoiding bullets by moving from "cover to cover."[1]  And it showcases the combat-like use of its branded assault rifle in its own advertisements.[2]

9.     Smith & Wesson also misleadingly implies that its rifles are used or endorsed by the U.S. military, a strategy referred to as the "halo" effect by its former CEO.[3]  The reality, however, is that none of its assault rifles are sold to the U.S. military.  Smith & Wesson uses this deceptive marketing despite knowing that a subset of the consumers attracted by the appeal of militaristic combat missions are impulsive young men prone to violence, like the Shooter here.

10.     The Shooter fits the demographic of customers that Smith & Wesson targeted with its negligent and unlawful marketing.  An avid user of the social media platforms used by Smith & Wesson to promote its assault rifles, the Shooter displayed his hardcore violent fantasies online, styling himself on one platform as a "Master Gunnery Sergeant," and on others as a video game assassin.  He spewed hatred online and often posted videos of himself playing first-person-shooter games.  In one animated video, he drew a young man in tactical gear, holding an assault rifle and shooting people before police appear and kill the shooter.  In another, he appears in a classroom in a helmet and tactical vest.

11.     At the age of 18, in 2019, the Shooter attempted suicide.  The following year, in 2020, shortly after creating his "Master Gunnery Sergeant" profile, he went online to buy a Smith

---

[1]     Provectus Group (@provestusgroup), INSTAGRAM (July 30, 2020), *available at* https://perma.cc/DR43-NL8V.

[2]     Smith & Wesson, Inc, "*The NEW Smith & Wesson Volunteer Rifle Series*," YOUTUBE (Jan. 18, 2022), *available at* https://perma.cc/Y29Q-H5JP.

[3]     Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 11 (Tr. of Conference Call and Webcast Conducted on Sept. 1, 2016) (Sept. 2, 2016).

& Wesson assault rifle.  On July 4, 2022, armed with his Smith & Wesson rifle, he was able to act out his violent fantasy—like so many disturbed and hate-filled young men before him.  The shooting played out in an entirely foreseeable way—with extreme and limitless power—just as Smith & Wesson advertised it would.

12.    Far from accepting any responsibility, after the Highland Park shooting, Smith & Wesson has painted *itself* as the victim, recently tweeting about "an unprecedented and unjustified attack on the firearm industry."[4]  The company's strident refusal to acknowledge its role in tragedies like Highland Park and its continued use of negligent and unlawful marketing and sales practices poses a clear and unacceptable risk to public safety.

13.    The marketing and sales practices of Smith & Wesson and other entities within the gun industry are the beginning and pivotal links in a foreseeable and predictable chain of events resulting in numerous mass shootings in America each year.  With full knowledge and appreciation of its role in facilitating these mass shootings, Smith & Wesson continues to intentionally and recklessly advertise, market, promote and sell a warrior mentality that a certain subset of youths and young men fantasize will propel them into infamy.  It has not taken even the simplest steps to prevent or discourage young, impulsive would-be mass shooters from acquiring its weapons, such as implementing age gates on its social media, warning consumers about the dangers of assault rifles, or making it harder for individuals like the Shooter to acquire their products.  Smith & Wesson's practices are negligent and unlawful under the Illinois Uniform Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act.

---

[4]    Smith & Wesson, Inc (@smithandwessoninc), TWITTER (Aug. 15, 2022), *available at* https://perma.cc/A3XS-MYTW.

14.    After years of conditioning by perverse and pervasive marketing by Smith & Wesson and the gun industry, would-be mass murders—like the Shooter—naturally look to obtain the products associated with the idolized warrior mentality featured by these promotions.

15.    At the age of 19, the Shooter was able to purchase the M&P assault rifle he used to terrorize Highland Park.  The Shooter's father sponsored his son's Firearm Owners Identification (FOID) card application, despite knowing that his son was a clear and present danger, and had only months before threatened suicide with a machete and threatened to kill everyone in his house. To sponsor the FOID application, the Shooter's Father signed an affidavit acknowledging that his sponsorship of the Shooter's FOID card carries with it "liab[ility]for any damages resulting from the minor applicant's use of firearm or firearm ammunition."  He too is liable for the havoc and death caused by his son.

16.    Armed with a disturbing thirst for violence stoked by Smith & Wesson's marketing and a FOID card sponsored by his reckless father, the Shooter next needed to obtain a weapon of war to carry out his "mission."  In or around June or July 2020, the Shooter went onto the website for Bud's Gun Shop, where he selected Smith & Wesson's M&P rifle for purchase.  Bud's Gun Shop sold the M&P assault rifle to the Shooter despite the fact that it is illegal for residents of Highwood, Illinois and Highland Park, Illinois to acquire and possess assault weapons.

17.    Bud's Gun Shop then shipped the gun to Red Dot Arms, a gun dealer located in Illinois, which transferred the assault rifle to the Shooter. Both companies (together, the "Gun Store Defendants") knew the Shooter's address, and thus knew that they were selling an assault rifle to a resident of a municipality that prohibited the possession of such weapons.  Nevertheless, they proceeded with the sale and transfer, enabling the Shooter to carry out his deadly mission.

18.     For years, Smith & Wesson, Bud's Gun Shop, Red Dot Arms, and other entities in the gun industry have, through their misconduct and illegal practices, been able to profit off the actions of disturbed and hate-filled young men like the Shooter.  They, like the Shooter's Father, willfully ignored the public's right to be safe from violence by placing a weapon of war into the Shooter's hands.  All of these actors must be held accountable for the massacre at Highland Park's Fourth of July Parade.

## PARTIES

19.     Plaintiffs Keely Roberts and Jason Roberts, parents of twin 8-year-old boys C.R. and L.R., are residents of Highland Park, Lake County, Illinois. They were all present at the July 4th Parade at Highland Park. Plaintiff C.R. remained hospitalized for 73-days for comprehensive treatment for the catastrophic injuries he sustained. Similarly, Plaintiff Keely Roberts was treated at Highland Park Hospital and Skokie Hospital for the injuries she sustained. Plaintiff L.R. was hit with shrapnel, for which he sought medical treatment at Highland Park Hospital. Collectively, the entire Roberts family has suffered, and continues to suffer, severe emotional distress stemming from the attack on their family.

20.     Defendant Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corporation) is a for-profit Nevada corporation, with its principal place of business in 2100 Roosevelt Ave. in Springfield, Massachusetts 01104.

21.     Defendant Smith & Wesson Sales Company (f/k/a American Outdoor Brands Sales Company; f/k/a Smith & Wesson Corp.) is a for-profit Delaware corporation and a wholly owned subsidiary of Smith & Wesson Brands, Inc. Smith & Wesson Sales Company is a federally licensed firearms manufacturer and importer that operates at 1800 North Route Z in Columbia, Missouri 65202 and has its principal office at 2100 Roosevelt Ave. in Springfield, Massachusetts 01104.

22.    Defendant Smith & Wesson, Inc. (f/k/a Smith & Wesson Firearms, Inc.) is a for-profit Delaware corporation and a wholly owned subsidiary of Smith & Wesson Sales Company, which is itself a wholly owned subsidiary of Smith & Wesson Brands, Inc.  Smith & Wesson, Inc. is a federally licensed firearms manufacturer and importer that operates at 2100 Roosevelt Ave. in Springfield, Massachusetts 01104 where it also has its principal office.

23.    Collectively, the Smith & Wesson defendants manufacture, design, market, and sell the M&P line of assault rifles under the Smith & Wesson and M&P brand names.

24.    One or more of the Smith & Wesson defendants manufactured, designed, marketed and sold the Smith & Wesson M&P15 semiautomatic rifle that was used in the shooting in Highland Park, Illinois on July 4, 2022.

25.    Defendant Bud's Gun Shop is and at all relevant times has been a distributor of firearms and is federally licensed to deal in firearms.  Bud's Gun Shop is headquartered in Lexington, Kentucky.  It has multiple physical locations in Kentucky and Tennessee, as well as a large online retail presence.  Bud's Gun Shop advertises itself as "America's # 1 Online Retailer of Firearms, Ammunition and Accessories."

26.    In or around June or July of 2020, Bud's Gun Shop sold the Shooter the Smith & Wesson M&P15 semiautomatic rifle that he used in the shooting in Highland Park, Illinois on July 4, 2022.

27.    Defendant Red Dot Arms is a retail gun store located in Lake County, Illinois.  In or around June or July of 2020, it transferred to the Shooter the Smith & Wesson M&P15 semiautomatic rifle he used in Highland Park, Illinois on July 4, 2022.

28.     Defendant Robert Crimo, III, the Shooter, lived in and, upon information and belief, was a resident of Highwood, Lake County, Illinois at the time of the shooting.[5]  He has been charged with 21 counts of first-degree murder, 48 counts of attempted murder, and 48 counts of aggravated battery and, upon information and belief, he is now in custody in the Lake County Jail.

29.     The Shooter purchased the Smith & Wesson M&P15 assault weapon online from Budsgunshop.com in June or July of 2020, when he was 19 years old.  He subsequently picked it up from Red Dot Arms and later used it to open fire on hundreds of innocent people attending the Fourth of July parade in Highland Park, Illinois.

30.     Defendant, Robert Crimo, Jr., the Shooter's Father, has at all relevant times lived in Highland Park, Lake County, Illinois.  The Shooter's Father and his son are jointly referred to herein as the "Crimo Defendants."

31.     The Shooter's Father sponsored his then-minor son's application for a FOID Card, which required him to attest under oath that he "understand[s] [he] shall be liable for any damages resulting from the minor applicant's use of firearm or firearm ammunition."

## JURISDICTION AND VENUE

32.     This is an Illinois action directly affecting residents of Lake County, Illinois. It is brought on behalf of Lake County residents for losses and harms that occurred in Lake County, as a result of Defendants' utter indifference, recklessness, willful, and wanton conduct.

33.     This Court has jurisdiction over Smith & Wesson and Bud's Gun Shop pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, have committed tortious

---

[5]     Based upon publicly-available information, the Shooter was associated with two addresses: one in Highwood and one in Highland Park, both in Lake County, Illinois. However, it appears that his last official place of residence was in Highwood.

acts in Illinois, and have transacted substantial business in Illinois that caused harm in Illinois, including business that is the subject matter of this complaint.

34.     This Court has jurisdiction over the Crimo Defendants and Red Dot Arms because they are residents of Illinois.

35.     Venue is proper in this Court under 735 ILCS 5/2-101 and 5/2-102, as the transactions and occurrences that form the basis for this complaint occurred, in part, in Lake County, and Red Dot Arms as well as the Crimo Defendants reside in Lake County.

## **GENERAL ALLEGATIONS**

36.     Each Defendant enabled the Shooter to carry out a massacre on July 4, 2022.

37.     *First*, Smith & Wesson knowingly sought to place its weapons in the hands of disturbed young men by targeting and exploiting the risk-seeking—and often troubling—desires of these consumers.  The Shooter and other would-be mass shooters are highly susceptible to the disturbing promotional messages from Smith & Wesson, which foreseeably feed the desires of these young men to act out their militaristic fantasies on a civilian population.

38.     *Second*, the Shooter's Father enabled the Shooter's thirst for violence by sponsoring his FOID application, despite his knowledge that the Shooter was disturbed and had threatened violence, thus allowing the Shooter to legally obtain the very weapon of war that Smith & Wesson had been promoting to consumers like the Shooter for years.

39.     *Third*, Bud's Gun Shop and Red Dot Arms enabled the Shooter to obtain the Smith & Wesson M&P assault rifle despite the fact that it was illegal for him to possess this weapon.

I.      **Smith & Wesson Designs and Markets Weapons of War to Civilians.**

        *a.   The Evolution of the Assault Weapon*

    40.    The assault rifles manufactured and promoted by Smith & Wesson to individuals like the Shooter have military origins. They were originally designed to kill as many people as possible as quickly as possible. Even today, Smith & Wesson promotes these rifles to consumers who fantasize about military-style combat.

    41.    During World War I, infantry soldiers were generally equipped with long-range battle rifles, which did not meet the needs of the trench warfare that characterized the war. As a result, countries began developing more compact, fast-firing weapons, such as the submachine gun. By World War II, the German military had developed the StG 44, also known as the "storm gun," and the "father of all assault rifles," because "[a]fter the war it was examined and dissected by almost every major gunmaking nation and led, in one way and another, to the present-day 5.56mm assault rifles."[6]

    42.    The first AR-15 rifles were designed in 1957 by Armalite, a small arms engineering company, for the U.S. military.[7] Armalite's goal was to create a lightweight portable select-fire rifle that would allow soldiers to quickly put many rounds on target from distances of a quarter mile or more.[8] Thus, the AR-15 was designed to be effective in combat and to kill or disable as many enemy soldiers as possible as quickly as possible, even from far away. Although Armalite

---

[6]    Violence Policy Center, *Understanding the Smith & Wesson M&P15 Semiautomatic Assault Rifle Used in the LAX Shooting* at 10 (Nov. 2013) (citation omitted).

[7]    "AR" stands for "Armalite Rifle."

[8]    A fully automatic rifle fires continuously as long as the trigger is held down. A semiautomatic rifle fires one round for each trigger pull, and then automatically reloads the chamber with the next round. A select-fire rifle can fire in either fully automatic or semiautomatic mode.

developed the first AR-15, today the term "AR-15" designates the type of the firearm, rather than the brand.

43.     Armalite's design performed so well that the U.S. military concluded that a five- or seven-man squad armed with AR-15s (known within the military as M16 rifles) had as good or better "hit-and-kill potential" in combat-style tests than an 11-man squad armed with older, select-fire M14 rifles.  In fact, the U.S. Army directs that semiautomatic mode, rather than automatic fire, be used for virtually all purposes, because it is more effective and lethal.  The Army has concluded that "[a]t ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and even time to hit."[9]

44.     The distinctive appearance of assault weapons is the result of the gun's functional design.  Assault weapons "have incorporated into their design *specific* features that enable shooters to spray ('hose down') a large number of bullets over a broad killing zone, without having to aim at each individual target.  These features not only give assault weapons a distinctive appearance, they make it easy to simply point the gun while rapidly pulling the trigger."[10]  These design features make assault weapons particularly lethal.

45.     In 1968, Congress amended the National Firearms Act of 1934 ("NFA") and expanded the definition of machinegun to include "any weapon which shoots, is *designed to shoot,* or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b) (emphasis added).  The definition includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts designed and intended, for use in converting a weapon into a machinegun," and "any combination

---

[9]     U.S. Dep't of Defense, *Operate Your Rifle Like a Pro: U.S. Army Official Manual,* at Chapter 7, Section II, 7-8 (2017).
[10]     Violence Policy Center, *supra* note 6, at 10-11.

off parts from which a machinegun can be assembled" if those "parts are in the possession or under the control of a person." *Id.* It is a crime to possess or transfer machine guns to any person who has not undergone the required registration and authorization process. *See* 18 U.S.C. § 922(b)(4); § 922(o)(1).

46.     Interpreting this language, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") clarified in 1982 that semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with "simple modification or elimination of existing component parts" were "machineguns" under the NFA.[11] That is, even if a gun was not originally a machinegun, it qualifies as one under the NFA if it can be simply modified into one.

47.     Two important developments occurred in 1994. *First*, the U.S. military began using the M4 carbine—a version of the M16 with a shorter 14.5-inch barrel and a collapsible stock. The M4 has slowly replaced the M16 in service because it is easier to use in close quarters, but still functions like the M16. *Second*, Congress further acted to limit access by civilians to these weapons by passing a federal assault weapon ban, which sunset in 2004.

48.     As the federal assault rifle ban lapsed in 2004, the gun industry saw an opportunity to market these weapons of war to civilians.

b.     *Smith & Wesson Designs and Profits From Assault Rifles and Mass Shootings*

49.     Smith & Wesson introduced its line of M&P assault rifles in early 2006, shortly after the federal assault weapon ban sunset. It designed the M&P rifle to mimic an M4 carbine.

---

[11]     ATF Ruling 82-2; ATF Ruling 82-8.



*2006 Presentation to investors including the following quote: "If you're a fan of the M4A1 Carbine, I can assure you that the new M&P Carbine is as good as it gets."*

50.    Smith & Wesson explained that these "tactical rifles" or "black rifles" were "specifically designed to satisfy the functionality and reliability needs of global military and law enforcement personnel."[12]  But the company pitched them to the civilian market, stating:  "[w]e also believe that our M&P rifle series fills a tremendous gap in the marketplace by delivering high-quality, feature-rich tactical rifles that will be readily available in commercial channels."[13]

51.    Not only were the M&P rifles "specifically designed to satisfy the functionality and reliability needs of global military and law enforcement personnel," but they have design features that allow them to be easily converted to fire automatically—without the need for advanced equipment or mechanical skills.  Such modification—which is illegal—can be accomplished by: (i) replacing the manufacturer-installed, semiautomatic sear system inside the rifle with a third-party sear system that enables automatic fire, such as an M16 auto sear, a "drop-in auto sear," a "lightning link,"  a "swift link," or even a carefully shaped coat hanger; (ii) shaving down part of

---

[12]    Smith & Wesson Holding Corp., *Annual Report* at 4 (Form 10-K) (Jul. 16, 2007).
[13]    Violence Policy Center, *supra* note 6, at 3.

14

the manufacturer-installed sear system to change the way it functions; or (iii) retrofitting the weapon with a device that dramatically increases its rate of fire to mimic a machinegun's, including a bump stock, trigger crank, Hellfire device, forced-reset trigger, binary trigger, or similar attachment.

52.    Smith & Wesson chose to design the M&P15 assault rifles with features that allow the rifles to be easily modified to fire automatically, but manufactured, transferred and sold them in violation of the NFA and the Gun Control Act ("GCA"), since the company failed to fill out the appropriate transfer forms, get approval of the forms by the ATF, pay occupational and transfer taxes and—most critically—register the firearms with ATF.

53.    Instead of designing a new civilian rifle by altering the design of the military M4 carbine so that it could not be easily modified to fire automatically, Smith & Wesson essentially copied the design of a fully automatic weapon that is made for combat, not for any legitimate need of a law-abiding civilian.

54.    For Smith & Wesson, the addition of the M&P assault rifles to the company's lineup significantly contributed to its bottom line.  In the early years of the product line, the company repeatedly bragged to investors about the strong "consumer response" to its "AR style tactical rifles."[14]

55.    In annual filings with the SEC for fiscal year 2012, Smith & Wesson estimated the domestic non-military firearm market for assault rifles to be $489 million.  And according to the company, the sale of its M&P assault rifles accounted for $75.1 million in net sales—over 18% of its total net sales—a 3,650% increase from 2006.[15]

---

[14]    *See, e.g.*, *id* at 4.
[15]    Smith & Wesson Holding Corp., Annual Report at 1–4 (Form 10-K) (July 14, 2006);
Smith & Wesson Holding Corp., Annual Report at 1–4 (Form 10-K) (June 28, 2012).

56.    While Smith & Wesson reaped the profits, the costs were borne by American civilians.  In July 2012, a 24-year-old male murdered 12 people and wounded 70 others in an Aurora, Colorado movie theater with a Smith & Wesson M&P rifle.  A few months later, in December 2012, a 20-year-old male murdered 26 people—including 20 young children—at Sandy Hook Elementary School, using another company's assault rifle.

57.    In its corporate filings that fiscal year, Smith & Wesson did not report any changes to its business practices as a result of these shootings.  Instead, Smith & Wesson only stopped separately reporting its assault-rifle profits.[16]  But the money kept rolling in:  for fiscal year 2013, the company reported that it had captured 20 percent of the assault rifle market and that the increase in firearms sales was due in part "to fears of renewed legislative activity surrounding restrictions on the sale or makeup of firearms."[17]  In other words, Smith & Wesson was profiting off the fear of stronger gun laws following the public outcry after the Aurora and Sandy Hook shootings.

58.    By fiscal year 2015, Smith & Wesson estimated that it had the "leading share" of the assault rifle market.[18]

59.    Then, on December 2, 2015, two attackers killed 14 people and seriously wounded 22 others at a Christmas party in San Bernardino, California.  Their arsenal included a Smith & Wesson M&P assault rifle.

60.    One week after the shooting, then-CEO James Debney announced that the company was increasing financial guidance for the fiscal year.[19]  Three months later, Debney told financial

---

[16]    *See* Smith & Wesson Holding Corp., Annual Report at 1–4 (Form 10-K) (June 25, 2013).

[17]    *Id.* at 34.

[18]    Smith & Wesson Holding Corp., Annual Report at 3 (Form 10-K) (Jun. 22, 2015); Smith & Wesson Brands, Inc., Annual Report at 4 (Form 10-K)(Jun. 19, 2020); Smith & Wesson Brands, Inc., Annual Report at 3 (Form 10-K) (Jun. 23, 2022).

[19]    Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 4–5 (Tr. of Conference Call and Webcast Conducted on Dec. 8, 2015) (Dec. 9, 2015).

analysts that the company was "obviously doing everything we can to capitalize on the strong market" in the preceding fiscal quarter.[20]

61.    On February 14, 2018, shortly after 2:00 p.m., 19-year-old Nikolas Cruz arrived on the grounds of Marjory Stoneman Douglas High School in Parkland, Florida.  He used a Smith & Wesson M&P rifle that he had purchased at the age of 18 to murder 17 students and staff members and injure 17 others.

62.    In an investor call shortly thereafter, Debney acknowledged the tragedy, but did not announce any steps that the company would take to stop marketing M&P rifles to dangerous, impulsive teenagers like Cruz.

63.    In September 2018, a majority of voting shareholders passed a resolution requesting an investigation into Smith & Wesson's "activities related to gun safety measures and mitigation of harm associated with gun products, including. . . evidence of monitoring of violent events associated with products produced by" Smith & Wesson.[21]  In the report that followed, Smith & Wesson stated that it engaged "an independent media monitoring firm" to "track violent events at which Smith & Wesson firearms were present" and would "continue with certain monitoring for at least one year to further test the[] initial results."[22]  The report claimed that adopting the shareholders' requested safety measures was not worth it.  Specifically, Smith & Wesson wrote: "[t]he Company's reputation as a strong defender of the Second Amendment is not worth risking

---

[20]    Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 7 (Tr. of Conference Call and Webcast Conducted on Mar. 3, 2016) (Mar. 4, 2016).

[21]    American Outdoor Brands Corporation, Shareholder Requested Report on Product Safety Measures and Monitoring of Industry Trends at 3 (Feb. 8, 2019).

[22]    *Id.* at 5.

for a vague goal of improving the company's reputation among non-customers or special interest groups with an anti-Second Amendment agenda."[23]

64.    In fiscal year 2021, Smith & Wesson boasted of "develop[ing] a new and exciting consumer-focused marketing approach," and noted that it welcomed eight million first-time gun buyers.[24]  As a result, Smith & Wesson's net sales surpassed $1 billion for the first time in its 169-year history.[25]

> c.   *Smith & Wesson Intentionally, Unfairly, and Deceptively Markets the M&P Line to Civilians, including Teenagers and Young Adults*

65.    Despite knowing that mass shootings have been repeatedly perpetrated by young men armed with its and other manufacturers' assault rifles, Smith & Wesson specifically and intentionally markets its M&P rifles in a way that appeals to adolescent and post-adolescent males. It has taken no steps to guard against the sale of these rifles to those who would foreseeably commit such violent acts.

66.    A recent investigation conducted by the U.S. House of Representatives' Committee on Oversight & Reform found that "despite [numerous] horrific mass shootings [with Smith & Wesson firearms], Smith & Wesson's marketing campaigns have consistently contained dangerous themes and messages."[26]

67.    Through its marketing and sales practices, Smith & Wesson willfully places profits over safety. Smith & Wesson does this in at least two ways.

---

[23]   *Id.* at 4.
[24]   Smith & Wesson Brands, Inc., 2021 Annual Report: 2021 in Review (2021).
[25]   Smith & Wesson Brands, Inc., Annual Report at 4 (Form 10-K) (Jun. 17, 2021).
[26]   Letter from Carolyn B. Maloney, Chairwoman of U.S. House Committee on Oversight and Reform, to Mark P. Smith, President and CEO of Smith & Wesson Brands, Inc., at 6 (August 1, 2022), *available at* https://perma.cc/DM57-QZGL.

68.    *First*, Smith & Wesson repeatedly markets its M&P rifles as closely associated with and/or endorsed by the U.S. military.  In fact, as stated above, the M&P brand name of Smith & Wesson's rifles stands for "Military & Police."[27]

69.    Starting from at least 2009, Smith & Wesson has advertised its M&P assault rifle as being the "chosen" firearm for on-duty service members:





**2009**                                          **2010**



**Date Uknown**

70.    As of 2018, the Smith & Wesson website prominently featured an image of an M&P rifle with the text "Military, Law Enforcement & Training" as an overlay:

---

27      According to Smith & Wesson, the name "M&P" comes from the company's Model 1899 *Military and Police* Revolver. *See* Smith & Wesson, History of M&P, *available at* https://perma.cc/L8QD-834U.



*Screenshot from Smith & Wesson Homepage in 2018 via Wayback Machine*

71.    And recent Smith & Wesson marketing features individuals who appear to be active

U.S. military service members in full uniform carrying weapons that resemble M&P rifles:



*Image of an M&P rifle and an American flag superimposed over what appears to be an active-duty soldier. Instagram - @smithandwessoninc (Nov. 4, 2018)*





*Advertisements featuring what appears to be an active-duty U.S. soldier,
holding an M&P rifle.  (2019)*

72.     The intent of this branding and marketing campaign is to increase civilian sales by conveying the message that M&P rifles are approved, endorsed, and used by the U.S. military. While the promotions above offer U.S. service members a discount, the images Smith & Wesson chose to use deliberately—and misleadingly—show the weapons being used not in a civilian context but by what are made to appear to be members of the U.S. military on active military duty.

73.     These campaigns also falsely imply that Smith & Wesson's line of M&P rifles are the same standard, quality, or grade that the U.S. military uses.

74.     Smith & Wesson has referred to this marketing strategy of promoting an association between its products and the United States military and/or law enforcement officials as an effort to take advantage of the "halo" effect, which is intended to confer credibility to the M&P line of products in the eyes of civilian buyers by connecting these weapons to the military and law enforcement.[28]

---

[28]     *See* Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 11 (Tr. of Conference Call and Webcast Conducted on Sep. 1, 2016) (Sept. 2, 2016).

75.    By cloaking products generally sold to the public in the mantle of revered members of the U.S. military and law enforcement, Smith & Wesson marketing suggests that buying these products will allow civilians to act like service members and engage in combat.

76.    For example, according to Smith & Wesson in its 2017 annual report, "Our M&P branded modern sporting rifles are specifically designed to satisfy the functionality and reliability needs of global military, law enforcement, and security personnel.  As a result, these long guns are popular with consumers as hunting and sporting target rifles and are sold through our sporting good distributors, retailers, and dealers."[29]

77.    Smith & Wesson is not the only gun company to engage in such marketing. The National Shooting Sport Foundation ("NSSF")—whose members include Smith & Wesson—led a charge for the industry to call assault rifles "modern sporting rifles" in order to mitigate the (correct) association between the assault rifle and its violent purpose and past.  As a result, the gun industry—including Smith & Wesson—began re-naming the rifle as a "modern sporting rifle" in order to promote a false narrative that the assault rifle was useful for hunting and sport shooting.

78.    The true use of the rifle is revealed, however, by the gun industry's continued push in advertising assault rifles with images of military and law enforcement.  A 2020 study of gun company and influencer content on YouTube and Twitter found that "military, patriotic, and law enforcement themes" were "commonplace," and glorification of military gun use were easily found in contemporary gun advertising.[30]

---

[29]    American Outdoor Brand Corp., Annual Report at 8 (Form 10-K) (Jun. 29, 2017).
[30]    Lisa Jordan et al., *Characteristics of Gun Advertisements on Social Media: Systematic Search and Content Analysis of Twitter and YouTube Posts*, 22 J. MED. INTERNET RES.3. (Mar. 27, 2020), *available at* https://perma.cc/RC8E-C25C.

79.     When it comes to Smith & Wesson, such advertising is false and misleading. Despite the plain suggestion that M&P rifles are used or endorsed by the military, approximately 90 percent of Smith & Wesson firearms, including M&P15 rifles, are sold through the domestic civilian consumer channels.[31] Indeed, in every single 10-K filing from 2009 to 2016, the company stated that it "ha[d] not [ ] secured any major contracts to supply firearms to any large domestic military agencies."[32]

80.     Additionally, information obtained in a 2020 Freedom of Information Act request, as well as a review of firearms contracts in the Federal Procurement Data System, appear to show the existence of only a single contract between Smith & Wesson and the military over the past decade—a 2012 order by the U.S. Army for 250 revolvers apparently destined for Thailand.

81.     A *second*, and related, way that Smith & Wesson markets its assault rifles to young, impulsive men is by appealing to their propensity for risk and excitement.

---

[31]     Smith & Wesson Holdings Corp., Annual Report at 7 (Form 10-K) (Jun. 28, 2012); Smith & Wesson Holdings Corp., Annual Report at 9 (Form 10-K) (Jun. 25, 2013); Smith & Wesson Holdings Corp., Annual Report at 10, 14–15 (Form 10-K) (Jun. 19, 2014); Smith & Wesson Holding Corp., Annual Report at 9 (Form 10-K) (Jun. 15, 2015); Smith & Wesson Holdings Corp., Annual Report at 10 (Form 10-K) (Jun. 16, 2016); American Outdoor Brands Corp., Annual Report at 13 (Form 10-K) (Jun. 27, 2017); American Outdoor Brands Corp., Annual Report at 14 (Form 10-K) (Jun. 20, 2018); American Outdoor Brands Corp., Annual Report at 14 (Form 10-K) (Jun. 19, 2019); Smith & Wesson Brands, Inc., Annual Report at 17 (Form 10-K) (Jun, 19, 2020); Smith & Wesson Brands, Inc., Annual Report at 9 (Form 10-K) (Jun. 17, 2021); Smith & Wesson Brands, Inc., Annual Report at 9 (Form 10-K) (Jun. 23, 2022).

[32]     Smith & Wesson Holdings Corp., Annual Report at 15 (Form 10-K) (Jun. 30, 2009); Smith & Wesson Holdings Corp., Annual Report at 17 (Form 10-K) (Jul. 1, 2010); Smith & Wesson Holdings Corp., Annual Report at 17-18 (Form 10-K) (Jun. 30, 2011); Smith & Wesson Holdings Corp., Annual Report at 10 (Form 10-K) (Jun. 28, 2012); Smith & Wesson Holdings Corp., Annual Report at 14 (Form 10-K) (Jun. 25, 2013); Smith & Wesson Holdings Corp., Annual Report at 14–15 (Form 10-K) (Jun. 19, 2014); Smith & Wesson Holding Corp., Annual Report at 12–13 (Form 10-K) (June 22, 2015); Smith & Wesson Holdings Corp., Annual Report at 13 (Form 10-K) (Jun. 16, 2016).

82.     For example, Smith & Wesson intentionally creates advertisements mimicking the first-person shooter aesthetic of popular video games like Call of Duty.  First-person shooter games typically involve players, like the Shooter, shooting at targets—often human targets.



*Screenshot of the Shooter playing Call of Duty in or around 2019*



*Screenshot of Smith & Wesson M&P Advertisement originally published in 2015, and still available online.*



*Smith & Wesson M&P Rifle Advertisement originally published in 2015, a variation of which was published on Smith & Wesson's homepage as of June 2020.*

83.     The advertisement above promises "[a]n Experience You Have to Feel to Believe" and "[a] Lifetime Service Policy That Lets You Set Your Sights on Just One Thing—More Adrenaline." The ad also dramatizes the visual effect of the target exploding.

84.     One Smith & Wesson ad, which was first posted on YouTube in February 2015 and which appears to have aired on television, shows off M&P rifles from various "first person" points of view. The ad is titled "Get the Experience," and its byline is "Experience real-life first person shooting with the Smith & Wesson M&P rifle."[33] As a narrator tells potential consumers to "experience more adrenaline," a shooter loads an M&P rifle from the first-person shooter perspective with a high-capacity magazine. Another shooter prepares to aim their M&P rifle from a distance using an optic.

 

85.     As far back as 2010, Smith & Wesson has been encouraging consumers to "Kick Brass" and to "burn through all the ammunition you want," while promising "Pure Adrenaline."

---

[33]     SMITH & WESSON, M&P RIFLE TV COMMERCIAL, "GET THE EXPERIENCE," *available at* https://perma.cc/K9GZ-9H8N.



*Advertisement originally published by Smith & Wesson in or around 2010.*

86.    The strategy appears designed to exploit the attraction of adolescents and young adults to impulsive, thrill-seeking behavior.  And it is eerily reminiscent of the historical practices of the tobacco and alcohol industries, exploiting the vulnerability of young consumers to advertisements that promote thrill-seeking conduct in order to hook them early and convert them into lifelong purchasers of their products.[34]

87.    In fact, in a December 2019 presentation to investors, Smith & Wesson described that its brand strategy for the M&P brand was to "focus[ ] on reaching the 'Hardcore' and 'Young Gun' segments" of the market.[35]

88.    For Smith & Wesson, the younger the shooter, the better. Industry analysis published by the NSSF recommends reaching potential consumers at an early age because, "[i]t appears that hunters and shooters who started at a young age derive more satisfaction from hunting

---

[34]    *See* BOSTON UNIVERSITY CENTER ON ALCOHOL MARKETING AND YOUTH, Alcohol Advertising and Youth (2007) ("Research clearly indicates that, in addition to parents and peers, alcohol advertising and marketing have a significant impact on youth decisions to drink."); John J. Pierce et al., *Ass'n Between Receptivity to Tobacco Advertising and Progression to Tobacco Use in Youth and Young Adults in the PATH Study*, 172 JAMA PEDIATR. 444 (May 2018) ("Our study reinforces that tobacco product marketing continues to be an important contributor to tobacco use among young people.").

[35]    American Outdoor Brand Corp., Investor Presentation at 17 (Dec. 2019).

and target shooting, compared to those who started later in life – in other words, some satisfaction

becomes ingrained."[36]  In a 2017 investor call, then-CEO James Debney touted the company's

shift to younger consumers, stating "demographics [are] changing for the better. It's good to see

younger people interested in the shooting sports[.]"[37]

89.    To increase its profits, Smith & Wesson aims to hook young shooters at an early

age, so they can become consumers later in life:





---

[36]    NSSF, *Understanding Activities that Compete with Hunting and Target Shooting* at vii
(2011), *available at* https://perma.cc/937M-VYH8.

[37]    American Outdoor Brands Corp., Current Report (Form 8-K) (March 2, 2017), Exhibit
99.1 at 15 (Tr. of Tr. of Conference Call and Webcast Conducted on Mar. 2, 2017).



90.    To market its M&P rifles, Smith & Wesson maintains an active presence on social media, through platforms such as Twitter, Instagram and YouTube.  Notably, it does not employ any age gates on its social media—or its website for that matter— that would prevent minors from accessing its marketing materials, even though platforms like Instagram are exceedingly popular with youth.  Nor does Smith & Wesson include any legal or regulatory disclosures on its social media accounts, including any warnings about the dangers of assault rifles.

91.    Instead, Smith & Wesson utilizes social media influencers who promote the M&P rifle's ability to do things like shoot ten shots fired into four different targets in 1.59 seconds.[38] Influencers teach followers how to use the Smith & Wesson M&P rifle when running from target to target while avoiding bullets—something that would only be useful in a combat situation.[39]

92.    Smith & Wesson knows or should know that its paid influencers are engaged in this conduct, particularly since, under the rules of the Federal Trade Commission, advertisers are liable for false or unsubstantiated statements made by their influencers.

93.    And Smith & Wesson shows no sign of slowing down. After a 17-year-old shooter infamously used an M&P assault rifle to kill two protesters at a racial justice rally in Kenosha,

---

[38]    *See* Smith & Wesson, Inc., *Smith & Wesson M&P15 T Rifle with Jerry Miculek*, YOUTUBE (Apr. 21, 2017), https://perma.cc/3Y89-TBAM  (last visited July 21, 2022).

[39]    Provectus Group (@provestusgroup), INSTAGRAM (July 30, 2020), *available at* https://perma.cc/6PMK-KJJ6.

Wisconsin in 2021, Smith & Wesson introduced an "enhanced line" of assault rifles, promising "More Power," and telling users that the rifle can "shoot beyond 300 yards."[40]  In its marketing, Smith & Wesson encourages consumers to "step up" to buy the "Volunteer" assault rifle.[41]



*Smith & Wesson promotional materials introducing its "Volunteer" rifle series (2022).*

94.     It is no secret to Smith & Wesson that its marketing practices attract a category of consumers, including individuals like the Shooter, who threaten the safety of others—impulsive young men with militaristic delusions who desire dangerous assault weapons like the M&P15 to effectively execute their violent fantasies.

95.     If Smith & Wesson ever was unaware of these risks, the growing number of mass shootings involving assault rifles each year have amply demonstrated the results of its conduct. From 2009 through May 2020, 50 percent of the 10 mass shootings with the highest count of

---

[40]     Smith & Wesson, Inc., *The NEW Smith & Wesson Volunteer Rifle Series*, YOUTUBE (Jan. 18, 2022), *available at* https://perma.cc/R52L-ZJWD; *Volunteer Series*, SMITH & WESSON (last visited Sept. 26, 2022), *available at* https://perma.cc/VV7D-VMZ6.

[41]     *Id.*

gunshot injuries and deaths were perpetrated by male shooters who were between the ages of 19 and 26.[42]  In the two years since then, that number has grown to 70 percent.[43]

96.    Similarly, Smith & Wesson knew or should have known in the last decade, mass shooters have used Smith & Wesson weapons as their weapon of choice:

| __Date__ | __Location__ | __Additional Description__ | __Number Killed__ | __Number Injured__ | __Weapon__ |
|---|---|---|---|---|---|
| 07/20/12 | Aurora, CO | Movie Theater Shooting | 12 | 70 | M&P 15 |
| 12/2/15 | San Bernardino, CA | Community Center | 14 | 22 | M&P 15 |
| 2/14/18 | Parkland, FL | Marjory Stoneman Douglas | 17 | 17 | M&P 15 |

97.    And as discussed in more detail below, Smith & Wesson knew that young men like the Shooter are generally more susceptible to advertising than adults, and that these young men are disproportionately prone to irresponsible, impulsive thrill-seeking behavior.  Yet, it continued to market its assault rifles in a misleading and dangerous manner.

> d.    _Smith & Wesson Knew that Adolescents and Young Adults are Prone to Impulsive, Risky, and Thrill-Seeking Behavior_

98.    It is well known that adolescents and young men between the ages of 15 and 24 are highly susceptible to product advertising and more likely than other age groups to engage in risky, thrill-seeking, violent, and impulsive behavior.

---

[42]    Smith & Wesson, Inc., _The NEW Smith & Wesson Volunteer Rifle Series_, YOUTUBE (Jan. 18, 2022), _available at_ https://perma.cc/R52L-ZJWD; _Volunteer Series_, SMITH & WESSON (last visited Sept. 26, 2022), _available at_ https://perma.cc/VV7D-VMZ6.

[43]    Complaint and Request for Investigation of Daniel Defense LLC from Everytown Law to Samuel Levine, Director,  Fed. Tr. Comm'n, Bureau of Consumer Protection at 26-27 (July 15, 2022), _available at_ https://perma.cc/SH3W-PJZD.

99.     Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood.[44]

100.     As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors.[45]

101.     Adolescents and young men are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior.[46]

102.     Negative emotions such as anger, depression, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.[47]

103.     Studies have further shown that this predilection for risky, thrill-seeking behavior extends to violent criminal behavior.  A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, with 18 to 20-year-olds being nearly four times more likely to perpetrate a gun homicide than those 21-years-old or older.[48]  And

---

[44]     *See, e.g.*, Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, 24 J. PUB. POLICY & MARKETING 202, 203–07 (2005); *see also* Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk Taking*, 28 DEVELOPMENTAL REV. 78 (2008); Agnieszka Tymula et al., *Adolescents' risk-taking behavior is driven by tolerance to ambiguity*, 109 PNAS 17135 (Oct. 16, 2012).

[45]     *Id.; see also* Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in Mass Shootings: Young Assailants*, N.Y. TIMES (June 2, 2022), *available at* https://perma.cc/BK7L-SN9Y

[46]     *See* Pechmann et al., *supra* note 44, at 202, 214.

[47]     *See* Pechmann et al., *supra* note 44, at 207-09; *see also* Lisa Rapaport, *Emotional distress tied to weapon use for teens*, REUTERS (Feb. 5, 2016), *available at* https://perma.cc/G6Z7-KYVU; Renata Sikora, *Risk behaviors at late childhood and early adolescence as predictors of depression symptoms*, 17 CURRENT PROBLEMS OF PSYCHIATRY 173 (2016).

[48]     Brad J. Bushman et al., *Youth Violence: What We Know and What We Need to Know*, 71 AM. PSYCHOLOGIST 17, 19 (2016); *see also* Everytown for Gun Safety, *Permitless Carry:*

as discussed above, adolescents and young men disproportionately represent the demographic of the most destructive mass shooters.

104.    Smith & Wesson, a "marketing-led business"[49] that employs scores of marketing employees and consultants, knows about, and seeks to exploit, adolescents' and young adults' susceptibility to product advertising.

105.  In fact, in 2000, Smith & Wesson negotiated a settlement agreement with the federal government, two states, one county, and several cities that included a commitment not to "market any firearm in a way that would make the firearm particularly appealing to juveniles."[50] Although Smith & Wesson later asserted that the settlement was "not legally binding," it demonstrates Smith & Wesson's knowledge that marketing to youth is particularly risky.

106.    As the maker of assault rifles that have been used in multiple mass shootings, Smith & Wesson is aware that these age groups are more likely to engage in risky, thrill-seeking, violent, and impulsive behavior.

107.    Despite this knowledge, Smith & Wesson continued marketing the M&P15 line in a manner that would appeal to thrill-seeking young men, who wanted the power and destruction of a military weapon, fully knowing and appreciating that the growth of the M&P line was due in part to its appeal to a younger demographic of users.  Smith & Wesson's marketing foreseeably led to the mass shooting in Highland Park.

---

*Carrying a Concealed Gun in Public with No Permit and No Training* (Feb. 2020), *available at* https://perma.cc/3D2X-PCWC.

[49]    Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 12 (Tr. of Conference Call and Webcast Conducted on Mar. 3, 2016) (Mar. 4, 2016).

[50]    U.S. Dep't of Justice, *Smith & Wesson Settlement Agreement*, at 14–15 (Mar. 17, 2000), *available at* https://perma.cc/L4DT-DTWB.

## II.     The Shooter Was the Type of Young Consumer Susceptible to Smith & Wesson's Deceptive & Unfair Marketing, and Was Enabled by His Father.

### a.     The Shooter's Dark History

108.     The Shooter was exactly the type of unstable and impressionable young consumer, obsessed with violence and filled with hatred and depressive thoughts, susceptible to Smith & Wesson's marketing, and more likely to engage in dangerous behavior.  He was well within the category of consumers targeted by Smith & Wesson's unfair, deceptive, and unlawful marketing practices, and was, in fact, exposed to Smith & Wesson's marketing.

109.     The Shooter had a turbulent youth.  Between 2009 and 2014, police officers visited the Shooter's home nearly 20 times, nine of which involved reports of domestic violence.  Upon information and belief, he attended Highland Park High School but dropped out before graduating.

110.     The Shooter long demonstrated an interest in guns and other violent weapons.

111.     In April 2019, when the Shooter was 18 years old, he attempted to commit suicide with a machete, and law enforcement was called to the home.

112.     Later that year, in September, law enforcement again visited the home in response to alleged threats by the Shooter against a family member.  At this time, police seized 16 knives, a dagger, and a sword from the Shooter after a family member reported to the police that he planned to "kill everyone."  The Shooter was not charged with a crime, but a "clear and present danger report" was filed with the Illinois State Police.

113.     The Shooter's obsession with violence and weapons is well-documented.  A review of his phone after the Fourth of July shooting showed photos of gore, dismembered bodies, and decapitated people.  The Shooter also documented his alarming obsession with weapons and violence online, on his own websites and on various social media platforms, including Facebook, Instagram, YouTube, TikTok, Tumblr, Discord and Reddit, among others.

114.    He would regularly post videos of himself playing Call of Duty, such as:

 

115.    He also posted violent songs and music videos on platforms such as Spotify, YouTube and Apple Music, under the stage name "Awake the Rapper." YouTube videos prepared by or featuring the Shooter show his interest in firearms and are clearly tied to the militarized or murderous use of weapons. His obsession with violence, including in the guise of military-style missions, made him a prime target for Smith & Wesson's youthful, adrenaline-fueled, military-style marketing and advertising.

116.    In one video, posted in January 2019, he rapped, "When I die, fuck it, I want to go to hell." In another music video, titled "Toy Soldier," he raps, "fuck this world." The animated video for "Toy Soldier" opens with a student texting in class. Then, images of a heavily armed shooter entering a school and opening fire are cut between scenes of him battling police outside. The shooter is seen lying in a pool of blood in the final scene.



117.    In another video prepared by and/or featuring the Shooter titled "On my Mind," the Shooter is depicted holding the American flag while wearing tactical gear inside a vacant classroom.



118.    In yet another video prepared by the Shooter, he raps alongside clips of what appears to be him carrying a weapon, "Like a sleepwalker, I am breaking through no matter what."



119.    In October 2021, the Shooter posted an ominous video, titled "Are You Awake?"

Over flashing images of a massacre with an assault rifle, he rapped,

> I need to just do it. It is my destiny. Everything has led up to this.
> Nothing can stop me, not even myself. Is there such a thing as free will?

120.    The Shooter's obsession with violence and firearms was not limited to music

videos. In the backyard of his mother's Highland Park home, the Shooter filmed himself painting

a full-sized soldier, with a yellow smiley face for a head, brandishing an assault rifle.



121.    On June 2, 2020, the Shooter joined the message board "Documenting Reality," in

which he gave himself the rank "Master Gunnery Sergeant."  He used this platform to engage in

hateful speech and to discuss graphic depictions of death:



122.    The Shooter's obsession with firearms was clear: his phone contained numerous photos of himself posing with guns, sometimes wearing a "Siege" style mask, and sometimes wearing body armor.  He was ready to go to war—just as Smith & Wesson told him he could.

   *b.    The Reckless FOID Application Submitted by the Crimo Defendants*

123.    In December 2019, at the age of 19, the Shooter applied for a FOID card that was sponsored by his father.

124.    In order to sponsor his son's FOID card application, the Shooter's Father had to sign a sworn affidavit that states that the Shooter's Father "underst[ood] [he] shall be liable for any damages resulting from the minor applicant's use of firearm or firearm ammunition."

125.    As required by Illinois law, an applicant for a FOID card must show, among other things, that they are "[n]ot a person whose mental condition is of such a nature that it poses a clear and present danger to the applicant, or any other person or the community."

126.    Upon information and belief, the application did not include any information about the Shooter's troubled behavior or his designation as a "clear and present danger."

127.    The Shooter's FOID card application was approved in January 2020, allowing him to purchase firearms in Illinois.

### III.    <u>Bud's Gun Shop and Red Dot Arms Turn Blind Eyes.</u>

128.    On or around June 9, 2020, the Shooter would purchase his first firearm.  By the end of July 2020, the Shooter had acquired an arsenal.  Not only had he acquired the Smith & Wesson M&P rifle that he would use for the shooting, he also purchased a Kel-Tec SUB2000, a Remington 700, and a shotgun.

129.    In June or July 2020, the Shooter went online to Bud's Gun Shop, to purchase a firearm that would enable him to live out his fantasy of being a "Master Gunnery Sergeant."

130.    Upon information and belief, the Shooter purchased an M&P15 because he was influenced and enticed by Smith & Wesson's unfair and deceptive marketing.

131.    Bud's Gun Shop's website featured Smith & Wesson marketing for M&P rifles and, upon information and belief, the Shooter was exposed to, and influenced by, these promotional materials.



*Screenshot from official Smith & Wesson M&P Rifle video hosted on Budsgunshop.com in 2020.*

132.    In order to purchase the weapon, the Shooter would have needed to provide his address to Bud's Gun Shop—first when setting up his account, and then when listing his billing address—making the retailer aware that the Shooter was a resident of Highland Park or Highwood, Illinois.  Bud's Gun Shop sold the M&P assault rifle to the Shooter despite the fact that it is illegal for residents of both Highwood and Highland Park to acquire and possess assault weapons.

133.    Bud's Gun Shop then shipped the murder weapon to Red Dot Arms, a gun dealer located in Illinois, which transferred the assault rifle to the Shooter.  In the summer of 2020, Red Dot Arms transferred the M&P rifle to the Shooter after conducting a background check and verifying the ID of the Shooter.

134.    Upon information and belief, both the federal transaction form and the Shooter's ID would have shown that he resided in Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the M&P rifle.

135.    In short order, the Shooter purchased at least three other firearms through Red Dot Arms—making him a repeat customer of the dealer.

### IV.    Lead Up to the Fourth of July Shooting

136.    The Shooter posted videos of what appears to be a portion of Highland Park's Fourth of July Parade on his social media almost a year before the shooting.

137.    According to the ADL's Center on Extremism, the Shooter stopped posting on most of his social media accounts several months prior to the shooting.

138.    Approximately a week before the shooting, he was seen investigating rooftop access in a building on Central Avenue in Highland Park.

139.    In the days before the shooting, he posted hateful messages on the Documenting Reality message board:

 

 

140.    On July 3, 2022, he wrote himself a note on his phone outlining the steps required to conceal his identity during the attack.

141.    On or before the morning of July 4, 2022, the Shooter packed his firearms, accessories, and three 30-round magazines in preparation to bring Smith & Wesson's promises of limitless and relentless power into fruition.

142.    On or around 8:30 a.m. on July 4, 2022, the Shooter was seen riding around the intersection of Central Avenue and 2nd Street on his bike, casing the scene before the Highland Park Fourth of July parade started.

143.    He approached the Ross Cosmetics building, a local store on the northwest corner of Central Avenue and 2nd Street in Highland Park, Illinois.  The Shooter gained access to the rooftop of the building by using an unsecured ladder attached to it.

144.     Starting at or around 10:14 a.m., using the Smith & Wesson M&P assault rifle, the Shooter fired a total of 83 shots indiscriminately at the hundreds of people gathered to watch and participate in the Highland Park Fourth of July Parade.

145.     Consistent with Smith & Wesson's marketing strategy of "kick[ing] brass" and "burn[ing] through. . .ammunition," the Shooter chose his M&P15 to inflict the most damage possible on the maximum number of people.   While he owned numerous other firearms, the M&P15 was his weapon of choice.  Upon information and belief, he made this choice because of its militaristic qualities and its perceived fit for carrying out his mission of inflicting the most violence possible.

146.     After unloading the barrage of bullets, he concealed the weapon in a red blanket and dropped it behind the building as he fled during the mayhem.  The Shooter proceeded to walk to his mother's home and took her car to escape.   He was apprehended by the police at approximately 7:40 p.m.  At the time of his arrest, seven other firearms were collected from him.

147.     Smith & Wesson's deceptive and unfair marketing acts and practices increased the level of violence and lethality of the Highland Park Fourth of July shooting by putting in the Shooter's hands a deadly weapon designed for mass death.

V.     **The Impact of the Shooting on the Roberts Family**

148.     The Roberts Family was preparing to attend the July 4th Parade in Highland Park for the first time. In anticipation for the parade, Jason and Keely rushed to get their sons ready hoping to get good seats along the parade route, which they were able to do right in front of Walker Brothers near the corner of Central Avenue and 2ndStreet.

149.     They were all enjoying the parade until the shooting started at or around 10:14 a.m. Jason first heard popping sounds, which he initially thought were fireworks. He then felt

heat from the bullets whizzing by his family. His worst nightmare became true when he heard Keely scream, "I've been hit!" She began bleeding profusely from her right foot. Without hesitation, Jason leapt to his wife's aid.

150.    The world around the Roberts was frantic with bullets sailing by them and people running confused in all directions. Jason directed his attention to his family, leaping to the ground to tend to Keely, who was lying on the ground experiencing indescribable pain in her foot that was also bleeding profusely. Jason attempted to move his family and seek cover under a nearby bench, moving Keely and the boys.

151.    After the shooting seemed to stop, Keely instructed her boys to run as fast and far away as they could and not stop. L.R. attempted to get up and run, but Jason held him down and continued to cover him. However, C.R. did not respond. He laid on the ground motionless, lying on his stomach.

152.    Jason flipped C.R. over on his back. C.R. laid on the ground lifeless. His skin was white, his lips were blue. He was unconscious.

153.    A short while later, an EMT arrived at the scene. Jason frantically began yelling to get his attention—"My son was shot. He's 8." It worked. The EMT came to C.R.'s aid. Keely's injured foot was quickly treated with a tourniquet; however, because she already lost so much blood, Keely was teetering in and out of consciousness. C.R., on the other hand, was not improving. He remained unconscious on the ground while the EMT and another good Samaritan began lifesaving CPR. Appreciating the gravity of C.R.'s injuries, it was recommended that they rush him to Highland Park Hospital.

154.    Jason was left to decide—do I leave my wife shot and bloodied on the ground, or do I take my unconscious 8-year-old son literally hanging on for life to the hospital?

155.     Feeling he had no other choice, Jason accompanied C.R. in the ambulance, leaving Keely and L.R. at the scene of this indescribable nightmare. L.R., now alone watching over his mother, was frantic. He began screaming, "[C.R.] was hit by the sleeping bullet." L.R. asked everyone and anyone for help crying he doesn't want his mom's lips to turn "blue like [C.R.'s]."

156.     Ultimately, Keely and L.R. were transported to Highland Park Hospital to join Jason and C.R. C.R. was undergoing lifesaving surgery when Keely arrived. Keely similarly received emergency medical treatment upon admission.

157.     On the whole for the Roberts Family, the mental recovery from the shooting has been difficult. They have trouble participating in public, crowded events due to fear of another massacre. The shooting plays on a loop for them, and it's not uncommon for any one of them to burst into tears when something triggers a memory of the shooting; or feel shame for not doing more that day. The wounds of that day –both physical and mental –are enduring

## COUNT I
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act - Unfairness**
**815 ILCS 505/2**
(***All Plaintiffs v. Smith & Wesson Defendants***)

158.     Plaintiffs incorporate paragraphs 1 through 18 of the Introduction section, paragraphs 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, and paragraphs 36 through 157 of the General Allegations section, as if fully set forth herein.

159.     Pursuant to Section 2 of the Illinois Consumer Fraud Act, it is unlawful for any company to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices, including, but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with

intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

160.    Smith & Wesson's marketing campaigns targeted at civilian adolescent and post-adolescent males are unfair and unlawful because they (i) offend public policy; (ii) are immoral, unethical, oppressive or unscrupulous; and (iii) cause substantial injury to innocent civilians through conduct that is directed at the consumer market.

161.    Smith & Wesson sells and promotes its line of assault rifles, which are designed for military and law enforcement personnel, by intentionally and unfairly targeting the propensity of young men for risk-taking, impulsive behavior.

162.    While military and law enforcement personnel who utilize these types of weapons are highly trained, Smith & Wesson knows that civilians are not required to undergo similar—or any—training before utilizing their assault rifles.

163.    Yet, among other things, the company promises young civilian men that these assault rifles will offer "more adrenaline."

164.    Smith & Wesson models its marketing videos after first-person shooter games despite the risk that a certain subset of young men who play these games will want to act them out in real life.

165.    Smith & Wesson's marketing targets high-risk, young users through social media posts that harness images and themes popular among young people like first-person shooter games.

166.    Smith & Wesson utilizes influencers on social media who show these young civilian consumers how to use the M&P rifles in combat-like situations.

167.    Smith & Wesson's unfair marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence.

168.    In its marketing, Smith & Wesson does not identify its M&P assault rifles as NFA weapons, leading people to believe that they can obtain these weapons without complying with the NFA's requirements.

169.    At all relevant times, Smith & Wesson knew or should have known that since it began marketing the M&P line of rifles, the United States had been plagued by a series of deadly mass shootings, many of which were at the hands of disturbed, violent young men wielding semiautomatic assault rifles, including the M&P rifle.  Since 2009, there have been over 250 mass shootings in the United States where four or more people were shot, excluding the perpetrator.

170.    Yet Smith & Wesson continued to market the M&P rifle line in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

171.    Smith & Wesson has made no material changes to its marketing and sales practices based on the increase in mass shootings.  Smith & Wesson's M&P rifle sales increase following mass shootings because segments of Smith & Wesson's consumer base fear that tighter gun regulations will be enacted.

172.    Smith & Wesson marketed the M&P line of rifles without regard for public safety.

173.    Smith & Wesson marketed in the above manner directly and through third parties.

174.    Smith & Wesson violated both the NFA and the Gun Control Act ("GCA") by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes or registering the firearms.

175.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

176.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

177.    Although Plaintiffs are not consumers of Smith & Wesson's M&P rifles, they nevertheless have standing to recover under the Consumer Fraud Act, which does not require a business relationship for those who have suffered damages resulting from conduct that is directed toward the market and that otherwise implicates consumer protection concerns.

178.    Accordingly, Plaintiffs are entitled to recovery against Smith & Wesson in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

<u>**COUNT II**</u>
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act - Deception**
**815 ILCS 505/2**
(***All Plaintiffs v. Smith & Wesson Defendants***)

179.    Plaintiffs incorporate paragraphs 1 through 18 of the Introduction section, paragraphs 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, and paragraphs 36 through 157 of the General Allegations section, as if fully set forth herein.

180.    Pursuant to Section 2 of the Illinois Consumer Fraud Act, it is unlawful for any company to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices, including, but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

181.    Section 2 of the Illinois Consumer Fraud Act also prohibits "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'"

182.    Smith & Wesson engaged in marketing and promotion campaigns deceptively associating its line of M&P rifles with United States military personnel to create the false impression that its products were utilized and/or endorsed by these reputable users, and to target a class of consumers at particular risk to use assault rifles for mass shootings.

183.    Smith & Wesson improperly marketed an association between its M&P line of rifles and U.S. military personnel in a misleading and false manner.

184.    Through its marketing of M&P rifles, Smith & Wesson misrepresents by implication that it is affiliated with the U.S. military. In particular, Smith & Wesson's advertising includes imagery, branding, and messaging that would cause consumers to believe that its rifles are endorsed and widely used by the U.S. military, when there is no evidence that this is true.

185.    Smith & Wesson marketed its M&P civilian line of rifles by promoting its militaristic uses.

186.    Smith & Wesson's marketing glorified the military design, functionality and appearance of its M&P rifles. In fact, an investigation conducted in 2022 by the House of

Representatives' Committee on Oversight and Reform found that Smith & Wesson's advertisements "emphasize the AR-15-style rifle's military roots[.]"[51]

187.    By engaging in such conduct, Smith & Wesson impliedly misrepresented and overstated that the U.S. military endorses or uses Smith & Wesson's M&P assault rifles, causing a likelihood of confusion and misunderstanding as to any military sponsorship, use, or approval of the company's M&P rifles.

188.    Smith & Wesson's marketing campaigns are also deceptive because they falsely imply that the M&P rifles are of a same standard, quality, or grade that the U.S. military uses.

189.    Smith & Wesson's marketing campaigns are also deceptive because they omit the fact that its M&P rifles are NFA weapons and require registration, approval, and payment of taxes before they can be possessed.

190.    Smith & Wesson's failure to identify their M&P rifles as NFA weapons qualifies as concealment, suppression, or omission of a material fact.

191.    Upon information and belief, Smith & Wesson failed to identify its M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission.

192.    At all relevant times, Smith & Wesson knew or should have known, that since it began marketing the M&P line of rifles, the United States had been plagued by a series of deadly mass shootings, many of which were at the hands of disturbed, violent young men wielding semiautomatic assault rifles, including the M&P rifle.

193.    Yet Smith & Wesson continued to market the M&P rifle line in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

---

[51]    Letter from Carolyn B. Maloney, Chairwoman of U.S. House Committee on Oversight and Reform, to Mark P. Smith, President and CEO of Smith & Wesson Brands, Inc., at 6 (August 1, 2022), *available at* https://perma.cc/DM57-QZGL.

48
**SA-48**

194.    Smith & Wesson marketed the M&P line of rifles without regard for public safety.

195.    Smith & Wesson marketed in the above manner directly and through third parties.

196.    Smith & Wesson marketed its rifles in a way that attracted and enabled dangerous persons like the Shooter.

197.    Smith & Wesson's deceptive marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence.

198.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

199.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

200.    Although Plaintiffs are not consumers of Smith & Wesson's M&P rifles, they nevertheless have standing to recover under the Consumer Fraud Act, which does not require a business relationship for those who have suffered damages resulting from conduct that is directed toward the market and otherwise implicates consumer protection concerns.

201.    Accordingly, Plaintiffs are entitled to recovery against Smith & Wesson in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law

division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**<u>COUNT III</u>**
**Violation of The Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/2, *et seq.***
**(*All Plaintiffs v. Smith & Wesson Defendants*)**

202.    Plaintiffs incorporate paragraphs 1 through 18 of the Introduction section, paragraphs 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, and paragraphs 36 through 157 of the General Allegations section, as if fully set forth herein.

203.    Section 2(a), subparagraphs 2, 5, 7, and 12 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, et seq. (IUDTPA), provides that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

*       *       *

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

*       *       *

(7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

*       *       *

(12)    engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

50
**SA-50**

204.    Smith & Wesson engaged in marketing and promotion campaigns deceptively associating its line of M&P rifles with U.S. military personnel to create the false impression that its rifles were utilized and/or endorsed by these reputable users, and to target a class of consumers at particular risk to use assault rifles for mass shootings.

205.    Smith & Wesson improperly marketed an association between its M&P line of rifles and U.S. military personnel in a misleading and false manner.

206.    Through its marketing of M&P rifles, Smith & Wesson misrepresented by implication that it is affiliated with the U.S. military.  In particular, Smith & Wesson's advertising includes imagery and messaging that would cause consumers to believe that its products are endorsed and widely used by the U.S. military, when there is no evidence that this is true.

207.    Smith & Wesson marketed its M&P civilian line of rifles by promoting its militaristic uses.

208.    Smith & Wesson's marketing glorified the military design, functionality, and appearance of its M&P rifles.

209.    By engaging in such conduct, Smith & Wesson impliedly misrepresented and overstated that the U.S. military endorses or uses Smith & Wesson's M&P assault rifles and Smith & Wesson exercises undue influence over a population that is particularly at risk to fall prey to this deceptive marketing.

210.    Smith & Wesson's marketing campaigns are deceptive because they cause a likelihood of confusion and misunderstanding as to any military sponsorship, use, or approval of the company's M&P rifles.

211.    Smith & Wesson's marketing campaigns are also deceptive because they falsely imply that the M&P rifles are of a same standard, quality, or grade that the U.S. military uses.

212.    Smith & Wesson's marketing campaigns are also deceptive because they omit the fact that its M&P rifles are NFA weapons and require registration, approval, and payment of taxes before they can be possessed.

213.    Smith & Wesson's failure to identify their M&P rifles as NFA weapons qualifies as concealment, suppression, or omission of a material fact.

214.    Upon information and belief, Smith & Wesson failed to identify its M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission.

215.    At all relevant times, Smith & Wesson knew or should have known that since it began marketing the M&P line of rifles, the United States had been plagued by a series of deadly mass shootings, many of which were at the hands of disturbed, violent young men wielding semiautomatic assault rifles, including the M&P rifle.

216.    Yet Smith & Wesson continued to market the M&P rifle line in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

217.    Smith & Wesson marketed the M&P line of rifles without regard for public safety.

218.    Smith & Wesson marketed in the above manner directly and through third parties.

219.    Smith & Wesson marketed its rifles in a way that attracted and enabled dangerous persons like the Shooter.

220.    Smith & Wesson's deceptive marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence.

221.    Smith & Wesson's violation of IUDTPA was a proximate cause of Plaintiffs' harms, including physical pain, mental suffering, loss of enjoyment of life, anxiety and severe emotional distress.

222.    Smith & Wesson's violation of IUDTPA was a proximate cause of Plaintiffs' economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

223.    Smith & Wesson's conduct, as set forth above, occurred prior to and continued through and after July 4, 2022.  As a result, Smith & Wesson continues to violate IUDTPA by continuing to perpetuate the misleading marketing of its assault rifles, and these products continue to pose a threat to all members of the public, including Plaintiffs.

224.    As a result, Plaintiffs seek an injunction from this Court against Smith & Wesson, requiring it to cease its deceptive marketing campaigns.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an injunction requiring them to cease its deceptive marketing campaigns, including:

  i.    prohibiting Smith & Wesson from targeting the marketing of its AR-15-style rifles to children and young adults;

  ii.   prohibiting Smith & Wesson  from using military, branding imagery or references in such advertising;

  iii.  requiring Smith & Wesson  to use age gates on social media when promoting its AR-15-style rifles on social media;

  iv.   requiring Smith & Wesson to include warnings in all advertisements of AR-15-style  rifles regarding the appropriate uses and inherent dangers of such products;

  v.    and requiring it to disclose when its advertisements feature actors;

plus fees and costs of bringing this action.

## COUNT IV
### Negligence
### (*All Plaintiffs v. Smith & Wesson Defendants*)

225.    Plaintiffs incorporate paragraphs 1 through 18 of the Introduction section, paragraphs 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, paragraphs 36 through 157 of the General Allegations section, paragraphs 159 through 174 of Count I, and paragraphs 180 through 197 of Count II, as if fully set forth herein.

226.    At all relevant times, Smith & Wesson is and has been subject to at least the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

227.    In fact, because Smith & Wesson is engaged in the highly risky activity of marketing assault rifles, it has a heightened duty to not expose others to foreseeable harm.

228.    Smith & Wesson has a duty to exercise reasonable care in marketing all firearms, including its M&P assault rifles, and to refrain from engaging in any activity creating a reasonably foreseeable risk of injury to others.  Breach of this duty constitutes negligence.

229.    At all relevant times, Smith & Wesson owed a duty to the public and Plaintiffs to market its firearms in a commercially reasonable manner.  As the manufacturer and marketer of the M&P15 assault rifle series, which it designed specifically for military and law enforcement professionals, Smith & Wesson had a duty to refrain from misleadingly and unfairly marketing these firearms in the manner described above to teenagers and young civilian adults who are foreseeably likely to handle these military-style weapons irresponsibly.  Breach of this duty constitutes negligence.

230.    Smith & Wesson knows, or should know, that adolescents and young adults are more prone to impulsive and risky behavior, including violent behavior, than other age groups.

231.    Smith & Wesson knows, or should know, that adolescents and young adults are more susceptible to claims made in advertising than older age groups.

232.    Smith & Wesson knows, or should know, that the most destructive mass shootings are disproportionately committed by adolescents and young adults, and that the weapon of choice for such shooters is often an AR-15 rifle.

233.    As evidenced by its settlement in 2000, Smith & Wesson knows, or should know, that irreparable harm has been and would be caused by marketing firearms in a way that would make them particularly appealing to juveniles.

234.    Thus, Smith & Wesson knows, or has reason to know, of the foreseeable risk that marketing of its M&P assault rifles to civilian adolescents and young adults using military and law enforcement imagery and references and appeals to increasing their adrenaline will inspire or encourage such consumers to choose M&P rifles for use in mass shootings.

235.    Smith & Wesson has breached its duty of care by choosing—in the face of this foreseeable risk—to negligently and misleadingly market its M&P rifles to teenagers and young adults.

236.    By engaging in the above conduct, Smith & Wesson knowingly violated the Illinois Consumer Fraud Act and Illinois Uniform Deceptive Trade Practice Act.

237.    Upon information and belief, Smith & Wesson's violations of the above laws influenced the Shooter's selection of his Smith & Wesson M&P15 rifle for use in his attack at the Highland Park Fourth of July Parade.

238.    In addition, Smith & Wesson knowingly violated both the NFA and GCA by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer

forms, getting approval of the forms by the ATF, paying occupational and transfer taxes, or registering the firearms.

239.     Upon information and belief, the Smith & Wesson M&P rifle used by the Shooter at the Highland Park Fourth of July Parade was a machinegun because it had design features that would allow the firearm to be easily modified or converted into a machinegun—without the need for advanced equipment or mechanical skills.

240.     However, Smith & Wesson marketed the rifle as not requiring NFA paperwork, and, upon information and belief, it manufactured and transferred the rifle without complying with any of the NFA's requirements.

241.     Upon information and belief, if Smith & Wesson had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon.

242.     Smith & Wesson's negligence and knowing violations of law were a direct and proximate cause of harm to Plaintiffs, by influencing and permitting the Shooter to purchase the M&P rifle and use it to fire upon parade-goers on July 4, 2022.

243.     As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

244.     As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

245.     Accordingly, Plaintiffs are entitled to recovery against Smith & Wesson in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

### COUNT V
### Negligence
### (*All Plaintiffs v. Gun Store Defendants*)

246.    Plaintiffs incorporate paragraphs 1 through 18 of the Introduction section, 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, and paragraphs 36 through 157 of the General Allegations section, as if fully set forth herein.

247.    At all relevant times, the Gun Store Defendants were subject to the general duty imposed on all persons and entities to act reasonably not to expose others to reasonably foreseeable risks of injury.

248.    In fact, the Gun Store Defendants, as sellers of lethal products, are subject to the highest duty of care because of the danger their products can cause.

249.    The Gun Store Defendants have a duty to exercise reasonable care in marketing, distributing, and selling firearms and large capacity magazines, and to refrain from engaging in any activity creating reasonably foreseeable risk of injury to others.  Breach of this duty constitutes negligence.

250.    In or around June or July 2020, Bud's Gun Shop sold the Smith & Wesson M&P rifle to the Shooter through an online transaction.

251. Upon information and belief, to consummate this sale, the Shooter provided Bud's Gun Shop with his address, when he created an account and when he provided the billing address associated with his method of payment.

252. The Shooter resided in either Highland Park, Illinois or Highwood, Illinois, and, upon information and belief, the method of payment would have been associated with one of the two addresses.

253. Both Highland Park and Highwood make it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine." HIGHWOOD, ILL., CODE OF ORDINANCES § 6-7-2(A) (2021); HIGHLAND PARK, ILL., CODE OF ORDINANCES § 136.005 (2021).

254. The M&P rifle purchased by the Shooter is an assault weapon pursuant to both the Highland Park and Highwood laws.

255. Yet, despite the fact that Bud's Gun Shop knew that the Shooter resided in Highland Park or Highwood, where it is illegal to acquire or possess an assault weapon, it sold the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

256. Bud's Gun Shop then shipped the M&P rifle to Red Dot Arms for Red Dot Arms to complete the transfer to the Shooter.

257. In June or July 2020, Red Dot Arms transferred the M&P rifle to the Shooter after, upon information and belief, conducting a background check and verifying the Shooter's identification.

258. Both the federal transaction form and the Shooter's ID should have shown that he resided in either Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the M&P rifle.

259.    Upon information and belief, despite knowing that the Shooter resided in a municipality that prohibited the possession of assault weapons, Red Dot Arms transferred the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

260.    Both Gun Store Defendants are federally licensed gun dealers, therefore they are charged with and obligated to know the relevant firearm laws.  In fact, among numerous other resources made available to them, is a collection of State Laws and Published Ordinances,  which contains state and local laws applicable to firearm sales—including the Highwood and Highland Park Assault Weapon Ban Ordinances.

261.    In addition, the Gun Store Defendants knowingly violated both the NFA and GCA by transferring and selling these weapons without filling out the appropriate transfer forms, getting ATF approval of the forms, paying occupational and transfer taxes, or registering the firearms.

262.    Upon information and belief, the Smith & Wesson M&P assault rifle used by the Shooter at the Fourth of July Parade in Highland Park was a machinegun because it has design features that would allow the firearm to be easily modified or converted into a machinegun— without the need for advanced equipment or mechanical skills .

263.    However, the Gun Store Defendants transferred the rifle without complying with any of the NFA's requirements.

264.    Upon information and belief, if the Gun Store Defendants had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon.

265.    The Gun Store Defendants' negligence and knowing violations of law were a direct and proximate cause of harm to Plaintiffs, by causing the Shooter to gain unlawful possession of an assault weapon, which he used to shoot and terrify Plaintiffs.

266.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

267.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

268.    Accordingly, Plaintiffs are entitled to recovery against the Gun Store Defendants in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., pray for judgment against Defendants, BUDSGUNSHOP.COM, LLC and RED DOT ARMS, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**COUNT VI**
**Aiding & Abetting**
**(*All Plaintiffs v. Gun Store Defendants*)**

269.    Plaintiffs incorporate paragraphs 1 through 18 of the Introduction section, 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, paragraphs and 36 through 157 of the General Allegations section, as if fully set forth herein.

270.    Both Gun Store Defendants aided and abetted the Shooter's acquisition of an illegal assault rifle, as well as the resulting mass shooting at the Highland Park Fourth of July parade, making them liable for the tort of aiding and abetting.

271.    In or around June or July 2020, Bud's Gun Shop sold a Smith & Wesson M&P rifle to the Shooter through an online transaction.

272.    Upon information and belief, to consummate this sale, the Shooter provided Bud's Gun Shop with his address when he created an account and when he provided the billing address associated with his method of payment.

273.    The Shooter resided in either Highland Park, Illinois or Highwood, Illinois, and, upon information and belief, the method of payment would have been associated with one of the two addresses.

274.    Both Highland Park and Highwood make it illegal to "acquire or possess any assault weapon or large capacity magazine."  HIGHWOOD, ILL., CODE OF ORDINANCES § 6-7-2(A) (2021); HIGHLAND PARK, ILL., CODE OF ORDINANCES § 136.005 (2021).

275.    The M&P rifle purchased by the Shooter is an assault weapon pursuant to both the Highland Park and Highwood laws.

276.    Yet, despite the fact that Bud's Gun Shop knew that the Shooter resided in Highland Park or Highwood, where it is illegal to acquire or possess an assault weapon, it sold the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

277.    Upon information and belief, Bud's Gun Shop then shipped the M&P rifle to Red Dot Arms for Red Dot Arms to complete the transfer to the Shooter.

278.    In June or July 2020, Red Dot Arms transferred the M&P rifle to the Shooter after, upon information and belief, conducting a background check and verifying the Shooter's ID.

279.    Both the federal transaction form and the Shooter's ID should have shown that he resided in either Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the M&P rifle.

280.    Upon information and belief, despite knowing that the Shooter resided in a municipality that prohibited the possession of assault weapons, Red Dot Arms transferred the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

281.    The Gun Store Defendants' aforementioned conduct was a direct and proximate cause of harm to Plaintiffs, by causing the Shooter to gain unlawful possession of an assault weapon, which he used to shoot and terrify Plaintiffs.

282.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

283.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

284.    Accordingly, Plaintiffs are entitled to recovery against the Gun Store Defendants in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., pray for judgment against Defendants, BUDSGUNSHOP.COM, LLC and RED DOT ARMS, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT VII
### Negligence
### (*All Plaintiffs v. Robert Crimo Jr.*)

285.    Plaintiffs incorporate paragraphs 1 through 18 of the Introduction section, 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, paragraphs and 36 through 157 of the General Allegations section, as if fully set forth herein.

286.    It was well documented long before the Fourth of July shooting that the Shooter was too dangerous and unstable to have access to weapons—especially firearms. And nobody knew that better than the Shooter's Father, Robert Crimo Jr.

287.    In April 2019, at the age of 18, the Shooter attempted suicide with a machete.

288.    Just a few months later, in September 2019, the Shooter made threats to a family member, who reported that the Shooter planned to "kill everyone." When law enforcement came to the home, they seized 16 knives, a dagger, and a sword from the Shooter. However, the Shooter's Father said that the weapons were his and "being kept in [the Shooter's] room for safekeeping." Both parents denied that the Shooter had threatened anyone.

289.    Upon information and belief, the knives, dagger, and sword belonged to the Shooter, not his father.

290.    The Shooter was not charged with a crime, but a "clear and present danger report" was filed with the Illinois State Police.

291.    Upon information and belief, the Shooter's Father knew that his son had been deemed a "a clear and present danger" in September of 2019.

292.    Despite this, in December 2019, he sponsored his son's application for a FOID card, which would allow the Shooter to purchase and possess firearms.

293.    The standard form, including, upon information and belief, the form signed by the Shooter's Father, stated the following:  "I hereby give my consent for this minor applicant to possess and acquire firearms and firearm ammunition and understand I shall be liable for any damages resulting from the minor applicant's use of firearms or firearm ammunition."

294.    Without his father's sponsorship, the Shooter would not have been able to obtain a FOID card and would not have been able to purchase, at the age of 19, the Smith & Wesson M&P rifle that he used to commit the shooting.

295.    Upon information and belief, the Shooter's Father was aware of his son's hate-filled and violent rhetoric.

296.    Upon information and belief, the Shooter's Father knew that his son was unstable and wanted to kill people.

297.    Yet despite this, upon information and belief, the Shooter's Father did not contact law enforcement to warn them of the danger posed by his son.

298.     Upon information and belief, the Shooter's Father also did not take any steps to obtain a Firearms Restraining Order, or take any other action, to remove the firearms from the Shooter's possession.

299.    Even though the Shooter's Father's actions caused his son to have access to firearms, he did not take any action to mitigate the threat posed by his son.

300.    Each of these actions and omissions constitutes negligence.

301.    As a direct and proximate result of the negligence of the Shooter's Father, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

302.     As a direct and proximate result of the negligence of the Shooter's Father, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

303.     Accordingly, Plaintiffs are entitled to recovery against the Shooter's Father in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., and JASON ROBERTS, individually and as parent and next friend of C.R. and L.R., pray for judgment against Defendant, ROBERT CRIMO, JR., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT VIII
**Battery**
***(Keely Roberts, individually and as parent and next friend of C.R., Jason Roberts, as parent and next friend of C.R. v. Robert Crimo III)***

304.     Plaintiffs Keely Roberts, individually and as parent and next friend of C.R., and Jason Roberts, as parent and next friend of C.R., incorporate paragraphs 1 through 18 of the Introduction section, 19 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, paragraphs and 36 through 157 of the General Allegations section, as if fully set forth herein.

305.     On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

306.     The Shooter killed seven people, injured dozens of others, and terrorized countless others.

307.    The foregoing conduct was deliberate and outrageous and was conducted with the intent to terrify, and to injure, maim, and kill people at the parade, including Plaintiffs, and, as such, constituted an intentional harmful or offensive contact with all Plaintiffs physically struck by projectiles and/or shrapnel.

308.    As a direct and foreseeable result of the Shooter's actions, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

309.    As a direct and proximate result of the Shooter's actions, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

310.    Accordingly, Plaintiffs are entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R., and JASON ROBERTS, as parent and next friend of C.R., pray for judgment against Defendant, ROBERT CRIMO, III, for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT IX
### Assault
***(Keely Roberts, as parent and next friend of L.R., and Jason Roberts, individually and as parent and next friend of L.R. v. Robert Crimo, III)***

311.    Plaintiffs, Keely Roberts, as parent and next friend of L.R., and Jason Roberts, individually and as parent and next friend of L.R., incorporate paragraphs 1 through 18 of the Introduction section, 19 through 31 of the Parties section, paragraphs 32 through 35 of the

Jurisdictional section, and paragraphs 36 through 157 of the General Allegations section, as if fully set forth herein.

312.     On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

313.     The Shooter killed seven people, injured dozens of others, and terrorized countless others.

314.     The foregoing conduct was deliberate and outrageous and was conducted with the intent to terrify, and to injure, maim, and kill people at the parade, including Plaintiffs.

315.     Plaintiffs, whether struck by projectiles and/or shrapnel or not, experienced reasonable apprehension of imminent offensive contact as a direct and proximate result of the Shooter's intentional actions.

316.     As a direct and foreseeable result of the Shooter's actions, Plaintiffs have sustained and will sustain mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

317.     As a direct and proximate result of the Shooter's actions, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

318.     Accordingly, Plaintiffs are entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, as parent and next friend of L.R., and JASON ROBERTS, individually and as parent and next friend of L.R., pray for judgment against Defendant, ROBERT CRIMO, III, for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the

19ᵗʰ Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT X
### IIED and NIED
### (*Keely Roberts, as parent and next friend of L.R., and Jason Roberts, individually and as parent and next friend of L.R. v. All Defendants*)

319.    Plaintiffs, Keely Roberts, as parent and next friend of L.R., and Jason Roberts, individually and as parent and next friend of L.R., incorporate the foregoing allegations as if fully set forth herein.

320.    On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

321.    As set forth in the various counts against each Defendant, the Shooter was enabled to purchase and use the M&P assault rifle through the conduct of the Smith & Wesson Defendants, the Gun Store Defendants, and Robert Crimo, Jr.

322.    Each defendants' conduct was both extreme and outrageous.

323.    Because of Jason Roberts' and L.R.'s proximity to the Shooter and the shooting victims, including but not limited to Plaintiffs, Keely Roberts and C.R., Plaintiffs were in a zone of physical danger.

324.    Plaintiffs Jason Roberts and L.R. reasonably experienced fear for their own safety because of the Shooter's conduct.

325.    As a direct and proximate result of the Shooter's conduct, Plaintiffs Jason Roberts and L.R. experienced emotional distress, as well as physical injury and illness resulting from the emotional distress, including but not limited to physical pain, mental suffering, loss of enjoyment of life, anxiety and severe emotional distress.

326.     As a direct and proximate result of the Shooter's actions, Plaintiffs Jason Roberts and L.R. have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

327.     Accordingly, the Plaintiffs, Keely Roberts, as parent and next friend of L.R., and Jason Roberts, individually and as parent and next friend of L.R., are entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, as parent and next friend of L.R., and JASON ROBERTS, individually and as parent and next friend of L.R., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO, III, for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT XI
### IIED and NIED
***(Keely Roberts, individually and as parent and next friend of C.R. and Jason Roberts, as parent and next friend of C.R. v. All Defendants)***

328.     Plaintiffs Keely Roberts, individually and as parent and next friend of C.R. and Jason Roberts, as parent and next friend of C.R. incorporate the foregoing allegations as if fully set forth herein.

329.     On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

330.    As set forth above, the Shooter was enabled to purchase and use the M&P assault rifle through the conduct of the Smith & Wesson Defendants, the Gun Store Defendants, and Robert Crimo, Jr.

331.    Each defendants' conduct was both extreme and outrageous.

332.    Plaintiffs, Keely Roberts and C.R. as shooting victims, were directly impacted by the Shooter's conduct.

333.    Plaintiffs, Keely Roberts and C.R. reasonably experienced fear for their own safety because of the Shooter's conduct.

334.    As a direct and proximate result of the Shooter's conduct, Plaintiffs, Keely Roberts and C.R. experienced emotional distress, including but not limited to physical pain, mental suffering, loss of enjoyment of life, anxiety and severe emotional distress.

335.    As a direct and proximate result of the Shooter's conduct, Plaintiffs, Keely Roberts and C.R. have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

336.    Plaintiffs Keely Roberts, individually and as parent and next friend of C.R. and Jason Roberts, as parent and next friend of C.R. are entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiffs, KEELY ROBERTS, individually and as parent and next friend of C.R., and JASON ROBERTS, as parent and next friend of C.R., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO, III, for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit

Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**PLEASE TAKE NOTICE THAT PLAINTIFFS DEMAND A TRIAL BY JURY.**

Dated: September 28, 2022                    Respectfully Submitted,

**EVERYTOWN LAW**                            **ROMANUCCI & BLANDIN, LLC**
Alla Lefkowitz*                              Antonio M. Romanucci
P.O Box # 14780                              Gina A. DeBoni
Washington D.C. 20044                        Robert S. Baizer
(mailing address)                            David A.  Neiman
Phone: (202) 545-3257                        Michael E. Holden
alefkowitz@everytown.org                     321 North Clark Street, Suite 900
                                             Chicago, Illinois 60654
                                             Phone: (312) 458-1000
                                             Fax: (312) 458-1004
                                             arommanucci@rblaw.net
                                             gad@rblaw.net
                                             rbaizer@rblaw.net
                                             dneiman@rblaw.net
                                             mholden@rblaw.net

**EVERYTOWN LAW**                            **PAUL, WEISS, RIFKIND, WHARTON**
Krystan Hitchcock*                           **& GARRISON LLP**
Laura Keeley*                                H. Christopher Boehning*
450 Lexington Ave.                           Jeffrey J. Recher*
P.O Box # 4184                               Carly Lagrotteria*
New York, NY 10017                           1285 Avenue of the Americas
(mailing address)                            New York, NY 10019
Phone: (646) 324-8218                        (mailing address)
khitchcock@everytown.org                     Phone: (212) 373-3700
lkeeley@everytown.org                        cboehning@paulweiss.com
                                             jrecher@paulweiss.com
                                             clagrotteria@paulweiss.com

                                             **HUNT LAW PC**
                                             Keith L. Hunt
                                             Bannockburn Atrium
                                             2275 Half Day Rd
                                             Suite 126
                                             Bannockburn, IL 60015
                                             Phone: 312-558-1300
                                             khunt@huntpclaw.com
                                             *Attorneys for Plaintiffs*

FILED
9/28/2022 8:09 AM
ERIN CARTWRIGHT WEINSTEIN
Clerk of the Circuit Court
Lake County, Illinois

IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| ELIZABETH TURNIPSEED, | Case No. |
| *Plaintiff*, | 22LA00000497 |
| v. | |
| SMITH & WESSON BRANDS, INC., a Nevada corporation, AMERICAN OUTDOOR BRANDS CORPORATION, a Nevada corporation, BUDSGUNSHOP.COM, LLC, a Kentucky limited liability company, RED DOT ARMS, INC., an Illinois corporation, ROBERT CRIMO III, an individual, ROBERT CRIMO, JR., an individual, | NOTICE PURSUANT TO LCR - 2-2.14 THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE IN COURTROOM _____ ON _____ AT _____ A.M./P.M. FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED. |
| *Defendants*, | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Elizabeth Turnipseed ("Turnipseed" or "Plaintiff") brings this Complaint and Demand for Jury Trial against Defendants Smith & Wesson Brands, Inc. ("Smith & Wesson"), American Outdoor Brands Corporation ("American Outdoor"), Budsgunshop.com, LLC ("Bud's Gun Shop"), Red Dot Arms, Inc. ("Red Dot Arms"), Robert Crimo III (the "Shooter"), and Robert Crimo, Jr. ("Crimo Jr.") (collectively, "Defendants"), and alleges as follows:

### INTRODUCTION

1.     On the morning of July 4, 2022, thousands of Highland Park community members and their families gathered downtown to celebrate America's birthday at the city's annual Independence Day Parade.

2.     As families were setting up chairs and strollers along the Central Avenue parade route, the Shooter was setting up in sniper position on a roof above them, preparing to carry out the final stage of a horrific attack on civilians that he had been planning for weeks. The Shooter

was incapable, on his own, of causing even a fraction of the physical and emotional carnage that he would soon unleash.

3.      To carry out a military-style assault, the Shooter used his Smith & Wesson M&P 15 semiautomatic, AR-15 style rifle (the "Rifle") to unleash more than 80 rounds into the sea of families and children innocently watching the parade below (the "Incident"). The bullets ripped through 55 human bodies in just 60 seconds, leaving 7 people dead and 48 others lying injured with gunshot wounds. Plaintiff Elizabeth Turnipseed was shot in her pelvis while standing next to her husband and three-year-old child.

4.      The Incident was foreseeable.

5.      Smith & Wesson and its former parent company, American Outdoor Brands (collectively, "Smith & Wesson"),[1] unfairly, deceptively, and unlawfully markets its military-style assault rifle in a way that attracts, encourages, and facilitates mass shooters, including by:

    i.   developing marketing campaigns that target impulsive young men with
         military complexes who were particularly likely to be attracted to the
         unique ability of AR-15 style weapons;

    ii.  developing marketing campaigns that target adolescents drawn to the
         excitement and risk-taking associated with militaristic weapons or
         combat missions, particularly young players of popular and realistic
         first-person shooter video games like Call of Duty, which prominently
         feature variants of the weapons sold by Smith & Wesson in real life; and

    iii. marketing their AR-15 style weapons as well-suited for civilians to
         carry out offensive military-style combat missions against their
         perceived enemies.

6.      Plaintiff brings claims against Smith & Wesson for violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") and negligence.

---

[1] On May 29, 2020, American Outdoors and Smith & Wesson merged into one corporation, Smith & Wesson Brands, Inc. Prior to that merger, Smith & Wesson Brands, Inc. was a wholly owned subsidiary of American Outdoor Brands.

7.     Defendant Bud's Gun Shop sold the Rifle to the Shooter, despite that it is illegal for residents of Highland Park and Highwood, Illinois to possess assault weapons.[2] Bud's Gun Shop then shipped the Rifle to Red Dot Arms, a gun dealer located in Illinois, which transferred the Rifle to the Shooter. Both Bud's Gun Shot and Red Dot Arms (together the "Gun Store Defendants") knew the Shooter's residential address, and thus knew that they were selling an assault rifle to a resident of a municipality that prohibited the possession of such weapons. Nevertheless, they proceeded with the sale and transfer, enabling the Shooter to carry out his deadly mission.

8.     Plaintiff brings claims against the Gun Store Defendants for negligence.

9.     Defendant Robert Crimo, Jr. is the father of the Shooter and facilitated his ability to purchase the Rifle used in the Incident despite knowing of the Shooter's propensity and desire to commit mass violence.

10.     Plaintiff brings claims against Defendant Robert Crimo, Jr. for negligence and negligent infliction of emotional distress.

11.     Plaintiff brings claims against the Shooter for assault and battery and intentional infliction of emotional distress for his military-style assault designed to injure, maim, or kill a large number of people at the Highland Park parade.

12.     But for the misconduct of all Defendants, Plaintiff would not have been harmed.

13.     This lawsuit does not seek to hold firearms manufacturers and/or sellers liable for responsibly marketing weapons for use by law-abiding citizens while complying with all relevant standards of care and applicable laws designed to prevent unlawful acts of violence.

---

[2] The Shooter is publicly associated with two residential addresses: one in Highwood and one in Highland Park. Both cities prohibit possession of assault rifles like the M&P 15 Rifle at issue.

14. Instead, this lawsuit seeks to impose liability for irresponsible and unlawful conduct by a firearms manufacturer for marketing weapons in an unsafe and illegal manner.

## PARTIES

15. Plaintiff Elizabeth Turnipseed is a natural person and resident of Highland Park, Illinois.

16. Defendant American Outdoor Brands Corporation was a Nevada corporation doing business in the State of Illinois and was the parent company of Smith & Wesson Brands, Inc.—the manufacturer of the Rifle used by the Shooter in the Incident.

17. As of May 29, 2020, American Outdoor Brands Corporation and Smith & Wesson Brands, Inc. merged to create Defendant Smith & Wesson Brands, Inc, a Nevada corporation doing business in the State of Illinois.

18. Defendant Bud's Gun Shop is and at all relevant times has been a distributor of firearms and is federally licensed to deal in firearms. Bud's Gun Shop is headquartered in Lexington, Kentucky. It has multiple physical locations in Kentucky and Tennessee, as well as a large online retail presence.

19. Upon information and belief, in or around June or July of 2020, Bud's Gun Shop sold the Shooter the Rifle that he used in the shooting in Highland Park on July 4, 2022.

20. Defendant Red Dot Arms is a retail gun store located in Lake County, Illinois. Upon information and belief, in or around June or July of 2020, it transferred the Rifle to the Shooter.

21. Defendant Robert Crimo III is a natural person and Illinois resident. The Shooter is currently being held in custody in the Lake County Jail and has been charged with 21 counts of first-degree murder, 48 counts of attempted murder and 48 counts of aggravated battery.

22.     Defendant Robert Crimo, Jr. is a natural person and Illinois resident.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this matter pursuant to Article VI, Section 9 of the Illinois Constitution.

24.     This Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, have committed tortious acts in Illinois, and have transacted substantial business in Illinois that caused harm in Illinois, including business that is the subject matter of this complaint.

25.     Venue is proper in this court under 735 ILCS 5/2-101 and 5/2-102, as the transactions and occurrences that form the basis for this complaint occurred, in part, in Lake County, and Red Dot Arms as well as the Shooter and Crimo Jr. reside in Lake County.

## FACTUAL ALLEGATIONS

***The Smith & Wesson M&P 15 Is A Weapon of War***

26.     The Rifle used by the Shooter to carry out the horrific attack in Highland Park was a Smith & Wesson M&P 15, an AR-15 style semiautomatic assault rifle.

27.     AR-15 style rifles are, by design, military weapons. After World War II, the U.S. Army's Operations Research Office analyzed millions of casualty reports from World Wars I and II and observed that modern combat occurred at short range and casualties were most often dependent on the total number of shots fired.

28.      These findings led the U.S. Army to develop specifications for a new combat weapon: a lightweight firearm that would hold a large detachable magazine and rapidly expel ammunition with enough velocity to penetrate body armor and steel helmets. This new firearm would give soldiers the ability to *lay down a high volume of fire over a wide killing zone*, also

known as "hosing down" an area.

29.    In response, a company called ArmaLite designed the now-infamous AR-15 (or ArmaLite Rifle). Armalite's goal was to create a lightweight, portable, select-fire rifle that would allow combatants to quickly put many rounds on target, from distances of 500 yards.[3] That is, the AR-15 was designed to be effective in combat by killing as many enemy soldiers as possible as quickly as possible, even from far away.

30.    After extensive testing, the military concluded that the AR-15 had superior "hit-and-kill" potential in combat situations—resulting in instantaneous deaths, as well as routine amputations, decapitations, and massive body wounds—and ultimately adopted the AR-15 as its standard-issue service rifle (renaming it the M16). Armalite's design performed so well that the Pentagon concluded that a "5- to 7- man squad armed with the AR-15 would be as effective as a 10-man squad armed with" the military's previous standard-issue weapon.[4]

31.    Seeking to capitalize on the military's "approval" of the AR-style rifle, the firearm industry introduced semiautomatic versions of military assault weapons for sale to the public in order to create and exploit new civilian markets for these deadly weapons. Though federal law bans the sale of *fully* automatic assault rifles—*i.e.*, rifles that fire continuously when the trigger is held—to civilians, firearm manufacturers began producing *semi*-automatic assault weapons, that replaced the fully automatic trigger with one that must be pulled back separately for each round fired.

---

[3] Tim Dickinson, *How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), https://www.rollingstone.com/politics/politicsfeatures/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice107819/.

[4] *Id.* (internal quotation marks omitted); *see also Worman v. Healey*, 849 F.3d 114, 124 (4th Cir. 2017).

32.     Smith & Wesson incorporated into their design *specific* features that enable shooters to spray ("hose down") a large number of bullets over a broad killing zone without having to aim at each individual target. These features not only give assault weapons a distinctive appearance, they make it easy to simply point the gun while rapidly pulling the trigger—including firing from the hip, a procedure seldom used in hunting anything but human beings. The most important of these design features include:

  i. **"High-capacity" detachable ammunition magazines** that hold as many as 100 rounds of ammunition. This allows the high volume of fire critical to hosing down a broad killing zone with no interruption for reloading;

  ii. **A rear pistol grip** (handle), including so-called "thumb-hole stocks" and magazines that function like pistol grips to enable easier and more rapid shooting;

  iii. **A forward grip or barrel shroud**. Forward grips (located under the barrel or the forward stock) give a shooter greater control over a weapon during recoil. Forward grips and barrel shrouds also make it possible to hold the gun with the non-trigger hand, even though the barrel gets extremely hot from firing multiple rounds; and

  iv. **Modifiable for automatic fire.** A design that allows for easy modification for automatic fire gives a would-be mass shooter an additional means to increase the lethality of the weapon, subverting federal restrictions on automatic weapons.

33.     These design features create the ability to quickly lay down a high volume of fire, making semiautomatic assault weapons a particularly dangerous addition to the civilian gun market. They explain why assault weapons are favored by terrorists, mass killers, and violent criminals, and they distinguish such weapons from true hunting and target guns.

34.     Deliberate, aimed fire from the shoulder may be more accurate than the "hosing down" of an area for which assault weapons were designed. But mass murderers and other violent criminals drawn to assault weapons are not after marksmanship medals. They want to kill

or maim as many people as possible in as short a time as possible—the exact job for which the semiautomatic assault weapon was designed.

***Smith & Wesson Knew That Civilian Assault Rifles Posed An Extreme Public Danger And Did Not Begin Selling Them Until After The PLCAA Was Enacted***

35.     In 1977, the ArmaLite's patent on the AR-15 rifle lapsed, and gun manufacturers began producing and selling civilian variants. When the ban on military-style semiautomatic assault rifles expired in 2004, gun manufacturers immediately began selling their semiautomatic assault rifles against to the civilian gun market. Yet, Smith & Wesson would wait 2 more years before manufacturing and selling them.

36.     During that time, Smith & Wesson partnered with the National Rifle Association and spent millions of dollars of its own money lobbying Congress for a new federal law that they hoped would shield gun makers from lawsuits filed against them when their guns, including assault rifles, were used to kill or injure people. Then-Smith & Wesson President and Chief Executive Officer Michael Golden personally lobbied legislators and was "amazed how easy it is to get audiences with key members of the House and Senate and the agencies" after making millions of dollars in political contributions.[5]

37.     These lobbying efforts resulted in the passage the Protection of Lawful Commerce and Arms Act ("PLCAA"), which was signed into law on October 25, 2005. On the next earnings call, Golden told investors he "had the honor of attending the signing of the [PLCAA]" and that it marked "a great day for our industry and for me personally."

---

[5] Leslie Wayne, *After taking bullets, Smith & Wesson lives*, N.Y. TIMES (Apr. 6, 2006), https://www.nytimes.com/2006/04/06/business/worldbusiness/after-taking-bullets-smith-wesson-lives.html.

38.    Within just a few months of the PLCAA being signed into law, Smith & Wesson entered the civilian assault weapons market and began selling the M&P 15.

39.    Since then, Smith & Wesson has enjoyed record-breaking sales and profits from its M&P 15 rifles, even as gun deaths and mass shootings have risen in the United States.

40.    By 2020, Smith & Wesson became the second largest maker of rifles in the United States.

41.    Between 2012 and 2021, Smith & Wesson generated more than $695 million in revenue from its M&P 15 sales.

42.    Smith & Wesson recognizes that its revenues increase when mass shootings are committed. In its 2019 10-K filing, Smith & Wesson acknowledged that speculation about the passage of gun violence prevention legislation—speculation which often increases in the wake of a mass shooting—can "often . . . result in increased near-term consumer demand" for Smith & Wesson products.

43.    As shown below, Smith & Wesson has made the decision to market its assault rifles in whichever ways will result in the most sales, even if its marketing attracts a dangerous category of consumers.

***Smith & Wesson Marketed and Designed the Rifle in a Way That Attracted and Enabled Dangerous Individuals Like the Shooter***

44.    Smith & Wesson failed to use reasonable care in marketing, advertising, and promoting its Rifle.

### <u>Smith & Wesson's Marketing Attracted a Dangerous Category of Consumers</u>

45.    When Smith & Wesson marketed the Rifle, it knew or should have known of the existence of a category of consumers containing individuals like the Shooter, who would be attracted to such a weapon and could pose a tremendous risk to the safety of others—namely

9

impulsive young men with hero complexes and/or militaristic delusions attracted to using the particularly high lethality of AR-15 style weapons like the Rifle to effectively execute their fantasies.

46.    Decades of scientific evidence demonstrates that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky, impulsive behaviors. Moreover, negative emotions such as anger, depression, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.

47.    Studies have further shown that this susceptibility to and predilection for risky, thrill-seeking behavior extends to violent criminal behavior. Indeed, a disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, and 18- to 20-year-olds are offenders in gun homicides at a rate nearly four times higher than adults 21 and older.

48.    Adolescents and young adults also exhibit increased susceptibility to advertisements, and research indicates that they are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior.

49.    Research further suggests that one propensity can feed the other: young people may be particularly responsive to advertisements portraying impulsive or risky behavior when they are in a negative emotional state involving, for instance, depression or anger. As studies have shown, such young people are more vulnerable to acting on impulse to seek immediate

gratification.

50.     For individuals with risk factors to violence, particularly emotionally troubled young men, the physical presence of assault weapons and related imagery make violent actions more likely. The medical literature describes a "weapons effect," wherein the physical presence of a firearm may incite aggressive cognition and provoke violent behavior. Violence has infectious qualities: individuals may emulate previous killers or violent acts they've observed, a concept known as "identification." Assault weapons advertisements also activate people who are predisposed to violence but might not engage in it if they did not have access to the weapons.

51.     Nonetheless, Smith & Wesson targets its advertising to exactly this vulnerable group: emotionally troubled young men. Young consumers represent a significant part of the growth in the sales of Smith & Wesson's M&P rifles, and Smith & Wesson has emphasized to its investors that young adults represent the growth area for new consumers of firearms.

52.     Smith & Wesson knows the data and the research. According to Smith & Wesson's public filings, the company does "a lot of analytics" about its markets, including "a lot of predictive work." Smith & Wesson knows that young men will be especially susceptible to advertisements that imply endorsement by the military and law enforcement and that offer them a real-life version of the adrenaline-filled experiences they've had in first-person shooter games. Smith & Wesson designs these advertisements to take advantage of young men's impulsive behavior and lack of self-control in order to increase sales of its M&P rifles.

53.     But Smith & Wesson also knows the data about mass shootings. Smith & Wesson knows that the same demographic it targets with its advertisements is disproportionately likely to commit a mass shooting.

54.     Smith & Wesson knew or should have known, among other facts, that:

(a)     The United States has been plagued by a series of deadly mass shootings, many of which were conducted by disturbed, violent young men wielding AR-15 style assault weapons.

(b)     Many of the mass shootings committed in the United States over the last 10 years with the highest numbers of gunshot injuries and deaths were perpetrated by male shooters who were between the ages of 19 and 28.

(c)     Many young mass shooters have used AR-15 style weapons like the Rifle in highly publicized mass shootings preceding the Incident, including:

> i.     the 24 year-old man who killed 12 and injured 70 in an attack at a movie theater in Aurora, Colorado in July 2012;
>
> ii.    the 20 year-old man who killed 27, including 20 children, and injured 2 in an attack at an elementary school in Sandy Hook, Connecticut in December 2012;
>
> iii.   the 26 year-old man who killed 26 and injured 20 in an attack at a church in Sutherland Springs, Texas in November 2017;
>
> iv.   the 19 year-old man who killed 17 and injured 17 in an attack at Marjorie Stoneman Douglas High School in Parkland, Florida in February 2018; and
>
> v.    the 19 year-old man who killed 1 and injured 3 in an attack at the Chabad of Poway synagogue in Poway, California; and
>
> vi.   the 28 year-old man and his wife who killed 14 and injured 22 others in an attack at the San Bernadino Inland Regional Center in San Bernadino, California in December 2015

(d)     The Aurora, Parkland, San Bernadino, and Poway attackers all used Smith & Wesson M&P 15 rifles—the same Rifle used by the Highland Park Shooter—to commit their mass shootings.

55.    Accordingly, Smith & Wesson had actual or constructive knowledge that:

(a)     Young men like the Shooter are generally more susceptible to advertising

than fully neurologically developed adults;

(b)    Young men like the Shooter are disproportionately prone to irresponsible, impulsive and thrill-seeking behavior;

(c)    Young men like the Shooter are more likely to harbor delusional, militaristic fantasies involving acting as a supposed hero eradicating large groups of perceived enemies;

(d)    Young men like the Shooter are particularly attracted to highly lethal AR-15 style weapons like the Rifle in mass shootings because they fulfill their fantasies; and

(e)    AR-15 style weapons are particularly attractive to mass shooters because, *inter alia*, they allow shooters to rapidly expend large numbers of bullets at multiple targets.

56.    At all relevant times, Smith & Wesson was aware and had actual or constructive knowledge of the fact that its marketing had the effect of attracting this category of consumers.

57.    Smith & Wesson has been aware since at least 2000 that its marketing practices played a role in contributing to gun crimes, when the company negotiated a settlement agreement with the federal government ("2000 Settlement Agreement") and agreed, *inter alia*, to "[n]ot market any firearm in a way that would make the firearm particularly appealing to juveniles or criminals" due to the foreseeable risk of such advertising fueling unlawful acts of violence by such actors.

58.    Smith & Wesson chose to defy the safe marketing practices it committed to in the 2000 Settlement Agreement, and instead chose to continue targeting young consumers.

**Smith & Wesson's Use of the First-Person Shooter Aesthetic Marketing**

59.     When Smith & Wesson first began selling M&P 15 assault rifles in 2006, then-President and Chief Executive Officer Michael Golden acknowledged, in discussing the launch of the M&P rifle brand, that the company was marketing weapons as "tactical," stating: "We also believe that our M&P rifle series fills a tremendous gap in the marketplace by delivering high-quality, feature-rich tactical rifles that will be readily available in commercial channels."

60.     Smith & Wesson designed advertisements for its products to mimic the aesthetic of being the shooter in a video game ("first-person shooter aesthetic"). These types of video games are disproportionately popular among young men like those in the class of individuals described above.

61.     This first-person shooter aesthetic is used in many popular games, including in the Call of Duty video game franchise, which is popular among teens and young adults, including the Highland Park Shooter. Call of Duty is played by more than 400 million people and is played by at least 6.5 million people on a daily basis.[6] In Call of Duty, players step into the shoes of members of the military or law enforcement and seek to complete virtual combat missions.

62.     The screenshot below is actual game footage from Call of Duty: WWII.

---

[6] Tisha Apolinario, How Many People Play Call of Duty, FICTION HORIZON (Mar. 11 2022), https://fictionhorizon.com/how-many-people-play-call-of-duty-user-growth-stats/.



**Official Call of Duty®: WWII Insider - Loadouts**
204,870 views · Jan 3, 2018

63.    Smith & Wesson's advertising mimics this first-person shooter aesthetic including

in, but not limited to, the following examples:

(a)    Smith & Wesson published the following advertisement for its M&P series

of rifles on its corporate channel on the popular social media site YouTube:



**M&P Rifle Experience Commercial**
18,388 views

(b)    Smith & Wesson published the following advertisement for its M&P series

of rifles:



(c)     Smith & Wesson published an advertisement that encouraged people to "Experience real-life first-person shooting with the Smith & Wesson M&P rifle" and displayed the following scene showing a shooter loading an M&P 15 rifle from the first-person shooter perspective, with what appears to be a high-capacity magazine, as the narrator invited viewers to "Experience more adrenaline"[7]:

---

[7] Smith & Wesson, *Get the Experience*, ISPOT.TV (Feb. 26, 2015), https://www.ispot.tv/ad/7a72/smith-and-wesson-m-and-p-rifle-get-the-experience.



64.     Smith & Wesson ads mimicking such games are aimed at appealing to young and predominantly male consumers of these first-person shooter games, who are excited by and attracted to reenacting their video game experience in real life. These advertisements gamify the use of firearms in real life, glorify the lone gunman and the militaristic design of the M&P 15, and indicate that its AR-15 style weapons are well-suited for civilians to carry out offensive military-style combat missions against their perceived enemies.

65.     Smith & Wesson chose to publish its advertisements and establish a marketing presence on social media platforms disproportionately visited by younger consumers, including but not limited to YouTube, Instagram, and Facebook (@smithwessoninc, @smithandwessongear, and facebook.com/SmithandWessonInc).

66.     Smith & Wesson chose to market its M&P series using images of children handling its firearms, distributing those images over social media.

67.     Smith & Wesson targeted youth despite the fact that many states, including Illinois, impose age restrictions preventing youth from lawfully possessing its M&P rifles.

**Smith & Wesson's Misleading Association with Military and Law Enforcement**

68.     Smith & Wesson's marketing campaign caters to the characteristics and preferences of the above dangerous category of individuals and promotes the Rifle's suitability

for offensive military-style combat missions by repeatedly and falsely associating Smith &
Wesson civilian products, like the Rifle, with United States military and law enforcement,
including but not limited to, by:

> (a)    falsely representing or suggesting that Smith & Wesson products are utilized
> or endorsed by military and law enforcement;
>
> (b)    using "M&P" in the "M&P 15" designation of the Rifle to stand for
> "Military & Police"; and
>
> (c)    showing Smith & Wesson products similar to the Rifle being used by or
> positioned near individuals wearing what appear to be military and/or law
> enforcement uniforms or gear, with text resembling oaths taken by military and/or
> law enforcement personnel, and implying that Smith & Wesson products are
> "[s]elected" or "[c]hosen" by these groups, reinforcing this association with
> pictures of American flags.

69.    Examples of advertisements reflecting this facet of Smith & Wesson's marketing
campaign—and specifically involving M&P weapons like the Rifle—include but are not limited
to the following:

> (a)    Smith & Wesson ran the below advertisement for its M&P brand weapons—
> including both the M&P rifle series and its related M&P line of handguns:



(b)     Smith & Wesson published the following M&P rifle series advertisement:



(c)     Smith & Wesson produced the following advertisement to promote its

M&P brand of weapons:



(d)     Smith & Wesson also produced the below advertisement, which describes an M&P rifle as enabling "reliability when your job is to serve and protect," echoing the motto of the Los Angeles Police Department, "to protect and to serve." This advertisement explicitly spells out the fact that M&P stands for "Military and Police", and even features a new "M&P" logo that incorporates the words "Military" and "Police" into the design:



70.     The advertisement above further highlights that the Rifle comes with a 30-round magazine. No Smith & Wesson firearm product holds more ammunition than the M&P 15.

Importantly, Smith & Wesson does not highlight the magazine capacity in advertisements for any of the other firearms it sells for legal civilian purposes, such as hunting and sport shooting.

71.    Smith & Wesson has even run promotions where buyers of its M&P 15 Rifle would receive "5 FREE MAGAZINES":



72.    In publicly available documents, Smith & Wesson has referred to the strategy of associating its products with the military and law enforcement for the purpose of attracting civilian consumers as the "halo effect." Smith & Wesson has explained to investors that the "halo [effect]" benefits the M&P brand by conferring "credibility" on M&P products in the eyes of civilian consumers.

73.    This supposed association of Smith & Wesson M&P brand products with the United States military and law enforcement agencies is a fiction aimed at deceiving the public and attracting the above-described dangerous class of would-be mass shooters. It also promotes the notion that Smith & Wesson weapons are well-suited for offensive military-style combat missions.

74.    By cloaking products generally sold to the public in the heroic aura of United States military and law enforcement, Smith & Wesson marketing suggests to individuals that buying a Smith & Wesson product like the Rifle will enable them to model behavior of military and law enforcement personnel.

75.    The intent of this branding and marketing campaign is clear: to increase civilian sales by conveying the deceptive implied claim that M&P AR-15s are approved and used by the U.S. military and law enforcement. Smith & Wesson's emphasis on militaristic and law enforcement imagery in its M&P rifle series marketing aligns with advice from the National Shooting Sports Foundation to the industry in 2017 that the segment of the consumer market "most likely to purchase [an AR-15-style rifle] . . . places value on firearms that have been recommended or used by professionals."

76.    The implication that Smith & Wesson's rifles are endorsed or regularly used by the United States military and law enforcement increases their "credibility" and consequently makes it more likely that consumers will purchase them. The company's public statements regarding its "halo effect" strategy reveal Smith & Wesson's belief that those associations are material to consumers.

77.    As discussed throughout this Complaint, in addition to capitalizing on the "halo effect" through advertising infused with military and law enforcement imagery, Smith & Wesson publishes advertisements for its M&P rifles that gamify shooting, glorify the lone gunman, and glorify the militaristic design, functionality, and appearance of its M&P 15.

78.    Smith & Wesson's marketing and advertising also caters to the propensity for thrill-seeking behavior disproportionately exhibited by impulsive young men like the Shooter by associating Smith & Wesson products like the Rifle with the adrenaline-pumping experience of

combat.

79.     Smith & Wesson's marketing and advertising repeatedly emphasizes the ability of Smith & Wesson weapons to function in combat-like scenarios and quickly dispatch a large number of perceived enemies with a torrent of fire.

80.     Examples of advertisements illustrating this message include, but are not limited to, the advertisements identified throughout this complaint, as well as the following:

(a)     Smith & Wesson advertises its M&P 15 rifle by emphasizing that its weapon gives shooters "Pure Adrenaline" and lets them "KICK BRASS" by "[b]urn[ing] through all the ammunition you want":



(b)     Smith & Wesson touts that its M&P firearms are "capable of handling as many rounds as you are":



Precision-built for accuracy and reliability, M&P® firearms are designed to stand up to the conditions you're facing day in and day out. We're confident that your M&P® firearm is capable of handling as many rounds as you are. With an ever-expanding line of full-size, compact and sub-compact pistols, revolvers and patrol rifles, the M&P® brand continues to bring innovative, dependable firearms to the most demanding military and law enforcement professionals.

(c)     Smith & Wesson also promotes an endorsement on its YouTube channel from a professional shooter who describes using the weapon to achieve a "world record" in speed shooting by firing 10 shots into four different targets in just 1.59 seconds.[8]

81.     The narratives conveyed by Smith & Wesson's advertising combine to promote its products in a way which increased the likelihood of their foreseeable misuse by individuals like the Shooter.

82.     The advertisements and marketing tactics described above demonstrate that Smith & Wesson knowingly marketed, advertised, and promoted the Rifle to civilians for illegal purposes, including to carry out offensive, military style combat missions against their perceived enemies.

83.     Since 2006, Smith & Wesson has sought to grow the market for its M&P 15 Rifle by extolling the militaristic and assaultive qualities of their AR-15 rifles and, specifically, the weapon's suitability for offensive combat missions.

---

[8] *See* Smith & Wesson, Inc., *Smith & Wesson M&P 15 T Rifle with Jerry Miculek*, YOUTUBE (Apr. 21, 2017), https://www.youtube.com/watch?v=guNHME8cB0M.

84.     Smith & Wesson's militaristic marketing reinforces the image of its M&P 15 Rifle as a combat weapon that is intended to be used for the purposes of waging war and killing human beings.

85.     Consistent with that image, Smith & Wesson further promoted the M&P 15 Rifle as a combat weapon system by touting in their product advertisements that the Rifle comes with a 30-round magazine.

## **Smith & Wesson Designed The Rifle For Easy Modification to Automatic Fire**

86.     Smith & Wesson violated federal prohibition on the sale of "machinegun[s]" to the general public either directly or as accomplices.

87.     The federal National Firearms Act ("NFA") defines "machinegun" as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person

26 U.S.C. § 5845(b).

88.     Section 922(b)(4) of 18 U.S.C. prohibits the sale of "machinegun[s]" to members of the general public who, like the Shooter, have not undergone a required registration process.

89.     The definition of "machinegun" under the NFA includes not only weapons that are designed to function as fully automatic firearms when they leave the factory but also weapons that are designed to be easily modified to fire in a fully automatic capacity and/or approximate the rate of fire of a fully automatic weapon.

90.     An automatic weapon will continue firing rounds as long as a shooter keeps the trigger depressed with his or her finger and the gun has any ammunition remaining.

91.     In contrast, a semi-automatic weapon requires the user to squeeze the trigger to

discharge each bullet.

92.    In 1982, the Bureau of Alcohol, Tobacco Firearms and Explosives underscored that the NFA definition of "machinegun[s]" includes "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts."

93.    AR-15 style weapons like the Rifle are "machinegun[s]" because they can be easily modified to facilitate automatic fire.

94.    Congress restricted the sale and possession of "machinegun[s]" because automatic fire weapons pose an undue risk to members of the public, provide no or negligible benefit to law-abiding civilian users, and will be disproportionately likely to be misused by bad actors like the Shooter in a mass shooting.

95.    Instead of significantly altering the design of AR-15 style weapons to reduce their utility in combat-like situations and to adapt the weapons to the legitimate needs of law-abiding civilians, Smith & Wesson made few changes to the basic AR-15 design when producing weapons like the Rifle for the civilian market.

96.    In particular, upon information and belief, the Rifle's internal parts and exterior components like the barrel, rail, and stock remained almost identical to and interchangeable with those of the military-model AR-15.

97.    The only critical difference was, upon information and belief, the removal of the selector switch.

98.    Upon information and belief, Smith & Wesson designed weapons like the Rifle so that they can be readily modified to function as fully automatic weapons or approximate a fully automatic rate of fire in a variety of ways.

99.     For example, weapons like the Rifle can be easily modified to accomplish this goal by individuals with minimal financial resources and little to no gunsmithing expertise through methods including but not limited to:

(a)     replacing the manufacturer-installed sear system inside the Rifle (which enables semi-automatic fire) with a third-party sear system which enables automatic fire;

(b)     shaving down part of the manufacturer-installed sear system to change the way it functions and;

(c)     attaching an external device such as a "bump stock" or trigger crank to the weapon.

100.     The parts and tools needed to implement such modifications are relatively cheap.

101.     Parts and tutorials for some or all of the above modification methods are readily available from online sources.

102.     It was eminently foreseeable to Smith & Wesson that its AR-15 style rifles could be easily modified to create a fully automatic weapon or a weapon approximating a fully automatic rate of fire.

103.     In fact, one of the two shooters in the 2015 San Bernardino, California mass shooting wielded a Smith & Wesson M&P-15 rifle that had been modified via the "shaving down" method described above.

104.     This widely publicized event provided Smith & Wesson with even more notice of the ease with which weapons similar to the Rifle can be modified to create a fully automatic weapon or a weapon approximating a fully automatic rate of fire.

105.     This event also provided Smith & Wesson with specific notice that weapons like

the Rifle were attractive to mass shooters in part because of their susceptibility to such modifications.

106.    Smith & Wesson committed in the 2000 Settlement Agreement that as a responsible firearms manufacturer it should not "sell . . . a weapon designed in a manner so that with few additional parts and/or minimal modifications an owner can convert the firearm to an illegal fully automatic weapon."

107.    Smith & Wesson could have and should have refused to distribute or sell weapons like the Rifle because, upon information and belief, they were susceptible to modifications like those described above.

108.    Smith & Wesson could have and should have designed firearms like the Rifle so as to prevent or deter such modifications and, thereby, avoid selling prohibited "machinegun[s]" to the general public.

109.    There were a number of economically and technologically feasible design choices Smith & Wesson could have employed to prevent the easy modification of firearms like the Rifle so that they would not function as fully automatic weapons/approximate an automatic rate of fire.

110.    Any of these proposed changes would inhibit dangerous modifications to products like the Rifle, while not diminishing the utility and safety of Smith & Wesson firearms in lawful activities.

111.    For example, making internal components of the Rifle such as the sear system out of less malleable metal and alternate configurations would prevent modification or degradation of weapons like the Rifle into fully automatic weapons/weapons approximating a fully automatic rate of fire.

112.     Smith & Wesson chose to design the Rifle in a manner that made it able to be easily modified or degraded to fire automatically.

113.     Smith & Wesson knowingly sold firearms, including the Rifle, which were designed to be and were, in fact, capable of ready modification to function as automatic weapons or approximate the rate of fire of automatic weapons with minimal expenditure of cost or effort.

114.     Smith & Wesson is thus responsible, either directly or as accomplices or co-conspirators, for violations of § 922(b)(4)'s prohibition on the sale of "machinegun[s]."

***The Shooter Fell Within the Dangerous Category of Consumers and Was Foreseeably Motivated by Smith & Wesson's Advertising and Design***

115.     The Shooter fell within the dangerous category of consumers targeted by Smith & Wesson's unfair and deceptive marketing and design tactics.

116.     The Highland Park Shooter fits the profile of the young consumer Smith & Wesson's military and law enforcement-associated, adrenaline-focused marketing of the M&P rifle series is designed to attract.

117.     As documented through his social media footprint, the Shooter's interest in firearms was clearly tied to his obsession with the military, law enforcement, and the glorification of violence, which rendered him a prime target for Smith & Wesson's youth-targeted, military- and law-enforcement-slanted, and adrenaline-focused advertising.

118.     For years before the Incident, the Shooter expressed his fascination with military and law-enforcement-related violence in both his real-life and online activities. His online footprint—and offline actions—reveal his militaristic delusions and a twisted hero complex.

119.     In the backyard of his mother's home, the Shooter filmed himself painting a life-

size soldier with a yellow smiley face holding an assault rifle[9]:



120.    In music videos glorifying violence, the Shooter filmed himself standing next to (and sometimes wearing) an American flag with a tactical vest and helmet of the sort typically worn by law enforcement officials[10]:

---

[9] Josh Boswell & Paul Farrell, *July Fourth gunman Robert Crimo videoed himself building his tiny home in the backyard of his parents' house and painitng armed solder on their wall*, DAILYMAIL.COM (July 6, 2022), https://www.dailymail.co.uk/news/article-10986199/July-Fourth-shooter-Robert-Crimo-built-tiny-home-backyard-parents-house.html.

[10] Becky Sullivan, *Highland Park suspect's online history reveals a fascination with violence*, NPR (July 5, 2022), https://www.npr.org/2022/07/05/1109844728/highland-park-suspects-online-history-reveals-a-fascination-with-violence;%20https://www.thedailybeast.com/robert-bobby-crimo-person-of-interest-in-highland-park-parade-massacre-is-rapper-with-creepy-videos.



121.    The Shooter photographed himself wearing an FBI baseball cap,[11] and at least one of his online videos was addressed to an imaginary FBI agent[12][13]:

---

[11] Pilar Melendez et al., *Inside the Murder Obsessed Posts of Parade Massacre Suspect*, DAILY BEAST (July 5, 2022), https://www.thedailybeast.com/robert-bobby-crimo-person-of-interest-in-highland-park-parade-massacre-is-rapper-with-creepy-videos.

[12] *Robert "Bobby" E. Crimo III / Awake the Rapper*, KNOW YOUR MEME, https://knowyourmeme.com/photos/2398591-robert-bobby-e-crimo-iii-awake-the-rapper (last visited Sept. 27, 2022).

[13] Josh Boswell & Paul Farrell, *July Fourth gunman Robert Crimo videoed himself building his tiny home in the backyard of his parents' house and painitng armed solder on their wall*, DAILYMAIL.COM (July 6, 2022), https://www.dailymail.co.uk/news/article-10986199/July-Fourth-shooter-Robert-Crimo-built-tiny-home-backyard-parents-house.html.



awake.rip @awake_rip · Jun 18, 2021



122.    The Shooter was also the administrator of a Discord social media channel named "SS,"[14] presumably after the "Schutzstaffel," the self-described "political soldiers" of Nazi Germany, responsible for unspeakable acts of violence and mass murder.

123.    In September 2020, the Shooter attended a Blue Lives Matters rally in Highland Park and became violent, physically pushing and intimidating counter-protesters.

124.    During a "Protect the Results" vigil held in Highland Park in December 2020, a group of individuals, including the Shooter, participated in a counter-protest and were observed "doing Nazi salutes and screaming statements that they 'refused to accept a socialist-communist America . . . and wouldn't rest until the Antifa scum and Black Lives Matter monkeys get put in

---

[14] Pilar Melendez et al., *Inside the Murder Obsessed Posts of Parade Massacre Suspect*, DAILY BEAST (July 5, 2022), https://www.thedailybeast.com/robert-bobby-crimo-person-of-interest-in-highland-park-parade-massacre-is-rapper-with-creepy-videos.

their place.'"[15]

125.    In April 2022, the Shooter entered a local Highland Park synagogue during a Passover service before being promptly asked to leave.

126.    On July 2, 2022—two days before the Incident—the Shooter posted racist messages on social media, including "retarded jews" and "orientals should be gassed and washed." Four days before that he posted those messages, he posted "i say we just get rid of the blacks all together."

127.    The Shooter's obsession with first-person shooter games further exemplifies his susceptibility to the "halo effect" tactic pursued by Smith & Wesson by associating its M&P assault rifle line with the military and police. The Shooter was an avid player of Call of Duty, the first-person shooter game where users play as a member of the military or law enforcement, which he began playing as a teenager.

128.    The Shooter posted dozens of clips online of himself playing Call of Duty, including one where he is positioned on a rooftop and using an assault rifle to unload hundreds of rounds into a crowd of civilians below him.

129.    The Shooter also used trailer footage from the 2009 release of the Call of Duty franchise installment—Call of Duty: Modern Warfare 2—in a music video that he posted online, which features a soldier wearing a tactical vest and helmet (eerily similar to the one worn by the Shooter above) standing over a body:

---

[15] *Our Voice: Recognizing the Foot Soldiers of Fascism*, ARK VALLEY VOICE (July 11, 2022), https://arkvalleyvoice.com/our-voice-recognizing-the-foot-soldiers-of-fascism/.



130.    Smith & Wesson's presentation of its products—including weapons like the Rifle—as having an association with noble warriors in the United States military and law enforcement agencies fueled a false narrative that possessing a Smith & Wesson product would enable someone to adopt the heroic, military mantle the Shooter craved.

131.    The Shooter, consistent with Smith & Wesson marketing emphasizing the ability of M&P weapons like the Rifle to rapidly burn through large amounts of ammunition and destroy many targets, planned to use the Rifle to engage in the massacre at the Highland Park parade because it would enable him to inflict the most carnage quickly. In fact, the Shooter owned at least 4 other firearms—a Remington 700 bolt-action rifle, a foldable Kel-Tec Sub 2000 rifle, a shotgun, and a Glock handgun—yet chose to use his M&P 15 to carry out his attack precisely because, on information and belief, of its military and assaultive qualities, and in particular its efficiency in inflicting mass casualties.

132.    The Shooter was a prime target for Smith & Wesson's marketing of the M&P rifle series as associated with the U.S. military and law enforcement agencies, as well as Smith &

Wesson's advertisements promising more adrenaline and using imagery associated with first-person shooter video games.

133.    Likewise, at the time of the Highland Park shooting, the Shooter also fit the profile of an impulsive, unstable young man with limited control over his emotional and violent urges. The Shooter has mental health issues, attempted suicide, and exhibited a propensity and desire to commit mass violence. In September 2019, a family member called the police on him after he threatened to "kill everyone" in his family.[16]

134.    According to medical literature, assault weapon advertisements may activate people who are predisposed to violence. Individuals predisposed to violence include many emotionally troubled, young male purchasers of Smith & Wesson's M&P 15 who could be induced or encouraged toward unlawful use of the assault rifle they have purchased by defendant's unfair and deceptive practices.

135.    The Highland Park Shooter was one such emotionally troubled, young male purchaser of Smith & Wesson's M&P 15 who, on information and belief, was induced or encouraged toward unlawful use of his M&P 15 assault rifle by Smith & Wesson's unfair and deceptive marketing tactics and the public image of AR-15-style weapons they promoted.

136.    Defendants' deceptive and unfair marketing acts and practices therefore magnified the lethality of the Highland Park shooting by inspiring the shooter or causing him to select a more efficiently deadly weapon for his attack that is well-suited for offensive military-style combat missions.

---

[16] Emily Hoerner, et al., *Police records paint picture of turbulent home life for alleged sniper in Highland Park mass shooting*, CHICAGO TRIBUNE (July 8, 2022), https://www.chicagotribune.com/news/breaking/ct-highland-park-crimo-family-20220708-n34hdnbcyrhxte6lg7rkfwpskm-story.html.

137.    The fact that a weapon like the Rifle would be used in a hate-motivated mass shooting was also predictable in light of the history of guns being used in hate-fueled shootings in the United States.

138.    Upon information and belief, the Shooter would not have acquired the Rifle or used it in the Incident but for his exposure to the reckless, deceptive, and illegal marketing campaign disseminated by Smith & Wesson.

139.    As a result of the incident, Plaintiff Turnipseed sustained gunshot-related injuries, including severe pain and suffering and emotional distress.

140.    The Shooter's hateful attack with an AR-15 style weapon like the Rifle was both entirely foreseeable and entirely preventable.

141.    Smith & Wesson's marketing of the M&P 15 Rifle to civilians for offensive assault missions was a substantial factor in causing Plaintiff's injuries. As shown above, the Shooter had twisted and violent fantasies about being a soldier and was, therefore, especially susceptible to militaristic marketing.

142.    The Shooter selected the M&P 15 Rifle for his assault from among an arsenal that included various less lethal arms——a Remington 700 bolt-action rifle, a foldable Kel-Tec Sub 2000 rifle, a shotgun, a Glock handgun, 16 knives, a sword, and a dagger—and specifically chose the M&P 15 not only for its functional capabilities, including its assaultive qualities and efficiency in inflicting mass casualties, but also because of its marketed association with the military.

143.    The Shooter was also a devoted player of first-person shooter games featuring variants of the M&P 15 Rifle, and he employed techniques taught in those games to enhance the lethality of his assault on the parade.

144.     The Shooter's attack, had it occurred at all, would have been less lethal and the carnage less grievous if the Shooter had not been encouraged by Smith & Wesson's marketing campaign to select the M&P 15 Rifle as his weapon of choice.

***Crimo Jr.'s Negligence Also Proximately Caused The Shooting***

145.     At all relevant times, the Shooter lived with his father—Crimo Jr.—and was dependent on him for shelter, food, health care, transportation, and financial assistance.

146.     Crimo Jr. had actual or constructive knowledge of the Shooter's troubled history, violent fantasies and tendencies, mental health issues, attempted suicide, and desire to commit mass violence.

147.     Crimo Jr. knew that the Shooter attempted to commit suicide in April 2019.

148.     Crimo Jr. also knew that five months later, in September 2019, the Shooter threatened to "kill everyone" in his family and that the police were called to his residence by a family member concerned about the Shooter's threat to commit mass violence.

149.     Crimo Jr. also knew that when the police arrived at his residence to investigate the threat in September 2019, the police searched the minor Shooter's bedroom and confiscated 16 knives, a dagger, and a sword belonging to the minor Shooter. Rather than allowing the police to retain the confiscated property, Crimo Jr. told the police that the 16 knives, dagger, and sword belonged to him, even though they were found in the Shooter's bedroom.

150.     In December 2019, the Shooter—then a 19 year-old minor—asked Crimo Jr. to sponsor his FOID application so that he may obtain a FOID card and purchase firearms before he turned 21. Crimo Jr. agreed.

151.     As such, in December 2019—8 months after the Shooter attempted suicide and just 3 months after the Shooter threatened to "kill everyone" in his family—Crimo Jr. submitted

a signed, notarized affidavit indicating that he has agreed to sponsor the Shooter's FOID

application and submitted an affidavit to the Illinois State Police Firearms Services Bureau that

stated, in relevant part:

> I hereby give my consent for this minor applicant to possess and acquire
> firearms and firearm ammunition and understand *I shall be liable for any*
> *damages resulting from the minor applicant's use of firearms or firearm*
> *ammunition*. (Emphasis added.)

152.    The Shooter was thereafter issued his FOID card in January 2020, and later that

year, purchased the Rifle that he would use to murder 7 people and injure 48 others at the

Highland Park July Fourth Parade.

153.    Though Crimo Jr. knew that the Shooter had a troubled history, exhibited violent

tendencies, had significant mental health issues, attempted suicide, and displayed a desire to

commit mass violence, Crimo Jr. allowed the Shooter to store the semiautomatic assault Rifle,

along with tactical gear and ammunition, in his residence and to freely access the Rifle whenever

the Shooter wanted to.

154.    Crimo Jr. also failed to notify police that the Shooter purchased and possessed the

Rifle, even though they had recently responded to the Shooter's suicide attempt and threat to

commit mass violence.

155.    Instead, Crimo Jr. allowed the Shooter to freely access and use the Rifle, both in

and out of his residence.

156.    All Defendants other than the Shooter thus had actual or constructive knowledge

of the risk that their actions/omissions might enable hateful and disturbed individuals exactly like

the Shooter to arm themselves with weapons like the Rifle and transform their violent fantasies

into lethal realities.

157.    All Defendants directly and proximately caused Plaintiff's injuries.

**FIRST CAUSE OF ACTION**
**Violation of Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq.***
**(Against Defendant Smith & Wesson)**

158.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

159.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act,

815 ILCS 505, et seq. provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration should be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

160.   As described in detail above, while conducting trade or commerce, Smith &

Wesson engaged in deceptive and/or unfair acts or practices by:

(a)   engaging in marketing campaigns that targeted impulsive young men with

military complexes who were particularly likely to be attracted to the unique

ability of AR-15 style weapons;

(b)   engaging in marketing campaigns that targeted adolescents drawn to the

excitement and risk-taking associated with militaristic weapons or combat

missions, including young players of popular and realistic first-person shooter

video games like Call of Duty, which prominently feature variants of the weapons

sold by Smith & Wesson in real life; and

(c)   marketing their AR-15 style weapons as well-suited for civilians to carry out

offensive military-style combat missions against their perceived enemies.

161.    Smith & Wesson marketed the Rifle to civilians for criminal purposes, and its wrongful marketing tactics caused or contributed to the Highland Park massacre.

162.    As described throughout this Complaint, Smith & Wesson unethically, unfairly, and unlawfully promoted its M&P 15 Rifle for offensive, military style missions by publishing advertisements that: (i) invoke the violent first-person shooter video game aesthetic by encouraging young people to "Experience real-life first-person shooting with the Smith & Wesson M&P rifle" and "Experience more adrenaline"; (ii) promise that the Rifle "is capable of handling as many rounds as you are"; (iii) depict soldiers on patrol armed with M&P 15 Rifles; (iv) feature the slogan "KICK BRASS," and promise shooters "Pure Adrenaline" when they "burn through all the ammunition you want"; (v) tout, unlike any other firearm it sells, that the M&P 15 Rifle comes with 30-round magazines; (vi) promote sales by giving away 5 free 30-round magazines with the purchase of the M&P 15 Rifle; (vii) claim that military and police professionals use M&P 15 Rifles, including for combat; (vii) invoke lone wolf imagery by depicting an individual dressed in tactical gear aiming an M&P 15 Rifle above the slogan, "The Chosen One"; (viii) glorifying the lone gunman, (ix) glorifying lone gunman assault; and (x) promoting the M&P 15 Rifle's militaristic and assaultive capabilities.

163.    Smith & Wesson marketed, and continues to market, its M&P 15 Rifle in the ways described herein despite evidence of their increasing use in mass shootings.

164.    Smith & Wesson directed its marketing and advertising to the market generally, as well as to the public at large.

165.    The association between Smith & Wesson products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

166.    Smith & Wesson's targeting of its marketing campaign at youth is unfair and

unlawful.

167.    Smith & Wesson marketed its firearms in a way that attracted and enabled dangerous persons like the Shooter.

168.    Smith & Wesson's deceptive and unfair marketing practices encouraged, facilitated, and magnified the lethality of the Highland Park shooting and caused the injuries for which Plaintiff seeks to recover.

169.    The requested relief would serve the interests of consumers by prohibiting Smith & Wesson's unfair and deceptive practices, reducing the risk that vulnerable or high-risk users would be encouraged to acquire and unlawfully use an assault rifle.

170.    Smith & Wesson's unlawful marketing foreseeably caused the Shooter to select and utilize the Rifle to complete his twisted, delusional fantasy as a heroic warrior fighting what he wrongly believed was his noble war.

171.    The Shooter selected the M&P 15 Rifle for his assault from among an arsenal that included various less lethal arms——a Remington 700 bolt-action rifle, a foldable Kel-Tec Sub 2000 rifle, a shotgun, a Glock handgun, 16 knives, a sword, and a dagger—and specifically chose the M&P 15 not only for its functional capabilities, including its assaultive qualities and efficiency in inflicting mass casualties, but also because of its marketed association with the military.

172.    The Shooter was also a devoted player of first-person shooter games featuring variants of the M&P15 Rifle and that he employed techniques taught in those games to enhance the lethality of his assault on the parade.

173.    The Shooter's attack, had it occurred at all, would have been less lethal and the carnage less grievous if the Shooter had not been encouraged by Smith & Wesson's marketing

campaign to select the M&P 15 Rifle as his weapon of choice.

174.    Further, Smith & Wesson does not identify its M&P assault rifles as NFA weapons in its marketing or advertising, leading people to believe that they can obtain these weapons without complying with the NFA's requirements.

175.    Upon information and belief, Smith & Wesson violated both the NFA and the Gun Control Act ("GCA") by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes, or registering the firearms.

176.    As a direct and proximate cause of Smith & Wesson's violation of the ICFA, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

177.    Smith & Wesson continues to act in violation of the ICFA by continuing to perpetrate the irresponsible, misleading, and unlawful advertising described above.

178.    These actions continue to pose a threat to all members of the public, including Plaintiff, and significantly impact the health and safety of the public, including Illinois residents.

179.    In addition to monetary damages, Plaintiff also seeks injunctive relief under the ICFA that prohibits Smith & Wesson from falsely representing its products as being commonly used by, endorsed by, or associated with United States military/law enforcement personnel and unfairly and unlawfully targeting youth in their marketing.

## SECOND CAUSE OF ACTION
### Negligence
### (Against Defendant Smith & Wesson)

180.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

181.    Smith & Wesson had, at all relevant times, a duty to market and design their firearms in a manner that would not create an unreasonable risk of harm to others.

182.    Smith & Wesson breached its duty by engaging in the deceptive, unfair, and unlawful marketing practices described above. Not only did these marketing practices breach Smith & Wesson's common law duties, they also constituted knowing violations of the ICFA, the Illinois Criminal Deceptive Advertising Statute, 720 ILCS 5/17-5.7, and the Nevada Deceptive Trade Practices Act, NRS § 598.0915.

183.    Smith & Wesson negligently marketed the Rifle to civilians for criminal purposes, and its negligent marketing tactics caused or contributed to the Highland Park massacre, as well as Plaintiff's injuries.

184.    In addition, Smith & Wesson knowingly violated the National Firearms Act, which classifies a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger[.]" In order to manufacture or transfer any NFA weapon, a company is required to fill out the appropriate transfer forms, get approval of the forms by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), pay occupational and transfer taxes, and register the firearms.

185.    Upon information and belief, the Smith & Wesson M&P assault rifle used by the Shooter at the July 4th Parade in Highland Park was a machine gun because it can be easily modified or converted into a machinegun—without the need for advanced equipment or

mechanical skills—and therefore was designed to shoot automatically.

186.    However, the Smith & Wesson Defendants marketed the rifle as not requiring NFA paperwork, and, upon information and belief, it manufactured and transferred the rifle without complying with any of the NFA's requirements, in violation of the Gun Control Act and the NFA.

187.    Upon information and belief, if Smith & Wesson had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon.

188.    Smith & Wesson's negligence and knowing violations of law were a direct and proximate cause of harm to the Plaintiffs, by influencing and permitting the Shooter to purchase the assault weapon and use it to fire upon parade-goers on July 4, 2022.

189.    As a direct and foreseeable result of Smith & Wesson's breach of its duty of care, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

### THIRD CAUSE OF ACTION
#### Negligence
#### (Against the Gun Store Defendants)

190.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

191.    The Gun Store Defendants have a duty to exercise reasonable care in distributing and selling firearms and large capacity magazines and to refrain from engaging in any activity creating reasonably foreseeable risk of injury to others. A breach of such a duty constitutes negligence.

192.    In or around June or July 2020, Bud's Gun Shop sold the Rifle to the Shooter

through an online transaction.

193.    Upon information and belief, to consummate this sale, the Shooter provided Bud's Gun Shop with his residential address at least twice—both when he created an account with the website and when he provided the billing address associated with his method of payment.

194.    Upon information and belief, the Shooter resided in Highland Park or Highwood and identified his address as residing in Highland Park or Highwood when he created his Bud's Gun Shop online account and when he provided the billing address associated with his method of payment.

195.    Both Highland Park and Highwood make it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine." Highwood, Ill., Code of Ordinances, Tit. 6, § 6-7-2(A); Highland Park, Ill., Code of Ordinances, Tit. XIII, § 136.005.

196.    The Rifle purchased by the Shooter is an assault weapon under the Highland Park and Highwood municipal ordinances.

197.    Yet, despite that Bud's Gun Shop knew that the Shooter resided in Highland Park or Highwood, where it is illegal to acquire or possess an assault weapon, it sold the Rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

198.    Upon information and belief, Bud's Gun Shop then shipped the Rifle to Red Dot Arms for Red Dot Arms to complete the transfer to the Shooter.

199.    Upon information and belief, in June or July 2020, Red Dot Arms transferred the Rifle to the Shooter after conducting a background check and verifying the identification of the Shooter.

200.    Upon information and belief, both the federal transaction form and the Shooter's identification card would have shown that he resided in either Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the Rifle.

201.    Upon information and belief, despite knowing that the Shooter resided in a municipality that prohibited the possession of assault weapons, Red Dot Arms transferred the Rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

202.    Both Gun Store Defendants are federally licensed gun dealers and are therefore obligated to know and comply with the relevant firearm laws. In fact, among numerous other resources made available to them, is a booklet entitled "Federal Firearms Regulations Reference Guide," which contains federal, state, and local laws applicable to firearm sales –including the Highwood and Highland Park Assault Weapon Ban Ordinances.

203.    In addition, the Gun Store Defendants knowingly violated the National Firearms Act, which classifies "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger[.]"  In order to transfer any NFA weapon, a company is required to fill out the appropriate transfer forms, get approval of the forms by the ATF, pay transfer taxes and register the firearms.

204.    Upon information and belief, the Smith & Wesson M&P Rifle used by the Shooter at the July 4th Parade in Highland Park was a machine gun because it can be easily modified or converted into a machinegun – without the need for advanced equipment or mechanical skills – and therefore was designed to shoot automatically.

205.    However, the Gun Store Defendants transferred the Rifle without complying with any of the NFA's requirements.

206.    Upon information and belief, if the Gun Store Defendants had complied with the

requirements of the NFA, the Shooter would not have been able to access the weapon.

207.    The Gun Store Defendants' negligence and knowing violation of law were a direct and proximate cause of harm to Plaintiff by causing the Shooter to gain unlawful possession of an assault weapon that he used to shoot and terrify the Plaintiff.

208.    As a direct and foreseeable result of the Gun Store Defendants' negligence, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

### FOURTH CAUSE OF ACTION
### Assault and Battery
### (Against Defendant Crimo III)

209.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

210.    On July 4, 2022, with malicious intent, the Shooter fired more than 80 rounds into the crowd of people below him using the Rifle, killing 7 people and inflicting gunshot wounds on 48 others, including Plaintiff.

211.    The foregoing conduct was deliberate and outrageous and was conducted with the intent to cause injure, maim, and kill Plaintiff and everybody else attending the parade.

212.    As a direct and foreseeable result, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

**FIFTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(Against Defendant Crimo III)**

213.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

214.     On July 4, 2022, with malicious intent, the Shooter fired more than 80 rounds into the crowd of people below him using the Rifle, killing 7 people and inflicting gunshot wounds on 48 others, including Plaintiff.

215.     The foregoing conduct was deliberate and outrageous and was conducted with the intent to cause unfathomable emotional distress to Plaintiff and everybody else attending the parade.

216.     As a direct and foreseeable result, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

**SIXTH CAUSE OF ACTION**
**Negligence and Negligent Infliction of Emotional Distress**
**(Against Defendant Crimo III)**

217.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

218.     The Shooter had a duty not to engage in activity that would create an unreasonable risk of harm to others and to utilize the Rifle in a reasonable manner.

219.     The Shooter breached his duty of care owed to Plaintiff when he fired the Rifle in a careless, reckless, and indiscriminate manner. Such conduct directly caused Plaintiff substantial injury.

220.     At the time of the Incident, the Shooter knew or should have known that firing the

48
**SA-119**

Rifle in careless, reckless, and indiscriminate manner could lead to significant harm to people attending the parade.

221.    It was entirely foreseeable that the Shooter's breach of the duty of care owed to Plaintiff would cause significant injury and/or death to the people attending the parade.

222.    As a direct and proximate cause of the Shooter's negligent and reckless act or omissions set forth herein, Plaintiff was negligently struck by a bullet.

223.    As a direct and foreseeable result, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

**SEVENTH CAUSE OF ACTION**
**Negligence and Negligent Infliction of Emotional Distress**
**<u>(Against Defendant Crimo Jr.)</u>**

224.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

225.    A parent residing in Illinois has a duty to exercise reasonable care to control his or her minor child and prevent it from intentionally harming others, if the parent: (a) knows or has reason to know that he or she has the ability to control the child, and (b) knows or should know of the necessity and opportunity for exercising such control. Restatement (Second) of Torts § 316, at 123–24 (1965).

226.    Crimo Jr. knew or should have known that he had the ability to control his son, the Shooter, at all relevant times, as both a minor and adult, because:

(a)    The Shooter was financially dependent upon him for shelter, food, health care, transportation, and financial assistance;

49
**SA-120**

(b)    The Shooter lived with Crimo Jr. in his two-story residence; and

(c)    Specifically relevant to this case, the Shooter, as a 19 year-old minor, could not have obtained a FOID card—or purchased the M&P 15 semiautomatic assault rifle that was used to kill 7 people and injure 48 others on July 4, 2022— without Crimo Jr.'s agreement to serve as the parent-sponsor of the Shooter's FOID application.

227.    Crimo Jr. owed a duty of care to Plaintiff because:

(a)    Crimo Jr. controlled the minor Shooter's ability to obtain a FOID card;

(b)    Crimo Jr. agreed to serve as the parent-sponsor for the minor Shooter's FOID card;

(c)    Crimo Jr. controlled the purchase and acquisition of the Rifle by the minor Shooter;

(d)    Crimo Jr. allowed the minor Shooter to store the Rifle, ammunition, and other tactical gear at his residence;

(e)    Crimo Jr. had actual or constructive knowledge of the minor Shooter's troubled history, violent fantasies and tendencies, mental health issues, attempted suicide, and desire to commit mass violence;

(f)    Crimo Jr. had actual or constructive knowledge that the minor Shooter attempted to commit suicide in April 2019;

(g)    Crimo Jr. had actual or constructive knowledge that in September 2019, the minor Shooter threatened to "kill everyone" in his family and that the police were called to his residence by a family member concerned about the Shooter's threat to commit mass violence;

(h)    Crimo Jr. had actual knowledge that when the police were called by a concerned family member in September 2019, the police searched the minor Shooter's bedroom and confiscated 16 knives, a dagger, and a sword belonging to the minor Shooter. Far from seeking help for the Shooter from behavioral and mental health professionals, Crimo Jr. represented to the police that the knives were his and were being stored in the minor Shooter's closet for safekeeping

(i)    Three months after the minor Shooter threatened to "kill everyone" in his family, Crimo Jr. agreed to serve as the minor Shooter's parent-sponsor for purposes of enabling the minor Shooter to obtain a FOID card before he turned 21;

(j)    To serve as the minor Shooter's parent-sponsor of his FOID card, Crimo Jr. submitted a signed, notarized affidavit to the Illinois State Police Firearms Services Bureau that, in relevant part, stated:

> I hereby give my consent for this minor applicant to possess and acquire firearms and firearm ammunition and understand *I shall be liable for any damages resulting from the minor applicant's use of firearms or firearm ammunition*. (Emphasis added.)

228.    Crimo Jr. breached his duty of care owed to Plaintiff by failing to act as reasonable individuals would under similar circumstances. Despite his knowledge of the minor Shooter's minor troubled history, violent fantasies and tendencies, mental health issues, attempted suicide, threat to "kill everyone" in his family, and desire to commit mass violence, Crimo Jr. nonetheless:

(a)    Agreed to serve as the minor Shooter's parent-sponsor for his FOID card, just 3 months after the Shooter threatened to "kill everyone" in his family;

(b)    Allowed the Shooter to use his parent-sponsored FOID card to purchase

the Rifle—a semiautomatic assault weapon designed to quickly kill, injure, and maim large amounts of people;

(c)     Allowed the Shooter to store the Rifle and ammunition at his residence;

(d)     Allowed the Shooter to store tactical gear at his residence;

(e)     Failed to warn the police that the Shooter purchased and possessed the Rifle; and

(f)     Failed to take any action protect the public, including Plaintiff, from the Shooter.

229.    As a direct and proximate result of Crimo Jr.'s breach of this duty of care owed to Plaintiff, under the same or similar circumstances, Plaintiff has suffered severe physical and emotional harm. This breach is the factual and legal cause of Plaintiffs' harm because:

(a)     But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have obtained his FOID card or purchased the Rifle in 2020;

(b)     But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have stored the Rifle at his residence;

(c)     But for Crimo Jr.'s failure to exercise reasonable care, the Rifle would not have been stored in a manner such that it was freely accessible to the Shooter;

(d)     But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have had the opportunity to possess or train with the Rifle for 2 years before the Incident; and

(e)     But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have had the opportunity nor the instrumentalities to harm Plaintiff.

230.    As a direct and foreseeable result of Crimo Jr.'s breach of his duty of care,

Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Elizabeth Turnipseed respectfully requests judgment against the Defendants as follows:

A.  For general damages in the sum according to proof and in an amount in excess of the jurisdictional limits of this Court;

B.  For special and economic damages;

C.  For punitive damages;

D.  For loss of earnings;

E.  For interest provided by law;

F.  For all statutorily allowed damages;

G.  For restitution;

H.  For an injunction issued against Defendant Smith & Wesson requiring it to cease its illegal, deceptive and/or negligent marketing campaign;

I.  For reasonable attorney's fees and costs incurred; and

J.  For other and further relief as the Court deems proper.

## **JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Respectfully Submitted,

**ELIZABETH TURNIPSEED**,

Dated: September 28, 2022            By: _____
                                    One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Ari Scharg (ARDC No.: 6297536)
ascharg@edelson.com
David I. Mindell
dmindell@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
Amy Hausmann
abhausmann@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
Firm ID: 62075

Erin Davis (pro hac vice to be applied for)
edavis@bradyunited.org
Philip Bangle (pro hac vice to be applied for)
pbangle@bradyunited.org
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
Tel: (202) 370-8100

Donna J. Vobornik
donna.vobornik@dentons.com
Brian E. Cohen
brian.cohen@dentons.com
DENTONS
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-7370

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2023, the Brief of Defendants-Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 7, 2023

DLA PIPER LLP (US)

By:  */s/ Kenneth L. Schmetterer*

Kenneth L. Schmetterer